UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,<br><br>  Plaintiffs,<br><br>  vs.<br><br>NEW CENTURY PHARMACY INC., REFILL RX PHARMACY INC, MY RX PHARMACY, INC., DIRECT RX PHARMACY INC, EDUARD ARONOV, KATRIN MATATOV, ALEXANDER SHARAFYAN, BORIS KANDOV, RAFO YAGUDA f/k/a RAFAIL YAGUDAYEV, FIRST CLASS MEDICAL, P.C., NY MEDICAL ARTS, P.C., RICHMOND MEDICAL CARE P.C., GONY MEDICAL SERVICES P.C., LIFE HEALTH CARE MEDICAL, P.C., MANI USHYAROV, D.O., AMR A. EL-SANDUBY, M.D., JEAN-PIERRE GEORGES BARAKAT, M.D., TOMAS M. PATTUGALAN, JR., M.D., AND RAFAEL ANTONIO DELACRUZ-GOMEZ, M.D.,<br><br>  Defendants. | C.A. No. |

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

## I.   <u>INTRODUCTION</u>

1.     This case involves a wide-ranging and pervasive scheme in which several pharmacies, their owners, and various healthcare providers worked together to defraud Allstate by fraudulently prescribing and delivering an array of medications and healthcare services, and then seeking payment for the delivery of these medications and services even though they were unnecessary, unwanted, unneeded, and, in some cases, never even provided.

2.     As alleged herein, the defendants took advantage of New York's "No-Fault" insurance laws by (a) rendering tests and services that were unnecessary, excessive, and clinically worthless, (b) prescribing medications when there was no clinical basis for doing so, (c) producing and dispensing these unnecessary medications to patients that did not want or need them, and (d) submitting false and fraudulent charges to Allstate seeking payment for these unnecessary and unneeded medications, tests, and services.

3.     This scheme involved the actions of the following defendants:

  a.     New Century Pharmacy Inc. ("New Century"), Refill Rx Pharmacy Inc ("Refill Rx"), My Rx Pharmacy, Inc. ("My Rx Pharmacy"), and Direct Rx Pharmacy Inc ("Direct Rx") (collectively, "Pharmacy Defendants");

  b.     Eduard Aronov ("Aronov"), Katrin Matatov ("Matatov"), Alexander Sharafyan ("Sharafyan"), Boris Kandov ("Kandov"), and Rafo Yaguda f/k/a Rafail Yagudayev ("Yaguda") (collectively, "Pharmacy Owner Defendants");

  c.     First Class Medical, P.C. ("First Class Medical"), NY Medical Arts, P.C. ("NY Medical Arts"), Richmond Medical Care P.C. ("Richmond Medical"), GONY Medical Services P.C. ("GONY Medical"), and Life

Health Care Medical, P.C. ("Life Health Care") (collectively, "PC Defendants"); and

d.     Mani Ushyarov, D.O. ("Ushyarov"), Amr A. El-Sanduby, M.D. ("El-Sanduby"), Jean-Pierre Georges Barakat, M.D. ("Barakat"), Tomas M. Pattugalan, Jr., M.D. ("Pattugalan"), and Rafael Antonio Delacruz-Gomez, M.D. ("Delacruz-Gomez") (collectively, "Prescribing Defendants").

4.     Through this action, Allstate seeks to recover money fraudulently and unjustly obtained by and through the Pharmacy Defendants, the Pharmacy Owner Defendants, the PC Defendants, and the Prescribing Defendants (hereinafter collectively referred to as "defendants") in connection with medications, tests, and services that were purportedly prescribed and delivered to individuals who were involved in automobile accidents and eligible for benefits under Allstate insurance policies ("Allstate Claimants").

5.     The defendants' scheme was fueled by post-accident evaluations of Allstate Claimants—patient encounters that almost always resulted in an array of unwarranted recommendations and orders for unneeded tests, services, and medications, including prescriptions for compounded topical pain medications ("Compounded Products") and other drugs.

6.     The Prescribing Defendants and the PC Defendants drove part of this scheme by providing a battery of tests and services that were redundant, excessive, and repeated without any objective documented benefit to their patients.

7.     Throughout the course of this scheme, the Prescribing Defendants and the PC Defendants (or those working under their direction and control) purposely induced Allstate to pay the PC Defendants for excessive and medically unnecessary tests and services purportedly provided to Allstate Claimants while knowing that the charges for these tests and services were not compensable under New York law.

8.      As explained herein, the PC Defendants were never eligible to seek or receive No-Fault payments from Allstate because: (a) the tests and treatments, including, but not limited to, diagnostic testing, provided to Allstate Claimants were medically unnecessary and excessive; (b) the treatments, tests, and services provided to Allstate Claimants were not individualized to the needs of the particular Allstate Claimants; and (c) the PC Defendants falsely billed Allstate by misrepresenting the nature and extent of the services actually provided, including patient examinations and consultations.

9.      This scheme was also propelled by the Pharmacy Defendants, which were caused to prepare and dispense medications to Allstate Claimants, including Compounded Products, that were prescribed by the Prescribing Defendants without any medical justification.

10.      As explained herein, the Compounded Products prepared and dispensed by the Pharmacy Defendants, under the direction of the Pharmacy Owner Defendants, were false and fraudulent because they were not "specially formulated" medications at all; rather, the defendants' Compounded Products were nothing more than a pre-formulated assortment of creams, lotions, and gels in which pre-set combinations of medications are combined together in pre-determined quantities.

11.      Even if the defendants' Compounded Products could be considered legitimate compounded medications (which they were not), the provision of these products to Allstate Claimants was still false and fraudulent because the claimants' injuries did not warrant or justify the prescription or use of these products.

12.      In addition to wrongfully producing and dispensing Compounded Products, one or more of the Pharmacy Defendants and the Pharmacy Owner Defendants schemed to defraud

Allstate by dispensing over-the-counter (i.e., non-prescription) drugs to Allstate Claimants, and then charging Allstate as if prescription drugs had been dispensed.

13.     Throughout the course of this scheme, the defendants (or those working under their direction and control) purposely induced Allstate to pay the Pharmacy Defendants for Compounded Products and other drugs purportedly dispensed and delivered to Allstate Claimants knowing that the charges for such items were not compensable under New York law.

14.     As detailed below, the Pharmacy Defendants were never eligible to seek or receive No-Fault payments from Allstate because (a) the Compounded Products were produced and dispensed in violation of applicable regulatory and licensing requirements (including, without limitation, those regulations and licensing requirements concerning unlawful financial and other arrangements with prescribing providers, and the manufacturing of compounded medications) and (b) the Compounded Products and other drugs were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries.

15.     Additionally, in several cases, the charges submitted by the Pharmacy Defendants were unlawful and not compensable because the drugs were not eligible for coverage under No-Fault, the drugs were charged at grossly excessive rates, and, in certain cases, the drugs were never actually provided or dispensed.

16.     The success of the defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim reimbursement documents warranting the Pharmacy Defendants' and PC Defendants' eligibility to collect No-Fault benefits under New York law.

17.     Allstate reasonably relied on the facial validity of the Pharmacy Defendants' and PC Defendants' documents—and the representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the Pharmacy Defendants and the PC Defendants.

18.     By this Complaint, Allstate brings this action against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; and (c) unjust enrichment.

19.     Allstate seeks to recover actual damages totaling over $1,630,841.00, which represent No-Fault benefit payments that Allstate was wrongfully caused to make to the defendants during the course of this scheme.

20.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay and/or reimburse the Pharmacy Defendants (or their agents) in connection with all previously-denied and/or presently pending No-Fault insurance claims that have been submitted to Allstate by, or on behalf of, the Pharmacy Defendants because the Pharmacy Defendants were, at all relevant times, caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering the Pharmacy Defendants completely ineligible to receive reimbursement under New York's No-Fault laws.

21.     Additionally, Allstate seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay and/or reimburse the PC Defendants (or their agents) in connection with all previously-denied and/or presently pending No-Fault insurance claims that have been submitted to Allstate by, or on behalf of, the PC Defendants because, at all relevant times, the treatments, tests, and services provided to Allstate Claimants were excessive, were not clinically necessary, and were rendered pursuant to a pattern of treatment designed solely to ensure financial enrichment.

22.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

23.     The defendants' fraudulent scheme was designed to elicit payment of automobile insurance contract proceeds from Allstate to, or for the benefit of, the defendants.

24.     In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the defendants sought—and in many cases obtained—payment for pharmacy services that were not compensable under New York's No-Fault laws.

25.     The defendants knew that the Allstate Claimants identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

26.     Allstate estimates that the defendants purposely submitted to Allstate hundreds of bills on behalf of the Pharmacy Defendants and/or PC Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II.     THE PARTIES

### A.     PLAINTIFFS

27.     Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

28.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company were authorized to conduct business in New York.

B.   DEFENDANTS

1.   **Pharmacy Defendants**

29.   New Century is a domestic business corporation organized under the laws of the State of New York.

30.   New Century maintains its principal place of business at 63-52 108th Street, Forest Hills, New York.

31.   As part of this scheme, Allstate Claimants were made to enter into assignment of benefit agreements with New Century, which gave New Century the right to seek payments directly from Allstate—payments that were funded using the claimants' available No-Fault insurance coverage.

32.   Following the execution of these assignment of benefit agreements, New Century purportedly dispensed and/or delivered medications to Allstate Claimants.

33.   New Century then sought and collected No-Fault benefit payments from Allstate.

34.   As alleged herein, because of the defendants' unlawful conduct, New Century was never lawfully eligible to receive such payments from Allstate.

35.   Refill Rx is a domestic business corporation organized under the laws of the State of New York.

36.   Refill Rx maintains its principal place of business at 63-24 Austin Street, Rego Park, New York.

37.   As part of this scheme, Allstate Claimants were made to enter into assignment of benefit agreements with Refill Rx, which gave Refill Rx the right to seek payments directly from Allstate—payments that were funded using the claimants' available No-Fault insurance coverage.

38.     Following the execution of these assignment of benefit agreements, Refill Rx purportedly dispensed and/or delivered medications to Allstate Claimants.

39.     Refill Rx then sought and collected No-Fault benefit payments from Allstate.

40.     As alleged herein, because of the defendants' unlawful conduct, Refill Rx was never lawfully eligible to receive such payments from Allstate.

41.     My Rx Pharmacy is a domestic business corporation organized under the laws of the State of New York.

42.     My Rx Pharmacy maintains its principal place of business at 178-15 Union Turnpike, Fresh Meadows, New York.

43.     As part of this scheme, Allstate Claimants were made to enter into assignment of benefit agreements with My Rx Pharmacy, which gave My Rx Pharmacy the right to seek payments directly from Allstate—payments that were funded using the claimants' available No-Fault insurance coverage.

44.     Following the execution of these assignment of benefit agreements, My Rx Pharmacy purportedly dispensed and/or delivered medications to Allstate Claimants.

45.     My Rx Pharmacy then sought and collected No-Fault benefit payments from Allstate.

46.     As alleged herein, because of the defendants' unlawful conduct, My Rx Pharmacy was never lawfully eligible to receive such payments from Allstate.

47.     Direct Rx is a domestic business corporation organized under the laws of the State of New York.

48.     Direct Rx maintains its principal place of business at 102-05 Jamaica Avenue, Richmond Hill, New York.

49.     Direct Rx also operates under the trade name "Sharonas Pharmacy."

50.     As part of this scheme, Allstate Claimants were made to enter into assignment of benefit agreements with Direct Rx, which gave Direct Rx the right to seek payments directly from Allstate—payments that were funded using the claimants' available No-Fault insurance coverage.

51.     Following the execution of these assignment of benefit agreements, Direct Rx purportedly dispensed and/or delivered medications to Allstate Claimants.

52.     Direct Rx then sought and collected No-Fault benefit payments from Allstate.

53.     As alleged herein, because of the defendants' unlawful conduct, Direct Rx was never lawfully eligible to receive such payments from Allstate.

### 2.     **Pharmacy Owner Defendants**

54.     Aronov resides in and is a citizen of the State of New York.

55.     According to documents filed with the New York State Board of Pharmacy, Aronov is the President of New Century.

56.     At all relevant times, Aronov directed the operation and management of New Century as President of New Century.

57.     As detailed below, Aronov used New Century to exploit New York's No-Fault laws, and to systematically defraud Allstate through the dispensing of Compounded Products and other medications that were, in some cases, fraudulently billed and that were, in most cases, absolutely unnecessary and of no real benefit to the Allstate Claimants.

58.     Matatov resides in and is a citizen of the State of New York.

59.     According to documents filed with the New York State Board of Pharmacy, Matatov is the Vice-President of New Century.

60.     At all relevant times, Matatov directed the operation and management of New Century as Vice President of New Century.

61.     As detailed below, Matatov used New Century to exploit New York's No-Fault laws, and to systematically defraud Allstate through the dispensing of Compounded Products and other medications that were, in some cases, fraudulently billed and that were, in most cases, absolutely unnecessary and of no real benefit to the Allstate Claimants.

62.     Sharafyan resides in and is a citizen of the State of New York.

63.     According to documents filed with the New York State Board of Pharmacy, Sharafyan is the President of Refill Rx.

64.     At all relevant times, Sharafyan directed the operation and management of Refill Rx.

65.     As detailed below, Sharafyan used Refill Rx to exploit New York's No-Fault laws, and to systematically defraud Allstate through the dispensing of Compounded Products and other medications that were, in some cases, fraudulently billed and that were, in most cases, absolutely unnecessary and of no real benefit to the  Allstate Claimants.

66.     Kandov resides in and is a citizen of the State of New York.

67.     According to documents filed with the New York State Board of Pharmacy, Kandov is the President of My Rx Pharmacy.

68.     At all relevant times, Kandov directed the operation and management of My Rx Pharmacy as President of My Rx Pharmacy.

69.     As detailed below, Kandov used My Rx Pharmacy to exploit New York's No-Fault laws, and to systematically defraud Allstate through the dispensing of Compounded Products and

other medications that were, in some cases, fraudulently billed and that were, in most cases, absolutely unnecessary and of no real benefit to the Allstate claimants.

70.     Yaguda resides in and is a citizen of the State of New Jersey.

71.     According to documents filed with the New York State Board of Pharmacy, Yaguda is the President of Direct Rx.

72.     At all relevant times, Yaguda directed the operation and management of Direct Rx.

73.     As detailed below, Yaguda used Direct Rx to exploit New York's No-Fault laws, and to systematically defraud Allstate through the dispensing of Compounded Products and other medications that were, in some cases, fraudulently billed and that were, in most cases, absolutely unnecessary and of no real benefit to the Allstate Claimants.

### 3.     Prescribing Defendants and PC Defendants

#### a.     *Ushyarov and First Class Medical*

74.     Ushyarov resides in and is a citizen of the State of New York.

75.     Ushyarov has been licensed to practice medicine in the State of New York since 1996.

76.     As alleged herein, Ushyarov participated in this scheme by providing and/or directing the provision of treatments, tests, and/or services to Allstate Claimants, which treatments, tests, and/or services were medically unnecessary, excessive, and redundant, and, on the basis of this unnecessary treatment, and pursuant to an unlawful relationship with one or more of the Pharmacy Owner Defendants, by writing prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were intended to be dispensed and excessively charged by one of the Pharmacy Defendants.

77.     First Class Medical is a New York professional service corporation organized to provide professional physician services.

78.     According to records on file with the New York Office of the Professions, Ushyarov is the sole officer, director, and shareholder of First Class Medical, and First Class Medical's principal place of business is located at 31 Saddle Lane, Roslyn Heights, New York, which appears to be Ushyarov's personal residence.

79.     When Ushyarov provided treatments, tests, and services to Allstate Claimants while acting as an owner/employee of First Class Medical, all such patients were caused to enter into assignment of benefit agreements with First Class Medical, which gave First Class Medical the right to seek No-Fault payments directly from insurers.

80.     As an assignee of Allstate-insured patients, First Class Medical sought and collected No-Fault benefit payments from Allstate.

81.     As alleged herein, because of the defendants' unlawful conduct, First Class Medical was never lawfully eligible to receive such payments from Allstate.

**b.**     ***El-Sanduby and NY Medical Arts***

82.     El-Sanduby resides in and is a citizen of the State of New York.

83.     El-Sanduby has been licensed to practice medicine in the State of New York since 2000.

84.     As alleged herein, El-Sanduby participated in this scheme by providing and/or directing the provision of treatments, tests, and/or services to Allstate Claimants, which treatments, tests, and/or services were medically unnecessary, excessive, and redundant, and, on the basis of this unnecessary treatment, and pursuant to an unlawful relationship with one or more of the Pharmacy Owner Defendants, by writing prescriptions for medically unnecessary drugs and

medications, including Compounded Products, that were intended to be dispensed and excessively charged by one of the Pharmacy Defendants.

85.     NY Medical Arts is a New York professional service corporation organized to provide professional physician services.

86.     According to records on file with the New York Office of the Professions, El-Sanduby is the sole officer, director, and shareholder of NY Medical Arts, and NY Medical Art's principal place of business is located at 219 93rd Street, Brooklyn, New York.

87.     When El-Sanduby provided treatments, tests, and services to Allstate Claimants while acting as an owner/employee of NY Medical Arts, all such patients were caused to enter into assignment of benefit agreements with NY Medical Arts, which gave NY Medical Arts the right to seek No-Fault payments directly from insurers.

88.     As an assignee of Allstate-insured patients, NY Medical Arts sought and collected No-Fault benefit payments from Allstate.

89.     As alleged herein, because of the defendants' unlawful conduct, NY Medical Arts was never lawfully eligible to receive such payments from Allstate.

### c.     *Barakat and Richmond Medical*

90.     Barakat resides in and is a citizen of the State of New York.

91.     Barakat has been licensed to practice medicine in the State of New York since 2008.

92.     As alleged herein, Barakat participated in this scheme by providing and/or directing the provision of treatments, tests, and/or services to Allstate Claimants, which treatments, tests, and/or services were medically unnecessary, excessive, and redundant, and, on the basis of this unnecessary treatment, and pursuant to an unlawful relationship with one or more of the Pharmacy Owner Defendants, by writing prescriptions for medically unnecessary drugs and medications,

14

including Compounded Products, that were intended to be dispensed and excessively charged by one of the Pharmacy Defendants.

93.　　Richmond Medical is a New York professional service corporation organized to provide professional physician services.

94.　　According to records on file with the New York Office of the Professions, Barakat is the sole officer, director, and shareholder of Richmond Medical, and Richmond Medical's principal place of business is located at 1655 Richmond Avenue, Suite B102, Staten Island, New York.

95.　　When Barakat provided treatments, tests, and services to Allstate Claimants while acting as an owner/employee of Richmond Medical, all such patients were caused to enter into assignment of benefit agreements with Richmond Medical, which gave Richmond Medical the right to seek No-Fault payments directly from insurers.

96.　　As an assignee of Allstate-insured patients, Richmond Medical sought and collected No-Fault benefit payments from Allstate.

97.　　As alleged herein, because of the defendants' unlawful conduct, Richmond Medical was never lawfully eligible to receive such payments from Allstate.

### d.　　*Pattugalan and GONY Medical*

98.　　Pattugalan resides in and is a citizen of the State of New York.

99.　　Pattugalan has been licensed to practice medicine in the State of New York since 1982.

100.　　As alleged herein, Pattugalan participated in this scheme by providing and/or directing the provision of treatments, tests, and/or services to Allstate Claimants, which treatments, tests, and services were medically unnecessary, excessive, and redundant, and, on the basis of this

unnecessary treatment, and pursuant to an unlawful relationship with one or more of the Pharmacy Owner Defendants, by writing prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were intended to be dispensed and excessively charged by one of the Pharmacy Defendants.

101.    GONY Medical is a New York professional service corporation organized to provide professional physician services.

102.    According to records on file with the New York Office of the Professions, Pattugalan is the sole officer, director, and shareholder of GONY Medical.

103.    At all relevant times, GONY Medical operated from 60-40 82nd Street, Middle Village, New York.

104.    When Pattugalan provided treatments, tests, and services to Allstate Claimants while acting as an owner/employee of GONY Medical, all such patients were caused to enter into assignment of benefit agreements with GONY Medical, which gave GONY Medical the right to seek No-Fault payments directly from insurers.

105.    As an assignee of Allstate-insured patients, GONY Medical sought and collected No-Fault benefit payments from Allstate.

106.    As alleged herein, because of the defendants' unlawful conduct, GONY Medical was never lawfully eligible to receive such payments from Allstate.

### e.    *Delacruz-Gomez and Life Health Care*

107.    Delacruz-Gomez resides in and is a citizen of the State of New York.

108.    Delacruz-Gomez has been licensed to practice medicine in the State of New York since 1991.

109.     As alleged herein, Delacruz-Gomez participated in this scheme by providing and/or directing the provision of treatments, tests, and/or services to Allstate Claimants, which treatments, tests, and services were medically unnecessary, excessive, and redundant, and, on the basis of this unnecessary treatment, and pursuant to an unlawful relationship with one or more of the Pharmacy Owner Defendants, by writing prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were intended to be dispensed and excessively charged by one of the Pharmacy Defendants.

110.     Life Health Care is a New York professional service corporation organized to provide professional physician services.

111.     According to records on file with the New York Office of the Professions, Delacruz-Gomez is the sole officer, director, and shareholder of Life Health Care, and Life Health Care's principal place of business is located at 852 Avenue Z, Brooklyn, New York.

112.     When Delacruz-Gomez provided treatments, tests, and services to Allstate Claimants while acting as an owner/employee of Life Health Care, all such patients were caused to enter into assignment of benefit agreements with Life Health Care, which gave Life Health Care the right to seek No-Fault payments directly from insurers.

113.     As an assignee of Allstate-insured patients, Life Health Care sought and collected No-Fault benefit payments from Allstate.

114.     As alleged herein, because of the defendants' unlawful conduct, Life Health Care was never lawfully eligible to receive such payments from Allstate.

## III.    JURISDICTION AND VENUE

115.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

116.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

117.    Venue is proper pursuant to 28 U.SC. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

118.    At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

119.    The defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

120.    As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue and Allstate's causes of action.

## IV.    APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A.    NEW YORK NO-FAULT LAWS AND REGULATIONS

121.    Allstate underwrites automobile insurance in the State of New York.

122.    New York's No-Fault laws are designed to ensure that injured victims of automobile accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services, including prescription drugs.

123.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "the No-Fault laws"), automobile insurers such as Allstate are required

to provide eligible persons with coverage for necessary accident-related expenses (hereinafter, "No-Fault benefits").

124.     Under New York's No-Fault laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of an automobile.

125.     "Basic economic loss" is defined to include "all necessary expenses" for, among other things, prescription drug services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

126.     No-Fault benefits include up to $50,000.00 per Allstate Claimant for necessary expenses that are incurred for healthcare goods and services, including prescription drugs.

127.     A patient can assign his/her No-Fault benefits to healthcare service providers, including pharmacies.

128.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

129.     Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

130.     The NF-3 and CMS-1500 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

131.     Pursuant to New York Insurance Law § 403(d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any

insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

132.    It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, testing, and other services—including prescription drugs—that: (a) are never provided: (b) are not necessary; or (c) are billed at a greater monetary charge than is permitted under the applicable fee schedule.

133.    Under New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

134.    Additionally, under New York Education Law § 6530(18), it is unlawful for a physician or chiropractor to directly or indirectly offer, give, solicit, receive, or agree to receive any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services.

135.    Likewise, under New York Public Health Law § 238-a, a practitioner authorized to order pharmacy services may not make a referral for such services to a healthcare provider authorized to provide such services, including to compounding pharmacies, where such practitioner has a financial relationship with such healthcare provider. A financial relationship includes a compensation agreement and includes an arrangement with a healthcare provider that is in excess of fair market value or that provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties. *See* N.Y. Pub. Health Law § 238-a(1), (5).

136.    Overall, New York's No-Fault laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet __*any*__ applicable New York State or local licensing requirement necessary to perform such services in New York."  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

137.    As detailed below, the defendants violated one or more of these regulations through the operation of the Pharmacy Defendants, including, but not limited to, (a) mailing NF-3 and/or CMS-1500 forms and supporting claims materials containing material misrepresentations, and (b) maintaining, upon information and belief, financial relationships with one or more of the healthcare providers, including, but not necessarily limited to, the Prescribing Defendants, that provided Allstate Claimants with prescriptions for Compounded Products and other drugs that were purportedly dispensed and delivered by the Pharmacy Defendants.

138.    As detailed below, the Prescribing Defendants also violated one or more of these regulations through the operation of the PC Defendants, including, but not limited to, (a) mailing NF-3 and/or CMS-1500 forms and supporting claims materials containing material misrepresentations, (b) failing to be engaged in the practice of medicine through one or more PC Defendant; and (c) providing medically unnecessary and excessive treatments, tests, and services that served as the purported justification for prescriptions for medically unnecessary drugs and medications, including Compounded Products.

**B.    REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER NEW YORK'S NO-FAULT LAWS**

139.    The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule"), which governs the fees charged by healthcare providers.

140.    The Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

141.    The Fee Schedule applicable to pharmacies and prescription drugs is set forth under 12 N.Y.C.R.R. § 440.1, *et seq*.

142.    In terms of charges submitted by pharmacies for brand name prescription drugs, 12 N.Y.C.R.R. § 440.5(a) states that a provider may charge no more than the Average Wholesale Price ("AWP") for the national drug code ("NDC") for the drug on the day it was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

143.    Under 12 N.Y.C.R.R. § 440.2(a), AWP means the average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed.

144.    The NDC is a unique 10-digit, 3-segment numeric identifier assigned to each drug that reflects the vendor of the drug, identifies the drug itself, and indicates the quantity in which the drug is packaged. Each NDC number has a corresponding AWP, which identifies the price.

145.    For charges submitted by pharmacies for generic prescription drugs, 12 N.Y.C.R.R. § 440.5(a) states that a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

146.    In terms of charges submitted by pharmacies for Compounded Products, 12 N.Y.C.R.R. §§ 440.5(a) and (d) states that the maximum amount that a provider may charge for medically necessary compounded medications is determined at the ingredient level.

22

147.     For each brand name drug included in a Compounded Product, a provider may

charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 12%

of the AWP, plus a single dispensing fee of $4.00.

148.     For each generic drug included in a Compounded Product, a provider may charge

no more than the AWP for the NDC for the drug on the day it was dispensed minus 20% of the

AWP, plus a single dispensing fee of $5.00.

### C.     LICENSING LAWS APPLICABLE TO COMPOUNDED PRODUCTS

149.     The United States Food and Drug Administration ("FDA") is authorized to oversee

the safety of food, drugs, and cosmetics under the Federal Food, Drug, and Cosmetic Act

("FDCA").

150.     Used primarily for pain management, compounded medications contain either a

single active drug in an inactive base or several active drugs.

151.     Compounded medications are prepared and dispensed by compounding

pharmacies, which are registered by the New York State Department of Education, with limited

FDA oversight.

152.     Under New York Education Law § 6808, no person, firm, corporation or

association shall possess drugs, prescriptions, or poisons for the purpose of compounding,

dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons

for sale at retail or wholesale unless registered by the New York State Department of Education as

a pharmacy, wholesaler, manufacturer, or outsourcing facility.

153.     If any person, firm, corporation, or association is a "manufacturer" or "outsourcing

facility" and seeks to register as such with the New York State Department of Education in the

manner required by New York Education Law § 6808, then such person, firm, corporation, or

association must also register with the FDA and be listed as a manufacturer or outsourcing facility on the FDA's website.

154.    Indeed, compounded drugs are generally not FDA approved, though they may include FDA-approved drugs, and are generally exempt from the FDA approval process that applies to new drugs.

155.    Moreover, compounded medications are not subject to the rigorous drug review process that all commercially available prescription drugs must undergo to demonstrate safety and effectiveness prior to receiving FDA approval.

156.    Further, compounded medications generally do not have standardized dosages and duration for use, and the protocols for preparing each compound are not necessarily standardized.

157.    For all of these reasons, compounded preparations are likely to have batch-to-batch variability, and their sterility and purity cannot be guaranteed.

158.    In terms of compounded pain topical medications, such as those prepared and dispensed by the Pharmacy Defendants, such compounded medications have not been proven (with rare exceptions) to be more effective than commercially-available, manufactured drugs.

159.    In fact, compounded pain topical medications have not been approved for safety and efficacy by the FDA.

160.    However, under 21 U.S.C. § 353a, pharmacies may engage in compounding if the drug is compounded for an identified individual patient based on the receipt of a valid prescription or a notation, approved by the prescribing practitioner on the prescription order, that a compounded product is necessary for the identified patient.

161.    When compounded pain topical medications meet these requirements of Section 353a and are compounded for an individual patient, they can be exempted from the requirement,

among others, that they obtain FDA approval. *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to [this section] is effective with respect to such drug.").

162.    When Congress adopted this provision of the FDCA governing compounding, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding." H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.).

163.    As Congress stated at the time, the "exemptions in [the section] are limited to compounding for an individual patient based on the medical need of such patient for the particular drug compound. To qualify for exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient." S. Rep. No. 105-43, at 67-68 (1997).

## V.    FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

164.    The FDA maintains broad regulatory authority over drugs, including prescription drugs (both brand-name and generic) and non-prescription (over-the-counter) drugs.

165.    In addition to approving drugs for sale in the United States, the FDA is also involved in overseeing drug manufacturing by testing drugs and performing routine inspections of places where drugs are manufactured.

166.    All drugs subject to FDA regulation must be approved prior to marketing, labelled in compliance with federal labeling laws, and produced and tested in accordance with federal laws governing the production and testing of pharmaceutical products.

167.    Notably, however, compounded drug products are exempt from FDA oversight if the drug products are compounded for an identified individual patient based on the receipt of a valid prescription or a notation from the prescribing provider on the prescription order that the compounded product is necessary for the identified patient, and if the compounding is performed by a licensed pharmacist in a state licensed pharmacy.

168.    Traditionally, drug compounding was used as a means of providing access to medications for patients with unique medical needs that cannot otherwise be met by commercially available products.

169.    However, drug compounding was never meant to be used as a means to exploit patients and their insurance coverage through the production and dispensation of expensive (and usually also ineffective and unnecessary) products under the guise that the compounded drug was necessary.

170.    In this case, the Pharmacy Owner Defendants and the Pharmacy Defendants formulated a series of their own compounded drugs (i.e., the "Compounded Products"), and then marketed the Compounded Products to prescribers.

171.    For the purpose of marketing them to prescribers, the Compounded Products were purposely formulated and marketed as pain-relieving topical creams and lotions.

172.     In some cases, the Compounded Products were given specific names just like other drugs that a patient would find at a pharmacy, such as Compound Rx 218N and Compound Rx 220W.

173.     In other cases, the Compounded Products were named according to their specific ingredients.

174.     In all cases, however, each Compounded Product had a specific pre-determined formula, which called for the same combination of drugs in the same pre-determined quantities.

175.     In many cases, the Compounded Products were produced using formulas purchased from third-parties, or formulas created by persons working on behalf of the Pharmacy Defendants.

176.     The Compounded Products were then marketed to prescribers, including the Prescribing Defendants and the PC Defendants.

177.     The prescribers were encouraged to prescribe the Compounded Products to their patients and then transmit the prescriptions for their Compounded Products directly to the Pharmacy Defendants.

178.     To facilitate the prescriptions, the prescribers were given pre-designed rubber stamps or pre-printed self-adhering labels and stickers that had been prepared by the Pharmacy Defendants or persons working on their behalf.

179.     The pre-printed labels and stickers and pre-designed rubber stamps contained the name of the Compounded Product along with the names and specific formulation of the drugs included in the Compounded Product, which allowed the prescriber to simply apply the label, sticker, or rubber stamp to a prescription pad note and submit the prescription to the pharmacy for processing.

180.    In any event, the formulations of the Compounded Products were pre-determined by the pharmacies, and in selecting/prescribing the Compounded Products the prescribers never altered the pre-determined formulation or tailored, in any way, the product to meet the unique needs of the individual patients.

181.    Because the formulations of the Compounded Products were pre-determined and static, the Pharmacy Owner Defendants and the Prescribing Defendants (or those persons working on their behalf) knew that these products were not individually tailored to the unique needs of the recipients.

182.    Because the Compounded Products were not individually tailored, the defendants knew that these products were not genuine compounded drug products, and thus were not exempt from FDA approval.

183.    The defendants also knew that the Compounded Products were not medically necessary for the unique, individualized needs of the recipient; in fact, the Prescribing Defendants never bothered to determine whether other commercially available alternatives could be used prior to prescribing the Compounded Products.

184.    Overall, with respect to the Compounded Products, the Prescribing Defendants knew (or should have known) that the Compounded Products were prescribed without regard for the patients' actual clinical needs.

185.    In addition to Compounded Products, the defendants' scheme also involved the purposeful prescribing and dispensing of topical pain patches and other products that were unnecessary and ineffective.

186.    Like the Compounded Products, the Pharmacy Owner Defendants and the Prescribing Defendants (or those persons working on their behalf) marketed a number of

manufactured topical pain relief products that were neither FDA-approved nor necessary for the treatment of the recipients.

187.     As with the Compounded Products, the Prescribing Defendants and the PC Defendants were given stamps or pre-printed labels bearing the name and dosage of these specific topical pain-relief products to facilitate the dispensing of the products by the Pharmacy Defendants.

188.     Similar to the Compounded Products, the topical pain-relief products were marketed, prescribed, and dispensed without regard for the patients' actual clinical needs.

189.     As explained below, the manner in which the Compounded Products and the topical pain products were marketed and prescribed represents just one example of the connections and collusive relationships that exist among the Pharmacy Owner Defendants, the Pharmacy Defendants, the Prescribing Defendants, and the PC Defendants.

190.     The defendants also charged excessive, and unlawful, amounts for the drugs that were dispensed to Allstate Claimants, including the Compounded Products and the topical pain products.

191.     The prices of the drugs far exceeded both the Fee Schedule's permissible rates and the defendants' actual acquisition costs.

192.     As demonstrated below, there was a massive profit margin for most of the Compounded Products and topical pain products that were prescribed and dispensed to Allstate claimants.

193.     During the course of this scheme, the defendants purposely exploited the collusive relationships between the prescribers and pharmacies to promote and prescribe these drugs as much as possible to take advantage of these massive profit margins.

## A.    CONNECTIONS AMONG THE PHARMACY DEFENDANTS

194.    There are demonstrable connections among the Pharmacy Defendants despite their outward appearances as disparate, independent pharmacies.

195.    For example, the Pharmacy Defendants have each produced and dispensed the same Compounded Products, several of which have identical names, ingredients, and formulations.

196.    The Pharmacy Defendants have also used the same paperwork and documentation when seeking payment from Allstate even though the Pharmacy Defendants purport to operate under different names and different owners at different locations.

197.    Indeed, the delivery receipts used by New Century, Refill Rx, My Rx Pharmacy, and Direct Rx are patterned after the same template, which contains nearly identical language.

198.    The proof-of-mailing forms used by Direct Rx and Refill Rx also follow an identical template.

199.    Additionally, the Assignment of Benefit forms used on one or more occasion by Refill Rx, New Century, and Direct Rx also follow the same template.

200.    The use of these templates demonstrates the connections among these pharmacies because the respective reproductions of the delivery receipts and assignment of benefit form templates contain the same unlikely typographical and grammatical errors.

201.    The Pharmacy Defendants' submission of the identical (or nearly-identical) claim forms was important to this scheme because the assignment of benefit forms gave the Pharmacy Defendants the right to collect No-Fault benefits, and the invoices and delivery receipts were meant to show Allstate that payment was owed for pharmacy services that had been rendered.

202.    When Allstate questioned the necessity of prescriptions or requested additional documents to verify the compensability of the claims, the Pharmacy Defendants also submitted

30

identical letters of medical necessity to Allstate in support of prescriptions for drugs and medications, including Compounded Products, that were purportedly dispensed and delivered by the Pharmacy Defendants.

203.    Letters of medical necessity are sometimes submitted by a provider to establish or explain the merits of a claim.

204.    In this case, Allstate received several letters of medical necessity purportedly authored by the Prescribing Defendants.

205.    The affirmative representations of medical necessity set forth in these letters are completely identical even though they were offered with respect to a broad range of patients, which patients supposedly had unique injuries and medical needs.

206.    The statements made in these letters of medical necessity are false because the drugs and medications were not medically necessary.

207.    The content of these letters is also false because the statements do not support the patients' individualized needs for these products.

208.    Indeed, there is no valid reason why different patients of different doctors would all have the same individualized needs.

209.    However, even if all of these patients did have the same individualized needs, the letters of medical necessity are still false to the extent that the letters were offered and submitted in support of a variety of different drugs and medications, including Compounded Products.

210.    The chart below provides representative examples of the defendants' use of identical, and fraudulent, statements of medical necessity during the relevant treatment period:

| Purported Author of Letter | PC | Date of Letter | Allstate Claimant | Medication/Drug at Issue | Pharmacy Defendant Purportedly Dispensing Medication/Drug |
|---|---|---|---|---|---|
| Mani Ushyarov, DO | First Class Medical, P.C. | 9/27/16 | C.S. (0427228093) | Compound Rx 4 | Refill Rx |
| Mani Ushyarov, DO | First Class Medical, P.C. | 6/22/16 | R.S. (0419710537) | Terocin External Patch 4% | Refill Rx |
| Rafael A. Delacruz-Gomez, M.D. | Life Health Care Medical, P.C. | 9/23/16 | B.F. (0424074946) | Compound Rx 220W | Direct Rx |
| Rafael A. Delacruz-Gomez, M.D. | Life Health Care Medical, P.C. | 10/8/15 | K.C. (0385839279) | Compound Rx 220W | Direct Rx |
| Amr El-Sanduby, M.D. | NY Medical Arts, P.C. | 1/27/16 | A.H. (0375394418) | Compound Rx 218N | Refill Rx |
| Amr El-Sanduby, M.D. | NY Medical Arts, P.C. | 1/17/17 | L.C. (0400879102) | Compound Rx 218N | Direct Rx |
| Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | 1/26/17 | J.B. (0933889377) | Compound Rx 4 | Direct Rx |
| Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | 12/17/15 | P.R. (0394030183) | Compound Rx 218N | Direct Rx |

211.    The use of these template letters of medical necessity also establishes connections between the Pharmacy Defendants, the PC Defendants, and the Prescribing Defendants.

212.    Indeed, as demonstrated by the examples listed above, although different providers prescribed different medications to different patients who then filled these prescriptions at different pharmacies, all of these seemingly disparate claims were supported by identical statements of medical necessity.

213.    For example, the letters of medical necessity used by these providers and pharmacies contain the same boilerplate language even though the letters were submitted to Allstate to support each patient's unique, individualized needs for these medications.

214.    By creating and submitting these letters to Allstate, the defendants falsely represented the necessity of medications and drugs that were dispensed and delivered to Allstate Claimants, including Compounded Products.

215.    Each of the defendants' bogus letters of medical necessity contain the following language:

> The patient has suffered from serious injuries since the accident on [date of loss] and after the initial evaluation by me the patient was placed on a comprehensive rehabilitation program in the office and home, which consist [*sic*] of using multiple physical therapy modalities, massage, and therapeutic exercises.
>
> The patient was started on complex physical therapy including heat modalities, Electrical[1] [*sic*] stimulation, ultrasound, massage to the cervical and lumbar-sacral region. The patient has demonstrated some response to physiotherapy, however still experience [*sic*] pain. The patient has difficulty in performing many daily activities due to the neck and lower back pain.
>
> Patient's chief complaint at this time was pain and stiffness of neck/lower back, with some muscle tenderness. Pain was described as sharp and constant. Clinical evaluation revealed moderate tenderness and pain of the cervical/lumbosacral spine, soft tissue and musculature. Pain is enhanced on movements against forced passive resistance. There[2] are limited and decreased flexion, extension and lateral bending noted to the cervical/lumbosacral area. Deceased muscular strength and muscular spasm are noted.
>
> Impression is: post-vehicular multi-trauma syndromes with clinical evidence of involvement of the cervical/lumbosacral spine, soft tissue, and musculature; with possible involvement of the cervical/lumbosacral nerves and nerve roots as well.

216.    As this example makes clear, the letters of medical necessity are false and fraudulent because they recite the same treatment plan and same diagnoses for each patient, even

---

[1] Each of the letters of medical necessity contained in the above chart capitalized the word "Electrical."

[2] The Letter of Medical Necessity dated January 27, 2016 regarding Allstate Claimant A.H. (claim no. 0375394418) and purportedly authored by El-Sanduby recited that "***They*** are limited and decreased flexion, extension and lateral bending noted to the cervical/lumbosacral area." (Emphasis added.).

though the letters were offered for the purpose of establishing each patient's unique, individualized medical needs.

217.     The use of these letters of medical necessity demonstrates the connections among the Pharmacy Defendants and the Prescribing Defendants.

218.     The existence of these bogus letters also establishes the collusive and coordinated efforts among the defendants to wrongly demand and collect No-Fault benefit payments from Allstate for drugs and medications that were unnecessary and unwarranted.

219.     The defendants also submitted identical peer-review rebuttal letters when trying to collect payment on claims that were denied by Allstate.

220.     In cases where Allstate determined that coverage for drugs and medications were not warranted, the defendants submitted rebuttal letters purportedly authored by physicians, including the Prescribing Defendants.

221.     In many cases, the defendants created these rebuttal letters and then submitted them in support of actions filed against Allstate to collect payment for healthcare services, including the drugs and medications dispensed by the Pharmacy Defendants.

222.     Like the letters of medical necessity, all of the rebuttal letters were strikingly similar even though they were submitted with respect to different patients who had different conditions for which different medications had been prescribed by different providers.

223.     Also like the letters of medical necessity, the rebuttal letters were false and fraudulent because they materially misrepresented the medical necessity of the billed-for drugs and medications.

224.    The chart below provides representative examples of the defendants' use of identical, and fraudulent, statements of medical necessity when pursuing payments from Allstate during the relevant period.

| Purported Author of Rebuttal | PC | Date of Rebuttal | Allstate Claimant | Medication/Drug at Issue | Pharmacy Defendant Purportedly Dispensing Medication/Drug |
|---|---|---|---|---|---|
| Amr El-Sanduby, M.D. | NY Medical Arts, P.C. | 6/30/16 | K.R. (0400230926) | Compound Rx CGL | New Century |
| Amr El-Sanduby, M.D. | NY Medical Arts, P.C. | 6/30/16 | V.V. (0403920985) | Compound Rx CGL | New Century |
| Tomas Pattugalan, M.D. | GONY Medical Services P.C. | 7/12/16 | H.M. (0405435025) | Compound Rx GLK | New Century |
| Tomas Pattugalan, M.D. | GONY Medical Services P.C. | 7/1/16 | D.A. (0405435025) | Compound Rx GLK | New Century |

225.    The rebuttal letters contained in the chart above contain portions of identical language and list the same four (4) references at the conclusion of each rebuttal.

226.    Additionally, the following chart illustrates further representative examples of rebuttal letters purportedly authored by several prescribing providers, including certain Prescribing Defendants, that contain portions of identical language.

| Purported Author of Rebuttal | PC | Date of Rebuttal | Allstate Claimant | Medication/Drug at Issue | Pharmacy Defendant Purportedly Dispensing Medication/Drug |
|---|---|---|---|---|---|
| Mani Ushyarov, D.O. | First Class Medical, P.C. | 11/30/15 | C.G. (0382538287) | Compound Rx GLK | New Century |

| Purported Author of Rebuttal | PC | Date of Rebuttal | Allstate Claimant | Medication/Drug at Issue | Pharmacy Defendant Purportedly Dispensing Medication/Drug |
|---|---|---|---|---|---|
| Mani Ushyarov, D.O. | First Class Medical, P.C. | 1/11/16 | A.T. (0384317285) | Compound Rx GLK | New Century |
| Tomas Pattugalan, M.D. | GONY Medical Services P.C. | 1/11/16 | F.R. (0384833588) | Compound Rx GLK | New Century |
| Mani Ushyarov, D.O. | Health Balance Medical, P.C. | 1/11/16 | A.L. (0376140067) | Compound Rx GLK | New Century |
| Mani Ushyarov, D.O. | Health Balance Medical, P.C. | 11/24/15 | A.O. (0380638643) | Compound Rx GLK | New Century |
| Mani Ushyarov, D.O. | Health Balance Medical, P.C. | 1/11/16 | B.F. (0388586760) | Compound Rx GLK | New Century |
| Mani Ushyarov, D.O. | Health Balance Medical, P.C. | 1/20/16 | E.C. (0388586760) | Compound Rx GLK | New Century |
| Mani Ushyarov, D.O. | Health Balance Medical, P.C. | 1/11/16 | J.C. (0387016645) | Compound Rx GLK | New Century |
| Mani Ushyarov, D.O. | Health Balance Medical, P.C. | 10/5/15 | R.V. (0384638532) | Compound Rx GLK | New Century |
| Tomas Pattugalan, M.D. | GONY Medical Services P.C. | 6/1/15 | M.F. (0256979278) | Terocin Lotion | New Century |

227.    The rebuttal letters contained in the chart above also contain portions of identical language and the same nine (9) references at the conclusion of each rebuttal.

228.    Other rebuttals, including the representative sample of rebuttal letters purportedly authored by a Prescribing Defendant listed in the chart below, borrowed identical portions of the language and/or references contained in other rebuttals submitted to Allstate in support of the defendants' requests for reimbursement under New York's No-Fault laws, including certain rebuttals listed in the charts above.

| Purported Author of Rebuttal | PC | Date of Rebuttal | Allstate Claimant | Medication/Drug at Issue | Pharmacy Defendant Purportedly Dispensing Medication/Drug |
|---|---|---|---|---|---|
| Leonid Shapiro, M.D. | Life Health Care Medical, P.C.[3] | 10/18/16 | K.C. (0385839279) | Compound Rx 220W | Direct Rx |
| Leonid Shapiro, M.D. | Epione Medical, P.C.[4] | 12/19/16 | A.M. (0384475745) | Compound Rx 218N | Direct Rx |
| Leonid Shapiro, M.D. | NY Medical Arts, P.C.[5] | 1/4/17 | A.H. (0375394418) | Compound Rx 218N | Refill Rx |
| Leonid Shapiro, M.D. | Epione Medical, P.C.[6] | 1/14/17 | B.C. (0383991098) | Compound Rx 218N | Direct Rx |
| Amr El-Sanduby, M.D. | NY Medical Arts, P.C. | 11/29/16 | J.R. (0355290065) | Compound Rx 218N | Refill Rx |

---

[3] The Compounded Product that is the subject of the rebuttal letter purportedly authored by Leonid Shapiro, M.D. was prescribed by Delacruz-Gomez.

[4] The Compounded Product that is the subject of the rebuttal letter purportedly authored by Leonid Shapiro, M.D. was prescribed by another provider.

[5] The Compounded Product that is the subject of the rebuttal letter purportedly authored by Leonid Shapiro, M.D. was prescribed by El-Sanduby.

[6] The Compounded Product that is the subject of the rebuttal letter purportedly authored by Leonid Shapiro, M.D. was prescribed by another provider.

| Purported Author of Rebuttal | PC | Date of Rebuttal | Allstate Claimant | Medication/Drug at Issue | Pharmacy Defendant Purportedly Dispensing Medication/Drug |
|---|---|---|---|---|---|
| Amr El-Sanduby, M.D. | NY Medical Arts, P.C. | 2/14/17[7] | J.O. (0341963775) | Compound Rx 218N | Refill Rx |
| Amr El-Sanduby, M.D. | NY Medical Arts, P.C. | 2/14/17[8] | J.O. (0341963775) | Compound Rx 218N | Refill Rx |
| Amr El-Sanduby, M.D. | NY Medical Arts, P.C. | 4/27/17 | H.H. (0375394418) | Compound Rx 218N | Refill Rx |
| Tomas Pattugalan, M.D. | GONY Medical Services P.C. | 10/7/16 | M.A. (0413250424) | Compound Rx | New Century |

229.    The existence of identical shared language and citations contained in the rebuttal letters across a broad range of providers further demonstrates the collusive connections among the Pharmacy Defendants, the Pharmacy Owner Defendants, the PC Defendants, and the Prescribing Defendants, including actions taken by them to collect No-Fault benefit payments from Allstate.

230.    Additionally, the connections among the Pharmacy Defendants are further established through their common employment of the same pharmacists and/or other staff.

231.    For example, Robert Yakutilov served as the Supervising Pharmacist at Direct Rx, New Century, and Refill Rx at various times during the relevant period.

232.    Robert Yakutilov, serving as the Supervising Pharmacist, was also involved in the initial registration of Direct Rx, New Century, and Refill Rx as pharmacies in the State of New York.

---

[7] This rebuttal letter pertains to the Compounded Product purportedly dispensed to J.O. on October 28, 2014.

[8] This rebuttal letter pertains to the Compounded Product purportedly dispensed to J.O. on December 5, 2014.

### B.   FALSE BILLING FOR NON-PRESCRIPTION DRUGS

233.   New York's No-Fault Laws permit reimbursement for prescription drugs, but claimants—and/or their assignees—have no right to claim No-Fault reimbursement for over-the-counter drugs, which can be dispensed without a prescription.

234.   Despite this prohibition, each of the Pharmacy Defendants have knowingly and intentionally demanded payment from Allstate, under New York's No-Fault Laws, for over-the-counter medications, including Terocin pain patches and/or Terocin lotion purportedly dispensed and delivered to Allstate Claimants.

235.   New Century, Refill Rx, Direct Rx, and My Rx Pharmacy's purported dispensing of Terocin pain patches or Terocin lotion to Allstate Claimants is a major component of the defendants' scheme to defraud Allstate.

236.   The Terocin pain patch and lotion are topical analgesics, which can be used to temporarily relieve minor muscle and joint aches and pains.

237.   The active ingredients in the Terocin pain patches are menthol (a topical analgesic) and lidocaine (a topical anesthetic).

238.   The active ingredients in the Terocin lotion are menthol, as well as capsaicin (a topical analgesic derived from chili peppers) and methyl salicylate (a topical analgesic).

239.   Crucially, Terocin pain patches and Terocin lotion are available over the counter, and do not require a prescription.

240.   As over-the-counter medications, Terocin pain patches and Terocin lotion are not covered drug items under New York's No-Fault Laws.

241.   Even though charges for Terocin pain patches and Terocin lotion are not reimbursable under New York's No-Fault Laws, New Century, Refill Rx, Direct Rx, and My Rx

Pharmacy have dispensed these products to Allstate Claimants, and have sought—pursuant to assignment of benefit agreements with these claimants—No-Fault benefit reimbursement from Allstate.

242.     By advancing charges for Terocin pain patches and Terocin lotion in terms of the product's AWP, the Pharmacy Defendants took purposeful steps to make it appear that the products were eligible for coverage under the No-Fault laws.

243.     The charges for these products are false and fraudulent because the products are not covered under New York's No-Fault laws.

244.     However, even if they were covered, the charges for these products are still false because the products are medically unnecessary and unwarranted.

245.     The Terocin products are not approved by the FDA, and nothing exists to establish the efficacy of these products.

246.     The defendants' claims for the Terocin products are also false because even if the products were eligible for coverage and were medically necessary, the charges for these products are grossly excessive and fraudulent.

247.     For example, New Century charged Allstate between $1,961.00 and $2,561.00 each time that sixty (60) Terocin pain patches were dispensed to an Allstate Claimant during the relevant period.

248.     Meanwhile, Direct Rx and Refill Rx charged Allstate between $1,278.00 and $1,410.30 each time that thirty (30) Terocin pain patches were dispensed to an Allstate Claimant during the relevant period.

249.    This manner of charging for the dispensing of the Terocin pain patches is significant because many of these charges were in excess of the amount allowed to be charged under the Fee Schedule.

250.    For instance, the allowable per-unit charge for Terocin pain patches (NDC 50488-1001-01) was $42.60 as of July 1, 2015. Therefore, the charge per unit under the applicable Fee Schedule (assuming that the Terocin pain patches were permitted to be charged under the Fee Schedule, which they were not) for this brand name product as of July 1, 2015 was $37.49.

251.    If covered, the No-Fault laws require pharmacies to charge covered prescriptions drugs according to the drug's AWP on the date of dispensing, minus a reduction of 12% or 20% depending on whether the drug is brand name or generic.

252.    Thus, even if the Terocin products were covered under the No-Fault laws, the Pharmacy Defendants' charges were still excessive.

253.    Moreover, when Allstate has denied the Pharmacy Defendants' claims for the Terocin pain patches and Terocin lotion, the Pharmacy Defendants have aggressively pursued payment from Allstate, typically through the filing of private arbitrations pursuant to New York Insurance Law § 5106, knowing that the charges for Terocin pain patches and Terocin lotion are not reimbursable under New York's No-Fault Laws.

254.    To the extent that Allstate was caused to make payments related to any Terocin pain patches or Terocin lotion purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, the Pharmacy Defendants in connection with these falsely-charged, over-the-counter items.

255.    Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, the defendants in connection with these Terocin pain patches and Terocin lotion remain unpaid,

Allstate is under no obligation to make any future payments in connection with those transactions because these Terocin pain patches and Terocin lotion are not eligible for reimbursement under No-Fault Law, and even if these over-the-counter items were eligible for reimbursement, these items were never medically necessary for the treatment of the Allstate Claimants' accident-related injuries.

**C.   FRAUDULENTLY DISPENSING MEDICALLY WORTHLESS COMPOUNDED PRODUCTS AND OTHER DRUGS**

256.    The production and dispensing of identical Compounded Products by several of the Pharmacy Defendants both illustrates the contours of this scheme, and demonstrates how and why the defendants' actions are false and fraudulent.

257.    As an initial matter, licensed pharmacists or licensed physicians create compounded drugs by combining, mixing, or altering drug ingredients.

258.    In limited circumstances, a patient may require compounded drugs when commercially available drugs cannot meet that patient's specific clinical needs.

259.    For example, a patient's allergy to an inactive ingredient, such as a dye, in a commercially available drug may warrant a special formulation of that drug to eliminate the offending ingredient.

260.    Likewise, a patient may have other conditions, such as ingestion or digestion problems, that prevent the safe and effective use of commercially available drugs, thus warranting the creation of a special formulation of the drugs to meet the patient's specific clinical needs.

261.    In these examples, the patient benefits from the physician's ability to prescribe and the pharmacy's ability to prepare and dispense a compounded drug that meets the unique and specific clinical needs of the patient.

262. If deployed responsibly, compounded drugs may, in albeit limited circumstances, play a useful role in patient treatment.

263. However, the over prescribing and excessive misuse and abuse of compounded drugs carry several significant risks relating to safety, efficacy, and cost.

264. Compounded drugs are not FDA-approved, meaning that the FDA has not evaluated these products for safety, effectiveness, and quality before they are provided to patients.

265. Safety-wise, most compounded drugs are exempt from the FDA's new drug approval process, current good manufacturing practices, and other FDA requirements.

266. Further, many of the Compounded Products created and dispensed by the Pharmacy Defendants were clinically ineffective and unwarranted, mostly because the patient had no legitimate clinical need for the Compounded Product, or because the Compounded Product contained a combination of ingredients that were clinically ineffective in their combined form.

267. To be exempt from FDA oversight, the drugs must be compounded by a licensed pharmacist or physician for an identified individual patient, based on the receipt of a valid prescription.

268. Also, compounded drugs that are essentially copies of commercially available drug products and compounded regularly or in large amounts are not exempt from FDA regulations.

269. The restrictions on making drugs that are essentially copies of existing commercially available products ensures that patients are not unnecessarily exposed to drug products that have not been shown to be safe and effective and that may have been prepared under substandard manufacturing conditions.

270. The restrictions on compounded drugs also protects patients from the potential high expense of these specialized products.

271.    As detailed below, the Compounded Products prescribed, produced, and dispensed by the defendants often contained a combination of drugs, each of which was commercially available on its own.

272.    If prescribed separately in their commercially available forms, the total combined cost of the drugs would be low-to-moderate, especially because all of the drugs are available in generic form.

273.    However, with respect to the compounded topical creams and gels prepared and dispensed by the Pharmacy Defendants, the total combined cost of the drugs in a topical form was significantly higher.

274.    If, as here, prescribers and pharmacies work together to create, prescribe, and dispense compounded topical creams and gels without regard for the patients' actual clinical needs, then patients are unjustly saddled with high charges for compounded drugs that are not needed and not effective.

### 1.      No Clinical Basis for Compounded Products

275.    The Compounded Products purportedly dispensed by the Pharmacy Defendants have no documented scientific or clinical efficacy.

276.    Indeed, no evidence exists to support the efficacy of the drug combinations that are included in the Pharmacy Defendants' predetermined formulas, especially when these drug combinations are administered in topical form.

277.    Moreover, with respect to claimants diagnosed with radiculopathy, deep joint injuries, or injuries to multiple body areas, there is no clinical basis for the Compounded Products prescribed and dispensed to these claimants.

278. For example, even if some of the component drugs might be useful if dispensed in their conventional form, the drugs have little-to-no clinical efficacy in topical form when given for radiculopathy or deep joint injuries.

279. It is also unknown and unproven whether, and to what extent, several of the drugs in the Compounded Products are even absorbed by the body.

280. If the drugs cannot be absorbed through the patient's skin, then there is simply no clinical basis to prescribe and administer these concoctions in topical form.

281. However, even if their safety and efficacy was proven (it is not), there is still no valid clinical reason why the Compounded Products were a reasonable and appropriate method of care because many of the drugs contained in the Compounded Products already exist in oral formulations or in other commercially available—and FDA-approved—topical formulations.

### 2. Compounded Products Were Not Uniquely Tailored to Patient Needs

282. Compounded Products must be formulated for individual patients based upon the receipt of a valid prescription for an identified individual patient, or a notation on a prescription that a compounded product is necessary for the identified patient. *See* 21 U.S.C. § 353a.

283. However, the Compounded Products prescribed to Allstate Claimants, and then purportedly dispensed and delivered by the Pharmacy Defendants, were never tailored to each claimant's unique needs, and were never necessary to address the claimant's accident-related conditions.

284. The prescriptions for the Compounded Products were also not valid for several reasons.

285.     First, legitimate compounded topical drugs should never be prescribed according to pre-determined formulas in which the type and quantity of the drugs included never change from patient to patient.

286.     Second, legitimate prescriptions for compounded topical drugs should not be generated by prescribers utilizing pre-set stamps or labels that recite the pharmacy's pre-determined formula, especially when the stamps or labels are created by the dispensing pharmacy.

287.     In this case, many of the prescriptions for Compounded Products were generated using a pre-set rubber stamp or label that contained identical information concerning the name of the product, the name of the drugs included, and the quantity of each drug included.

288.     The following chart contains representative examples of how the defendants utilized pre-set stamps and labels to facilitate prescriptions of the same compounded topical drugs using different prescribers and different pharmacies:

| Prescriber | PC | Allstate Claimant | Drug or Medication Prescribed | Stamp /Label | Date of Rx | Pharmacy |
|---|---|---|---|---|---|---|
| Amr A. El-Sanduby, M.D. | NY Medical Arts, P.C. | J.O. (0341963775) | Compound Rx 218N | Stamp | 10/27/14 | Refill Rx |
| Amr A. El-Sanduby, M.D. | NY Medical Arts, P.C. | A.H. (0375394418) | Compound Rx 218N | Stamp | 8/24/15 | Refill Rx |
| Amr A. El-Sanduby, M.D. | NY Medical Arts, P.C. | L.C. (0400879102) | Compound Rx 218N | Stamp | 10/19/16 | Direct Rx |
| Amr A. El-Sanduby, M.D. | NY Medical Arts, P.C. | V.V. (04039209852) | Compound Rx | Stamp | 3/31/16 | New Century |
| Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | S.G. (0333640317) | Compound Rx 218N | Stamp | 4/28/15 | Direct Rx |
| Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | P.R. (0394030183) | Compound Rx 218N | Stamp | 1/4/16 | Direct Rx |
| Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | Y.L. (0355606237) | Compound Rx 218N | Stamp | 3/20/15 | Direct Rx |

| Prescriber | PC | Allstate Claimant | Drug or Medication Prescribed | Stamp /Label | Date of Rx | Pharmacy |
|---|---|---|---|---|---|---|
| Tomas Pattugalan, M.D. | GONY Medical Services P.C. | U.M. (0460396848) | Compound Rx GLK | Stamp | 6/27/17 | New Century |
| Tomas Pattugalan, M.D. | GONY Medical Services P.C. | G.J. (0462064148) | Compound Rx GLK | Stamp | 7/11/17 | New Century |
| Mani Ushyarov, DO | First Class Medical, P.C. | A.T. (0384317285) | Compound Rx GLK | Stamp | 9/15/15 | New Century |
| Mani Ushyarov, DO | First Class Medical, P.C. | C.G. (0382538387) | Compound Rx GLK | Stamp | 9/3/15 | New Century |
| Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | J.B. (0436367122) | Compound Rx 4 | Label | 12/30/16 | Direct Rx |
| Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | W.M. (0438965378) | Compound Rx 4 | Label | 11/22/16 | Direct Rx |
| Mani Ushyarov, DO | First Class Medical, P.C. | C.S. (0427228093) | Compound Rx 4 | Stamp | 9/6/16 | Refill Rx |
| Rafael Antonio Delacruz-Gomez, M.D. | Life Health Care Medical, P.C. | A.J. (0352982978) | Compound Rx 220W | Stamp | 8/31/15 | Direct Rx |
| Rafael Antonio Delacruz-Gomez, M.D. | Life Health Care Medical, P.C. | U.G. (0423140938) | Compound Rx 220W | Stamp | 8/1/16 | Direct Rx |

289. As a result of the pre-determined nature of the Compounded Products offered by the Pharmacy Defendants, Allstate Claimants were provided with identical Compounded Products, which were never tailored to their unique circumstances.

290. In every instance, the prescriber's report never describes why a Compounded Product was necessary or why a commercially available FDA-approved drug would not be appropriate.

291. When prescribing Compounded Products, the prescribers also never explain why the patient's specific condition required the specific Compounded Product.

47

292.    The examination reports are devoid of any justification for the Compounded Products, and the prescribers, in some instances, only later attempt to provide a basis for the prescription of the Compounded Product through a separate "Letter of Medical Necessity" or a rebuttal to another physician's opinion.

293.    As explained above, however, these letters and rebuttals are substantially identical, and thus do not provide a valid justification for any of the Compounded Products.

294.    Overall, the dispensing of the Pharmacy Defendants' Compounded Products was never the product of a prescription necessary to address the unique needs of any individual patient; rather, these items were provided across many patients by different prescribing providers, including the Prescribing Defendants, without regard to the particular circumstances of any one patient.

295.    In reality, the Compounded Products prescribed and dispensed during this scheme were widely marketed, prescribed, and dispensed without any regard for the specific needs of any individual patient.

296.    As such, the Compounded Products were "new" drugs that required FDA approval, but the Pharmacy Defendants never sought or received such approval for any of the Compounded Products.

297.    By manufacturing and distributing their mass-produced compounded topical drugs under the guise of individually tailored compounded drugs exempt from FDA approval, the defendants unlawfully marketed and dispensed the Compounded Products.

298.    In doing so, the defendants deliberately avoided federal laws and regulations intended to protect the health and safety of patients.

299.     Overall, the Pharmacy Defendants, and their Compounded Products, were never exempt from any laws, regulations, or requirements governing the marketing, production, and dispensing of compounded drugs because the Compounded Products were (a) not individualized, (b) not specifically tailored to the unique characteristics of any claimant, (c) not dispensed according to valid, legitimate prescriptions, and (d) always prescribed and dispensed according to pre-determined ingredients and quantities.

300.     As a result, the Pharmacy Defendants violated one or more applicable state licensing requirement when dispensing and delivering Compounded Products to Allstate Claimants, and are thus not eligible for reimbursement under New York's No-Fault laws.

### 3.     The Pharmacy Defendants' Unlawful Relationships with the Prescribing Defendants and the PC Defendants

301.     The defendants' scheme depended on the Pharmacy Defendants' ability to dispense (and then bill and collect payment for) as many prescription drugs as possible.

302.     The defendants' scheme also depended upon the willingness of prescribers—like the Prescribing Defendants—to write prescriptions for the specific products offered by the Pharmacy Defendants.

303.     To achieve these objectives, the defendants engaged in unlawful, collusive conduct aimed at generating prescriptions to be dispensed by the Pharmacy Defendants.

304.     The defendants' scheme required the aggressive marketing of the Pharmacy Defendants' products to physicians that were in a position to prescribe them.

305.     The marketing involved the provision of pre-printed labels and stickers and/or rubber stamps to physicians containing information necessary to prescribe the Pharmacy Defendants' products.

306.    The marketing also involved measures to ensure that the drugs were dispensed and delivered to patients regardless of whether the patient even wanted them, including direct transmission of the prescriptions to the pharmacies and the automatic delivery of the drugs to the patient's home or the prescriber's office.

307.    These measures deprived the patients of all meaningful choices, and resulted in many patients receiving compounded medications that they did not want or need.

308.    These measures also resulted in several patients receiving Compounded Products and other drugs even though they were unaware that something had been prescribed.

309.    In addition to aggressive marketing, the defendants' scheme also relied upon aggressive prescription practices with regard to Compounded Products.

310.    For example, Allstate Claimant J.B. (claim no. 0436367122) was involved in a motor vehicle accident on November 18, 2016. Several days later, on November 22, 2016, J.B. underwent an initial examination at Richmond Medical conducted by Barakat.

311.    On that same day, November 22, 2016, Barakat prescribed Compound Rx 4 for J.B. by affixing, or causing the affixing of, a label bearing the ingredients for this Compounded Product on his prescription form. Barakat again prescribed J.B. with Compound Rx 4 in the same manner on December 30, 2016 and January 3, 2017.

312.    Direct Rx purportedly dispensed and delivered Compound Rx 4 pursuant to Barakat's prescriptions on or about November 29, 2016, January 4, 2017, and February 2, 2017.

313.    For the Compounded Products purportedly dispensed to J.B., Direct Rx billed Allstate $1,361.73 for a total charge of $4,085.19.

314.    However, the Compounded Products prescribed by Barakat and dispensed by Direct Rx were not clinically warranted.

315.    Barakat prescribed the Compounded Product at the outset of care, before J.B.'s unique clinical needs could be assessed.

316.    Barakat also prescribed the Compounded Product before having J.B. try commercially available drugs to determine effectiveness of and/or J.B.'s intolerance to these drugs.

317.    Barakat then prescribed Direct Rx's non-approved, mass-produced "Compound Rx 4" product without ever customizing the product to meet J.B.'s unique medical needs.

318.    Overall, as in nearly all of the claims involved in this scheme, Barakat's prescription of an unproven compounded topical drug was premature and not supported by any specific evidence that the compound was necessary, beneficial, or effective in the treatment of J.B.

319.    Indeed, in the far majority of cases, a Compounded Product was prescribed on the same day—or within days—of the claimant's initial evaluation with the prescribing provider, including the Prescribing Defendants, without any trial of more conservative treatment or a commercially available product, as demonstrated in the chart below:

| Claimant Initials | Claim No. | Pharmacy Defendant | Prescribing Provider | PC | Date of Initial Evaluation | Prescription Date for Compounded Product |
|---|---|---|---|---|---|---|
| N.M. | 0428534184 | Direct Rx | Amr A. El Sanduby, M.D. | NY Medical Arts, P.C. | 10/5/2016 | 10/5/2016 |
| K.R. | 0400230926 | New Century | Amr A. El Sanduby, M.D. | NY Medical Arts, P.C. | 2/15/2016 | 2/15/2016 |
| V.V. | 0403920985 | New Century | Amr A. El Sanduby, M.D. | NY Medical Arts, P.C. | 3/31/2016 | 3/31/2016 |
| C.A. | 0442233698 | Direct Rx | David Abbatematteo, M.D. | Metro Pain Specialists, P.C. | 2/21/2017 | 2/21/2017 |
| J.S. | 0455115931 | Direct Rx | Inna Levtsenko, NP | Metro Pain Specialists, P.C. | 6/12/2017 | 6/12/2017 |

| Claimant Initials | Claim No. | Pharmacy Defendant | Prescribing Provider | PC | Date of Initial Evaluation | Prescription Date for Compounded Product |
|---|---|---|---|---|---|---|
| S.G. | 0367294311 | Direct Rx | Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | 4/28/2015 | 4/28/2015 |
| J.B. | 0436367122 | Direct Rx | Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | 11/22/2016 | 11/22/2016 |
| V.L. | 0369034723 | Direct Rx | Jean-Pierre Georges Barakat, M.D. | Richmond Medical Care P.C. | 5/18/2015 | 5/18/2015 |
| A.T. | 0384317285 | New Century | Mani Ushyarov, DO | First Class Medical, P.C. | 9/15/2015 | 9/15/2015 |
| J.C. | 0391540333 | Refill Rx | Mani Ushyarov, DO | First Class Medical, P.C. | 12/1/2015 | 12/1/2015 |
| C.S. | 0427228093 | Refill Rx | Mani Ushyarov, DO | First Class Medical, P.C. | 9/6/2016 | 9/6/2016 |
| A.J. | 0387119571 | Direct Rx | Rafael Antonio Delacruz, M.D. | Life Health Care Medical, P.C. | 8/31/2015 | 8/31/2015 |
| J.M. | 0424074946 | Direct Rx | Rafael Antonio Delacruz, M.D. | Life Health Care Medical, P.C. | 8/10/2016 | 8/10/2016 |
| G.U. | 0423140938 | Direct Rx | Rafael Antonio Delacruz, M.D. | Life Health Care Medical, P.C. | 8/1/2016 | 8/1/2016 |
| G.J. | 0462064147 | New Century | Tomas Pattugalan, M.D. | GONY Medical Services P.C. | 7/11/2017 | 7/11/2017 |
| A.J. | 0462064148 | New Century | Tomas Pattugalan, M.D. | GONY Medical Services P.C. | 7/11/2017 | 7/11/2017 |

| Claimant Initials | Claim No. | Pharmacy Defendant | Prescribing Provider | PC | Date of Initial Evaluation | Prescription Date for Compounded Product |
|---|---|---|---|---|---|---|
| S.L. | 0360276570 | My Rx Pharmacy | Andrew Patrick, D.O. | Metrocare Medical, P.C. | 3/19/2015 | 3/19/2015 |
| M.B. | 0367346657 | My Rx Pharmacy | Andrew Patrick, D.O. | Metrocare Medical, P.C. | 5/13/2015 | 5/13/2015 |

320. Given the timing of these prescriptions, it was impossible for the prescribing providers, including the Prescribing Defendants, to account for the patients' injuries and medical needs thereby allowing the prescribers to tailor the compounds to the specific needs of each patient.

321. The timing of these prescriptions relative to the date of the examination also means that the prescribing providers, including the Prescribing Defendants, never even attempted any conservative treatment or FDA-approved alternatives prior to prescribing Compounded Products.

322. Indeed, these examples clearly demonstrate that the topical Compounded Products were used early and often without documentation of medical necessity, benefit, or functional improvement.

323. The close timing of the prescriptions for Compounded Products also supports the existence of collusive and/or unlawful financial relationships between the Pharmacy Defendants (and/or their agents) and the Prescribing Defendants and PC Defendants.

324. Specifically, the Pharmacy Defendants (and/or their agents), upon information and belief, conspired with various prescribing providers, including, but not necessarily limited to, the Prescribing Defendants, to induce the automatic prescription and dispensing of the Pharmacy Defendants' Compounded Products and other drugs.

325.    In furtherance of this scheme, the prescribing providers, including, but not necessarily limited to, the Prescribing Defendants, instructed Allstate Claimants that all prescriptions be filled exclusively by one of the Pharmacy Defendants, regardless of claimant preference. In most cases, Allstate Claimants were unaware that prescriptions were written and that medications would be forthcoming.

326.    To the extent that the prescribing providers, including, but not necessarily limited to, the Prescribing Defendants, prescribe the Pharmacy Defendants' Compounded Products and other drugs pursuant to a financial or other arrangement with the Pharmacy Defendants (and/or those working on behalf of the Pharmacy Defendants) that would violate New York's applicable licensing laws, then the Pharmacy Defendants would not be lawfully entitled to seek and collect assigned No-Fault benefits under New York law in connection with the dispensing of these unlawful prescriptions, and it also would be inequitable and unjust to allow the defendants to retain any monies received from Allstate as a result of a No-Fault claim whose underlying service (i.e., the dispensing and delivery of the Pharmacy Defendants' Compounded Products and other drugs) was the product of an unlawful financial arrangement.

### D.    FRAUDULENT BILLING

327.    The defendants also defrauded Allstate by causing the Pharmacy Defendants to submit massively inflated charges to Allstate when seeking payment for Compounded Products dispensed and delivered to Allstate Claimants.

328.    Under New York's No-Fault Laws, reimbursement for a medically necessary Compounded Product is calculated based upon the price of each drug included in the formula for the Compounded Product.

329.    The Compounded Products were deliberately formulated using several different ingredient drugs as a means to manipulate New York's No-Fault laws.

330.    Utilizing several drugs in each formula allowed the Pharmacy Defendants to unduly multiply the cost of each Compounded Product.

331.    As detailed below, the Pharmacy Defendants have engaged in wide-spread, abusive billing tactics during the course of this scheme.

332.    Knowing that the AWP of the ingredient drugs was inflated and that the prices charged came nowhere close to their actual acquisition costs, the Pharmacy Defendants nevertheless sought to dispense as many Compounded Products as possible.

333.    Overall, all of the Pharmacy Defendants' false billing conduct relating to Compounded Products and their ingredients was purposeful, was intentional, and was designed to extract massive amounts of money from Allstate through the Allstate Claimants' available No-Fault coverage—money that the Pharmacy Defendants had no lawful right to seek or collect.

### 1.    Billing in Excess of Fee Schedule

334.    In many instances, the defendants caused the Pharmacy Defendants to submit charges in excess of the prevailing Fee Schedule.

335.    Regardless of whether the Compounded Products were actually necessary (which they never were) or actually dispensed and delivered to Allstate Claimants (which, in certain instances, they never were), the prices charged by the Pharmacy Defendants for just one of the Compounded Products ranged in price from approximately $850.00 to in excess of $1,500.00.

336.    Even if these Compounded Products were necessary (which they never were), the sheer cost imposed upon the Allstate Claimants was designed to cause the rapid depletion of their available No-Fault benefits, especially where the Allstate Claimants' prescriptions for the

Compounded Products called for refills—refills that the Allstate Claimants were discouraged—and, in certain cases, prevented—from declining.

337.   However, the injuries caused to the Allstate Claimants—and, in turn, to Allstate as the party responsible for making payment—were always compounded by the fact that the Pharmacy Defendants' charges were, in many instances, (a) in excess of what was allowed under the Fee Schedule, and (b) unlawful.

338.   As part of this scheme, the Pharmacy Defendants marketed a number of topical pain creams, which were passed off as specifically compounded products that were purportedly formulated for the needs of individual patients.

339.   Examples of the medically unnecessary and unlawfully charged compounded topical drug pain creams purportedly dispensed and delivered to Allstate Claimants by the Pharmacy Defendants are described more fully below:

### a.   Compound Rx 218N

340.   A number of Allstate Claimants were prescribed a Compounded Product known as "Compound Rx 218N," which Compounded Product was prescribed by one or more of the Prescribing Defendants, including El-Sanduby and Barakat, and purportedly dispensed and delivered by one or more of the Pharmacy Defendants, including Direct Rx and Refill Rx.

341.   In addition to not being medically necessary, Compound Rx 218N was always dispensed and delivered to Allstate Claimants in a pre-determined, pre-formulated amount.

342.   Moreover, Direct Rx and Refill Rx also were caused to mail to Allstate one or more demand for No-Fault reimbursement that reflected an excessive and wholly unlawful charge for the dispensing and delivery of this Compounded Product.

343.    The chart below provides examples of instances where Direct Rx and Refill Rx were purportedly caused to dispense and deliver Compound Rx 218N to Allstate Claimants in pre-determined, pre-formulated quantities:

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| R.R. | 0359114675 | Direct Rx | Compound Rx 218N | 3/2/2015 | Stamp |
| V.M. | 0369034723 | Direct Rx | Compound Rx 218N | 6/29/2015 | Stamp |
| V.M. | 0369034723 | Direct Rx | Compound Rx 218N | 5/22/2015 | Stamp |
| S.B. | 0386672026 | Direct Rx | Compound Rx 218N | 10/15/2015 | Stamp |
| A.M. | 0387372931 | Direct Rx | Compound Rx 218N | 10/16//2015 | Stamp |
| J.O. | 0341963775 | Refill Rx | Compound Rx 218N | 12/5/2014 | Stamp |
| J.O. | 0341963775 | Refill Rx | Compound Rx 218N | 10/28/2014 | Stamp |
| M.B. | 0354003147 | Refill Rx | Compound Rx 218N | 3/30/2015 | Stamp |
| M.B. | 0354003147 | Refill Rx | Compound Rx 218N | 3/2/2015 | Stamp |
| J.R. | 0355290065 | Refill Rx | Compound Rx 218N | 9/29/2015 | Stamp |
| A.H. | 0375394418 | Refill Rx | Compound Rx 218N | 9/3/2015 | Stamp |
| C.S. | 0337032387 | Refill Rx | Compound Rx 218N | 12/17/2014 | Stamp |

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| C.S. | 0337032387 | Refill Rx | Compound Rx 218N | 2/9/2015 | Stamp |
| E.R. | 0913386719 | Refill Rx | Compound Rx 218N | 12/22/2015 | Stamp |
| Y.U. | 0326972429 | Refill Rx | Compound Rx 218N | 1/14/2015 | Stamp |
| H.H. | 0375394418 | Refill Rx | Compound Rx 218N | 9/3/2015 | Stamp |
| N.M. | 0428534184 | Direct Rx | Compound Rx 218N | 10/8/2016 | Stamp |
| T.J. | 0366050417 | Direct Rx | Compound Rx 218N | 4/30/2015 | Stamp |
| A.M. | 0384475745 | Direct Rx | Compound Rx 218N | 9/22/2015 | Stamp |
| A.M. | 0384475745 | Direct Rx | Compound Rx 218N | 10/23/2015 | Stamp |
| G.T. | 0371529843 | Direct Rx | Compound Rx 218N | 9/3/2015 | Stamp |
| S.M. | 0371215609 | Direct Rx | Compound Rx 218N | 6/5/2015 | Stamp |
| C.R. | 0347775264 | Direct Rx | Compound Rx 218N | 11/26/2014 | Stamp |
| Y.L. | 0355606237 | Direct Rx | Compound Rx 218N | 4/7/2015 | Stamp |
| Y.L. | 0355606237 | Direct Rx | Compound Rx 218N | 6/4/2015 | Stamp |
| P.R. | 0394030183 | Direct Rx | Compound Rx 218N | 12/21/2015 | Stamp |

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| P.R. | 0394030183 | Direct Rx | Compound Rx 218N | 1/25/2016 | Stamp |
| A.P. | 0370718140 | Direct Rx | Compound Rx 218N | 6/11/2015 | Stamp |
| D.P. | 0380290825 | Direct Rx | Compound Rx 218N | 8/14/2015 | Stamp |
| D.B. | 0377543145 | Direct Rx | Compound Rx 218N | 7/31/2015 | Stamp |
| S.G. | 0367294311 | Direct Rx | Compound Rx 218N | 5/8/2015 | Stamp |
| M.R. | 0341571503 | Direct Rx | Compound Rx 218N | 11/17/2014 | Stamp |
| B.C. | 0383991098 | Direct Rx | Compound Rx 218N | 9/23/2015 | Stamp |
| B.M. | 0387277908 | Direct Rx | Compound Rx 218N | 10/23/2015 | Stamp |
| L.C. | 0400879102 | Direct Rx | Compound Rx 218N | 10/28/2016 | Stamp |
| R.G. | 0450985007 | Direct Rx | Compound Rx 218N | 3/31/2017 | Stamp |
| A.B. | 0431633007 | Direct Rx | Compound Rx 218N | 11/18/2016 | Stamp |
| M.M. | 0352725089 | Direct Rx | Compound Rx 218N | 4/17/2015 | Stamp |
| I.B. | 0297131807 | Refill Rx | Compound Rx 218N | 5/5/2016 | Stamp |

344.     As noted in the chart above, and indicative of the intent of Direct Rx and Refill Rx, and those working on behalf of Direct Rx and Refill Rx, to dispense, deliver, and then charge Allstate exorbitant—and unlawfully inflated—prices for as many Compounded Products as possible, without regard to medical need, and in certain cases, the Allstate Claimants' desire to even receive these medications, these Pharmacy Defendants were caused to dispense and deliver Compound Rx 218N to several Allstate Claimants on multiple occasions.

345.     For instance, Allstate Claimant V.M. (claim no. 0369034723) was purportedly injured on May 15, 2015, and was subsequently prescribed Compound Rx 218N by Barakat just days later on May 18, 2015.

346.     On or about May 22, 2015, Direct Rx dispensed and delivered the Compound Rx 218N Compounded Product to V.M.

347.     Less than a month later, on June 18, 2015, Barakat again prescribed Compound Rx 218N to V.M., which Compounded Product Direct Rx purportedly dispensed and delivered to V.M. on or about June 29, 2015.

348.     Direct Rx charged nearly $2,000.00 to Allstate for two (2) instances of dispensing Compound Rx 218N to V.M. over the course of approximately six (6) weeks following the accident causing V.M.'s injuries.

349.     As explained herein, these Compound Rx 218N Compounded Products dispensed to V.M. were neither medically necessary nor lawfully charged.

350.     First, several prescribing providers, including one or more of the Prescribing Defendants, submitted a Letter of Medical Necessity purporting to justify the need for the Compound Rx 218N Compounded Product, but, in actuality, revealing that this Compounded Product was not individualized to the patient to whom it was prescribed.

351.   For instance, on January 12, 2016, Barakat, through Richmond Medical, submitted a Letter of Medical Necessity regarding the Compound Rx 218N Compounded Product prescribed by Barakat to claimant P.R. (claim no. 0394030183).

352.   Meanwhile, approximately one (1) year later, on January 17, 2017, El-Sanduby, through NY Medical Arts, purported to author a Letter of Medical Necessity in support of the Compound Rx 218N Compounded Product purportedly dispensed to claimant L.C. (claim no. 0400879102).

353.   However, despite pertaining to two (2) individual patients and purportedly being written by two (2) separate providers approximately one (1) year apart, these letters share identical substantive language regarding these claimants' rehabilitation programs, treatment, complaints, evaluation results, and impressions.

354.   Therefore, these Letters of Medical Necessity plainly do not evidence any medical need for Compound Rx 218N as these letters are essentially mere carbon copy templates distributed to these Prescribing Defendants for submission to insurers such as Allstate as a means to induce these insurers to make payments on fraudulent and non-compensable No-Fault claims for Compounded Products such as Compound Rx 218N.

355.   As further proof of the intent of  Direct Rx and Refill Rx, and those working on behalf of Direct Rx and Refill Rx, to defraud Allstate by unlawfully dispensing Compounded Products under the false pretense that each Compounded Product was specifically formulated to the unique needs of each individual patient, each of the Compound Rx 218N Compounded Products dispensed to the above-listed Allstate Claimants—along with most, if not all, of the other Allstate Claimants that purportedly received this Compounded Product—consisted of the same following generic drugs, in the same exact quantities: Ketoprofen Powder, Baclofen Powder,

Lidocaine Powder, Cyclobenzaprine Powder, Gabapentin Powder, Ibuprofen Powder, and Ethoxy Diglycol Liquid.

356.    According to documents mailed to Allstate by, or on behalf of, Direct Rx and Refill Rx in support of the charges levied by Direct Rx and Refill Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for all of these included drugs were supplied by Medisca.

357.    Each prescription mailed to Allstate by, or on behalf of, Direct Rx and Refill Rx in support of the charges levied by Direct Rx and Refill Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, called for fifty (50) grams of Pentravan Cream.

358.    According to documents mailed to Allstate by, or on behalf of, Direct Rx and Refill Rx in support of the charges levied by Direct Rx and Refill Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for the Pentravan Cream included in Compound Rx 218N were supplied by Fagron, Inc.

359.    However, for Allstate Claimants E.R. and J.R., Refill Rx included Penderm Cream Base in Compound Rx 218N, which, according to the documents mailed to Allstate by, or on behalf of, Refill Rx in support of the charges levied by Refill Rx for purportedly dispensing and delivering this Compounded Product to these Allstate Claimants, the NDCs listed for the Penderm Cream Base were supplied by Medisca.

360.    In connection with the Compound Rx 218N purportedly dispensed and delivered to Allstate Claimants J.O., M.B., A.H., C.S., Y.U., and H.H., this Compounded Product was formulated, and Refill Rx charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Ketoprofen Powder | 38779007808 | 20 | $209.00 | $167.20 | $41.80 |
| Lidocaine Powder | 38779008209 | 2.5 | $10.69 | $8.55 | $2.14 |
| Ibuprofen Powder | 38779029908 | 20 | $49.40 | $39.52 | $9.88 |
| Gabapentin Powder | 38779246108 | 6 | $313.50 | $287.28 | $26.22 |
| Baclofen Powder | 38779038808 | 2 | $71.26 | $57.01 | $14.25 |
| Cyclobenzaprine Powder | 38779039508 | 2 | $92.66 | $74.13 | $18.53 |
| Ethoxy Diglycol Liquid | 38779190301 | 17.5 mL | $5.98 | $4.79 | $1.19 |
| Pentravan Cream | 51552091908 | 50 | $100.00 | $90.00 | $10.00 |
| | | | $852.49 | $728.48 | **$124.01** |

361.    Even assuming that Refill Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Refill Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Refill Rx would have only been lawfully entitled to charge and collect $728.48 for the Compound Rx 218N  purportedly dispensed to Allstate Claimants J.O., M.B., A.H., C.S., Y.U., and H.H., provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

362.   However, as demonstrated above, the total amount that Refill Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 218N Compounded Product purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $124.01.

363.   In connection with the Compound Rx 218N Compounded Products purportedly dispensed and delivered to the Allstate Claimants R.R., V.M. (dispensed on or about May 22, 2015), T.J., S.M., C.R., Y.L., S.G., M.R., and M.M., this Compounded Product was formulated, and Direct Rx charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Ketoprofen Powder | 38779007808 | 20 | $230.02 | $167.20 | $62.82 |
| Lidocaine Powder | 38779008209 | 2.5 | $11.72 | $8.55 | $3.17 |
| Ibuprofen Powder | 38779029908 | 20 | $54.30 | $39.52 | $14.78 |
| Baclofen Powder | 38779038808 | 2 | $78.40 | $57.01 | $21.39 |
| Cyclobenzaprine Powder | 38779039508 | 2 | $101.93 | $74.13 | $27.80 |
| Ethoxy Diglycol Liquid | 38779190301 | 17.5 mL | $6.56 | $4.79 | $1.77 |
| Gabapentin Powder | 38779246108 | 6 | $344.81 | $287.28 | $57.53 |
| Pentravan Cream | 51552091908 | 50 | $110.00 | $90.00 | $20.00 |
| | | | $937.74 | $728.48 | **$209.26** |

364.    Even assuming that Direct Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Direct Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Direct Rx would have only been lawfully entitled to charge and collect $728.48 for the Compound Rx 218N Compounded Products purportedly dispensed to Allstate Claimants R.R., V.M., T.J., S.M., C.R., Y.L., S.G., and M.R., provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

365.    However, as demonstrated above, the total amount that Direct Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 218N Compounded Product purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $209.26.

366.    In connection with the Compound Rx 218N Compounded Products purportedly dispensed and delivered to the Allstate Claimants V.M. (dispensed on or about June 29, 2015), S.B., A.M.,[9] N.M., A.M., G.T., A.P., D.B., P.R., B.C.,[10] B.M., D.P., L.C.,[11] and A.B. this Compounded Product was formulated, and Direct Rx charged Allstate, as follows:

---

[9] The documents mailed to Allstate in support of the charges for the Compound Rx 218N Compounded Product purportedly dispensed and delivered to Allstate Claimants A.M., P.R., and B.M. by Direct Rx reported an NDC for Pentravan Cream as 51552091906 with an AWP of $2.2725. However, the total amount billed for the Pentravan Cream remained $109.95. Therefore, the total allowed by the Fee Schedule for this Compound Rx 218N Compounded Product was $729.38 and the amount fraudulently charged was $258.52.

[10] The documents mailed to Allstate in support of the charges for the Compound Rx 218N Compounded Product purportedly dispensed and delivered to Allstate Claimants B.C. and D.P. by Direct Rx reported an NDC for Cyclobenzaprine Powder of 38779039508, but charged $101.97. Therefore, the total amount billed by Direct Rx for the Compound Rx 218N was $987.92 and the amount fraudulently charged was $259.44.

[11] The documents mailed to Allstate in support of the charges for the Compound Rx 218N Compounded Product purportedly dispensed and delivered to Allstate Claimants L.C. and A.B. by Direct Rx reported an NDC for Pentravan Cream of 51552128508 with an AWP of $2.50. Therefore, the total allowed by the Fee Schedule for this Compound

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Ketoprofen Powder | 38779007808 | 20 | $229.99 | $167.20 | $62.79 |
| Lidocaine Powder | 38779008209 | 2.5 | $11.76 | $8.55 | $3.21 |
| Ibuprofen Powder | 38779029908 | 20 | $54.33 | $39.52 | $14.81 |
| Baclofen Powder | 38779038808 | 2 | $78.34 | $57.01 | $21.33 |
| Cyclobenzaprine Powder | 38779039508 | 2 | $101.95 | $74.13 | $27.82 |
| Ethoxy Diglycol Liquid | 38779190301 | 17.5 mL | $6.62 | $4.79 | $1.83 |
| Gabapentin Powder | 38779246108 | 6 | $394.96 | $287.28 | $107.68 |
| Pentravan Cream | 51552091908 | 50 | $109.95 | $90.00 | $19.95 |
| | | | $987.90 | $728.48 | **$259.42** |

367.    Even assuming that Direct Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Direct Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Direct Rx would have only been lawfully entitled to charge and collect $728.48 for the Compound Rx 218N purportedly dispensed to Allstate Claimants V.M., S.B., A.M., N.M., A.M. G.T., A.P., D.B., P.R., B.C., B.M, D.P., and L.C.

---

Rx 218N Compounded Product for Allstate Claimants L.C. and A.B. was $738.48 and the amount fraudulently charged was $249.42.

provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

368.    However, as demonstrated above, the total amount that Direct Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 218N Compounded Product purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $259.42.

369.    As noted above, Refill Rx did not charge for Pentravan Cream in connection with Compound 218N purportedly dispensed and delivered to Allstate Claimants J.R., E.R., and I.B. as called for the in prescriptions. Rather, Refill Rx charged for Penderm Cream Base, which caused the amounts charged and/or the amounts permitted under the Fee Schedule to differ.

370.    In connection with the Compound Rx 218N purportedly dispensed and delivered to the Allstate Claimants J.R., E.R., and I.B.,[12] this Compounded Product was formulated, and Refill Rx charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Ketoprofen Powder | 38779007809 | 20 | $209.00 | $167.20 | $41.80 |
| Baclofen Powder | 38779038808 | 2 | $71.26 | $57.01 | $14.25 |
| Lidocaine Powder | 38779008208 | 2.5 | $10.69 | $8.55 | $2.14 |
| Cyclobenzaprine Powder | 38779039508 | 2 | $92.66 | $74.13 | $18.53 |

[12] The documents mailed to Allstate in support of the charges for the Compound Rx 218N Compounded Product purportedly dispensed and delivered to Allstate Claimant I.B. by Refill Rx billed $47.50 for Penderm Cream Base, $357.48 for Gabapentin Powder, and $5.99 for Ethoxy Diglycol Liquid. Therefore, the total amount billed for Allstate Claimant I.B. was $843.98 and the amount fraudulently charged was $167.50.

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Ethoxy Diglycol Liquid | 38779190301 | 17.5 mL | $5.98 | $4.79 | $1.19 |
| Penderm Cream Base | 38779256401 | 50 | $100.00 | $38.00 | $62.00 |
| Ibuprofen Powder | 38779029909 | 20 | $49.40 | $39.52 | $9.88 |
| Gabapentin Powder | 38779246109 | 6 | $313.50 | $287.28 | $26.22 |
| | | | $852.49 | $676.48 | **$176.01** |

371.    Even assuming that Refill Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca were not fraudulent or inflated, had Refill Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Refill Rx would have only been lawfully entitled to charge and collect $676.48 for the Compound Rx 218N  purportedly dispensed to Allstate Claimants J.R. and E.R., provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

372.    However, as demonstrated above, the total amount that Refill Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 218N Compounded Product purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $176.01.

373.    In connection with the Compound Rx 218N purportedly dispensed and delivered to the Allstate Claimant R.G., this Compounded Product was formulated, and Direct Rx charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Pentravan Cream | 51552128508 | 50 | $125.00 | $100.00 | $25.00 |
| Lidocaine Powder | 38779008209 | 2.5 | $10.69 | $8.55 | $2.14 |
| Ketoprofen Powder | 38779007808 | 20 | $209.00 | $167.20 | $41.80 |
| Ibuprofen Powder | 38779029908 | 20 | $49.40 | $39.52 | $9.88 |
| Gabapentin Powder | 38779246108 | 6 | $359.10 | $287.28 | $71.82 |
| Ethoxy Diglycol Liquid | 38779190301 | 17.5 mL | $5.99 | $4.79 | $1.20 |
| Cyclobenzaprine Powder | 38779039508 | 2 | $92.66 | $74.13 | $18.53 |
| Baclofen Powder | 38779038808 | 2 | $71.26 | $57.01 | $14.25 |
|  |  |  | $923.10 | $738.48 | **$184.62** |

374.    Even assuming that Direct Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca were not fraudulent or inflated, had Direct Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Direct Rx would have only been lawfully entitled to charge and collect $738.48 for the Compound Rx 218N purportedly dispensed to Allstate Claimant R.G.,

provided that this Compounded Product was necessary to treat any of this Allstate Claimant's accident-related injuries, which it was not.

375.     However, as demonstrated above, the total amount that Direct Rx (or those acting under its direction and control) billed Allstate for the Compound Rx 218N Compounded Product purportedly provided to Allstate Claimant R.G. exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $184.62.

376.     Accordingly, because (a) the prescription and dispensing of the Compound Rx 218N Compounded Product were not medically necessary for the treatment of any of the Allstate Claimants' reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Direct Rx and Refill Rx in connection with their purported provision of this Compounded Product were fraudulent and excessive, Direct Rx's and Refill Rx's reimbursement demands mailed to Allstate in connection with each of the Allstate Claimants are not compensable under New York's No-Fault laws.

377.     To the extent that Allstate was caused to make payments related to these Compound Rx 218N Compounded Products purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the defendants, including Direct Rx and Refill Rx, in connection with these Compound Rx 218N Compounded Products.

378.     Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Direct Rx and Refill Rx in connection with these Compound Rx 218N Compounded Products remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these Compound Rx 218N Compounded Products (a) were never medically necessary for the treatment of the Allstate Claimants' accident-related injuries, and/or

(b) were fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### b.    *Compound Rx 220W*

379.    Numerous Allstate Claimants were prescribed a Compounded Product known as "Compound Rx 220W", which Compounded Product was prescribed by one or more of the Prescribing Defendants, including Delacruz-Gomez, and purportedly dispensed and delivered by one or more of the Pharmacy Defendants, including Direct Rx.

380.    In addition to not being medically necessary, Compound Rx 220W was always dispensed and delivered to Allstate Claimants in a pre-determined, pre-formulated amount.

381.    Moreover, Direct Rx also was caused to mail to Allstate one or more demand for No-Fault reimbursement that reflected an excessive and wholly unlawful charge for the dispensing and delivery of this Compounded Product.

382.    The chart below provides examples of instances where Direct Rx was purportedly caused to dispense and deliver Compound Rx 220W to Allstate Claimants in pre-determined, pre-formulated quantities:

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| U.G. | 04231409398 | Direct Rx | Compound Rx 220W | 8/10/2016 | Stamp |
| U.G. | 04231409398 | Direct Rx | Compound Rx 220W | 9/11/2016 | Stamp |
| B.F. | 0424074946 | Direct Rx | Compound Rx 220W | 9/20/2016 | Stamp |

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| B.F. | 0424074946 | Direct Rx | Compound Rx 220W | 8/24/2016 | Stamp |
| J.M. | 0424074946 | Direct Rx | Compound Rx 220W | 8/19/2016 | Stamp |
| J.M. | 0424074946 | Direct Rx | Compound Rx 220W | 9/20/2016 | Stamp |
| D.J. | 0400027595 | Direct Rx | Compound Rx 220W | 2/12/2016 | Stamp |
| D.J. | 0400027595 | Direct Rx | Compound Rx 220W | 3/14/2016 | Stamp |
| M.A. | 0400027595 | Direct Rx | Compound Rx 220W | 2/12/2016 | Stamp |
| M.A. | 0400027595 | Direct Rx | Compound Rx 220W | 3/14/2016 | Stamp |
| C.R. | 0400027595 | Direct Rx | Compound Rx 220W | 3/14/2016 | Stamp |
| C.R. | 0400027595 | Direct Rx | Compound Rx 220W | 2/12/2016 | Stamp |
| K.C. | 0385839279 | Direct Rx | Compound Rx 220W | 11/11/2015 | Stamp |
| K.C. | 0385839279 | Direct Rx | Compound Rx 220W | 10/9/2015 | Stamp |
| M.K. | 0413757386 | Direct Rx | Compound Rx 220W | 6/20/2016 | Stamp |
| M.K. | 0413757386 | Direct Rx | Compound Rx 220W | 5/19/2016 | Stamp |
| A.J. | 903873261 | Direct Rx | Compound Rx 220W | 9/21/2015 | Stamp |

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| A.J. | 903873261 | Direct Rx | Compound Rx 220W | 10/26/2015 | Stamp |
| D.E. | 0424074946 | Direct Rx | Compound Rx 220W | 9/20/2016 | Stamp |
| D.E. | 0424074946 | Direct Rx | Compound Rx 220W | 8/19/2016 | Stamp |
| A.M. | 0369098404 | Direct Rx | Compound Rx 220W | 6/16/2015 | Stamp |
| K.B. | 0429781684 | Direct Rx | Compound Rx 220W | 10/27/2016 | Stamp |
| K.B. | 0429781684 | Direct Rx | Compound Rx 220W | 11/25/2016 | Stamp |
| M.W. | 0413757386 | Direct Rx | Compound Rx 220W | 6/20/2016 | Stamp |
| M.W. | 0413757386 | Direct Rx | Compound Rx 220W | 5/19/2016 | Stamp |
| S.T. | 0442723771 | Direct Rx | Compound Rx 220W | 2/2/2017 | Stamp |
| S.T. | 0442723771 | Direct Rx | Compound Rx 220W | 3/2/2017 | Stamp |
| G.H. | 04427112223 | Direct Rx | Compound Rx 220W | 3/8/2017 | Stamp |

383.    As noted in the chart above, and indicative of the intent of Direct Rx, and those acting on behalf of Direct Rx, to dispense, deliver, and then charge Allstate exorbitant—and unlawfully inflated—prices for as many Compounded Products as possible, without regard to medical need, and in certain cases, the Allstate Claimants' desire to even receive these

medications, Direct Rx was caused to dispense and deliver Compound Rx 220W to a number of Allstate Claimants twice as a matter of routine.

384.    The majority of the Allstate Claimants listed above that received a refill of the Compound Rx 220W Compounded Product that was purportedly dispensed and delivered by Direct Rx were prescribed this Compounded Product by the same Prescribing Defendant, Delacruz-Gomez.

385.    Moreover, in each such instance, the prescription form was stamped with the ingredients to be included in the Compounded Product titled "Compound Rx 220W" and uniformly called for one refill.

386.    Indeed, in each instance where the prescription called for a refill, the Allstate Claimant received the refill of Compound Rx 220W as a matter of course nearly exactly one month after the initial delivery of the Compound Rx 220W.

387.    By contrast, Allstate Claimant A.M. (claim no. 0369098404) was prescribed Compound Rx 220W by a different prescribing provider who did not include a refill in the prescription, which evidences the collusive relationship between Direct Rx and Delacruz-Gomez to maximize the amounts charged to Allstate through the prescription of as many medically unnecessary Compounded Products as possible at exorbitant—and unlawfully inflated—prices.

388.    Indeed, Direct Rx charged Allstate nearly $3,000.00 in total for the Compound Rx 220W Compounded Products dispensed on two (2) occasions to the Allstate Claimants listed above. As explained below, these Compounded Products, which were not medically necessary, also were unlawfully charged.

389.    First, Delacruz-Gomez submitted Letters of Medical Necessity through Life Health Care to Allstate for nearly all of the claimants listed in the above chart to whom he prescribed

74

Compound Rx 220W purporting to justify the need for the Compound Rx 220W Compounded Product, but, in actuality, revealing that this Compounded Product was not individualized to the patient to whom it was prescribed.

390. For instance, Delacruz-Gomez purported to author at least fifteen (15) such letters that were submitted to Allstate in support of Compound Rx 220W Compounded Products prescribed by Delacruz-Gomez to Allstate Claimants.

391. On September 21, 2015, Delacruz-Gomez, through Life Health Care, submitted a Letter of Medical Necessity regarding the Compound Rx 220W Compounded Product prescribed by Delacruz-Gomez to claimant A.J. (claim no. 0387119571).

392. Meanwhile, nearly two (2) years later, Delacruz-Gomez, through Life Health Care, purported to author a Letter of Medical Necessity in support of the Compound Rx 220W Compounded Product purportedly dispensed to claimant G.H. (claim no. 0442697933).

393. However, despite pertaining to two (2) individual patients and purportedly being written nearly two (2) years apart, these letters share identical substantive language regarding these claimants' rehabilitation programs, treatment, complaints, evaluation results, and impressions.

394. The same identical language appears in the other Letters of Medical Necessity purportedly penned by Delacruz-Gomez falsely establishing justification for the prescribing and dispensing of Compound Rx 220W to Allstate Claimants B.F. (claim no. 0424074946), C.R. (claim no. 0400027595), D.J. (claim no. 0400027595), D.E. (claim no. 0424074946), J.W. (claim no. 0424074946), K.C. (claim no. 0385839279), K.B. (claim no. 0429781684), M.W. (claim no. 0413757386), M.K. (claim no. 0413757386), and U.G. (claim no. 04231409398) between 2015 and 2017.

395.     Some of these Letters of Medical Necessity submitted to Allstate by Delacruz-Gomez, such as those pertaining to claimants M.K. (claim no. 0413757386), C.R. (claim no. 0400027595), B.F. (claim no. 0424074946), D.J. (claim no. 0400027595), D.E. (claim no. 0424074946), J.W. (claim no. 0424074946), M.W. (claim no. 0413757386), and U.G. (claim no. 04231409398), also list the same exact ten (10) diagnoses for which Delacruz-Gomez purportedly had been treating each claimant, namely: (1) Acute Traumatic Cervical Radiculitis (M60.9); (2) Acute Cervical Musculo-Ligamentous Sprain/Strain (S13.4XXA)(M54.5); (3) Acute Traumatic Lumbosacral Radiculitis (M54.14); (4) Back Strain (S23.9XXA); (5) Acute Lumbosacral Musculo-Ligamentous Sprain/Strain (S.23.3XXA); (6) Anxiety, Tension, and Stress Reactive to Pain (F43.0) (R45.89); (7) Tension Headache (G44209); (8) Post-Traumatic Cervico-Thoracic Myofascitis (M54.13); (9) Post-Concussion Syndrome (S06.0X0A); and (10) Post-Traumatic Lumbar Myofascitis (M54.5) (M54.30). It is highly unlikely that eight (8) unique patients would present with the same exact ten (10) diagnoses, which fact further illustrates the bogus nature of these Letters of Medical Necessity.

396.     Therefore, these Letters of Medical Necessity plainly do not evidence any medical necessity for Compound Rx 220W as these letters are essentially mere carbon copy templates distributed to Delacruz-Gomez for submission to insurers such as Allstate as a means to induce these insurers to make payments on fraudulent and non-compensable No-Fault claims for Compounded Products such as Compound Rx 220W.

397.     As further proof of the intent of Direct Rx, and those acting on behalf of Direct Rx, to defraud Allstate by unlawfully dispensing Compounded Products under the false pretense that each Compounded Product was specifically formulated to the unique needs of each individual patient, each of the Compound Rx 220W Compounded Products dispensed to the above-listed

Allstate Claimants—along with most, if not all, of the other Allstate Claimants that purportedly received this Compounded Product—consisted of the same following generic drugs, in the same exact quantities: Lidocaine HCL Powder, Gabapentin Powder, Flurbiprofen Powder, Ethoxy Diglycol Liquid, Cyclobenzaprine Powder, and Baclofen Powder.

398.    According to documents mailed to Allstate by, or on behalf of, Direct Rx in support of the charges levied by Direct Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for all of these included drugs were supplied by Medisca.

399.    Each prescription mailed to Allstate by, or on behalf of, Direct Rx in support of the charges levied by Direct Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, called for forty-eight (48) grams of Pentravan Cream.

400.    According to documents mailed to Allstate by, or on behalf of, Direct Rx in support of the charges levied by Direct Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for the Pentravan Cream included in Compound Rx 220W were supplied by Fagron, Inc.

401.    In connection with the Compound Rx 220W purportedly dispensed and delivered to the Allstate Claimants G.U., B.F., J.M., D.J., M.A., C.R., K.C. (on or about October 9, 2015

and November 11, 2015),[13] M.K., D.E., K.B., M.W., and S.T.,[14] Direct Rx formulated this

Compounded Product, and charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Pentravan Cream | 51552128508 | 48 | $96.00 | $96.00 | $0.00 |
| Lidocaine Powder | 38779008105 | 5 | $21.38 | $17.10 | $4.28 |
| Gabapentin Powder | 38779246108 | 6 | $394.96 | $287.28 | $107.68 |
| Flurbiprofen Powder | 38779273908 | 20 | $731.60 | $585.28 | $146.32 |
| Ethoxy Diglycol Liquid | 38779190301 | 15 mL | $5.13 | $4.10 | $1.03 |
| Cyclobenzaprine Powder | 38779039508 | 2 | $101.95 | $74.13 | $27.82 |
| Baclofen Powder | 38779038808 | 4 | $142.52 | $114.02 | $28.50 |
| | | | $1,493.54 | $1,177.91 | **$315.63** |

402.    Even assuming that Direct Rx's documents reflect legitimate NDCs for the included

drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by

---

[13] For the Compound Rx 220W Compounded Product purportedly delivered and dispensed to Allstate Claimant K.C. on or about October 9, 2015, Direct Rx billed for the Pentravan Cream used in the Compound Rx 220W Compounded Product under NDC 51552091906, which has an AWP of $2.2725. Therefore, the amount fraudulently charged for the Compound Rx 220W Compounded Product purportedly delivered and dispensed to Allstate Claimant K.C. on October 9, 2015 was $324.36.

[14] For Compound Rx 220W Compounded Products purportedly delivered and dispensed to Allstate Claimant S.T. on February 2, 2017 and March 2, 2017, Direct Rx billed a total of $1,472.39. Therefore, the amount fraudulently charged for this Compounded Product was $294.48.

Medisca and Fagron, Inc. were not fraudulent or inflated, had Direct Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Direct Rx would have only been lawfully entitled to charge and collect $1,177.91 for the Compound Rx 220W purportedly dispensed to Allstate Claimants G.U., B.F., J.M., D.J., M.A., C.R., K.C., M.K., D.E., K.B., and M.W. provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

403.    However, as demonstrated above, the total amount that Direct Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 220W Compounded Product purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $315.63.

404.    In connection with the Compound Rx 220W purportedly dispensed and delivered to the Allstate Claimant A.M., Direct Rx formulated this Compounded Product, and charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Pentravan Cream | 51552091906 | 48 | $105.66 | $87.26 | $18.40 |
| Lidocaine HCL Powder | 38779008209 | 5 | $23.59 | $17.10 | $6.49 |
| Gabapentin Powder | 38779246108 | 6 | $374.73 | $287.28 | $87.45 |
| Flurbiprofen Powder | 38779273908 | 20 | $763.51 | $585.28 | $178.23 |
| Ethoxy Diglycol Liquid | 38779190301 | 15 mL | $5.59 | $4.10 | $1.49 |

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Cyclobenzaprine Powder | 38779039508 | 2 | $101.88 | $74.13 | $27.75 |
| Baclofen Powder | 38779038808 | 4 | $156.75 | $114.02 | $42.73 |
| | | | $1,531.71 | $1,169.18 | **$362.53** |

405.   Even assuming that Direct Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Direct Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Direct Rx would have only been lawfully entitled to charge and collect $1,169.18 for the Compound Rx 220W Compounded Product purportedly dispensed to Allstate Claimant A.M., provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

406.   However, as demonstrated above, the total amount that Direct Rx was caused to bill Allstate for the same Compound Rx 220W Compounded Product purportedly provided to this Allstate Claimant exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $362.53.

407.   In connection with the Compound Rx 220W Compounded Product purportedly dispensed and delivered to the Allstate Claimant A.J., Direct Rx formulated this Compounded Product, and charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Lidocaine HCL Powder | 38779008209 | 5 | $23.58 | $17.10 | $6.48 |
| Baclofen Powder | 38779038808 | 4 | $156.77 | $114.02 | $42.75 |
| Cyclobenzaprine Powder | 38779039508 | 2 | $101.97 | $74.13 | $27.84 |
| Flurbiprofen Powder | 38779273908 | 20 | $804.74 | $585.28 | $219.46 |
| Ethoxy Diglycol Liquid | 38779190301 | 15 mL | $5.58 | $4.10 | $1.48 |
| Gabapentin Powder | 38779246108 | 6 | $394.96 | $287.28 | $107.68 |
| Pentravan Cream | 51552091906 | 48 | $105.63 | $87.26 | $18.37 |
| | | | $1,593.23 | $1,169.18 | **$424.05** |

408.     Even assuming that Direct Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Direct Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Direct Rx would have only been lawfully entitled to charge and collect $1,169.18 for the Compound Rx 220W Compounded Product purportedly dispensed to Allstate Claimant A.J., provided that this Compounded Product was necessary to treat any of this Allstate Claimant's accident-related injuries, which it was not.

409.     However, as demonstrated above, the total amount that Direct Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 220W Compounded

Product purportedly provided to this Allstate Claimant exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $424.05.

410.    In connection with the Compound Rx 220W Compounded Product purportedly dispensed and delivered to the Allstate Claimants S.T. and G.H., Direct Rx formulated this Compounded Product, and charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Pentravan Cream | 51552128508 | 48 | $120.00 | $96.00 | $24.00 |
| Flurbiprofen Powder | 38779273908 | 20 | $731.60 | $585.28 | $146.32 |
| Gabapentin Powder | 38779246108 | 6 | $359.10 | $287.28 | $71.82 |
| Ethoxy Diglycol Liquid | 38779190301 | 15 mL | $5.13 | $4.10 | $1.03 |
| Cyclobenzaprine Powder | 38779039508 | 2 | $92.66 | $74.13 | $18.53 |
| Baclofen Powder | 38779038808 | 4 | $142.52 | $114.02 | $28.50 |
| Lidocaine HCL | 38779008105 | 5 | $21.38 | $17.10 | $4.28 |
| | | | $1,472.39 | $1,177.91 | **$294.48** |

411.    Even assuming that Direct Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Direct Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Direct Rx would have only been lawfully entitled to

charge and collect $1,177.91 for the Compound Rx 220W Compounded Product purportedly dispensed to Allstate Claimants S.T. and G.H., provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

412. However, as demonstrated above, the total amount that Direct Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 220W Compounded Product purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $294.48.

413. Accordingly, because (a) the prescription and dispensing of the Compound Rx 220W Compounded Product was not medically necessary for the treatment of any of the Allstate Claimants' reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Direct Rx in connection with its purported provision of this Compounded Product were fraudulent and excessive, Direct Rx's reimbursement demands mailed to Allstate in connection with each of the Allstate Claimants are not compensable under New York's No-Fault laws.

414. To the extent that Allstate was caused to make payments related to these Compound Rx 220W Compounded Products purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the defendants, including Direct Rx, in connection with these Compound Rx 220W Compounded Products.

415. Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Direct Rx in connection with these Compound Rx 220W Compounded Products remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these Compound Rx 220W Compounded Products (a) were never medically necessary for the treatment of the Allstate Claimants' accident-related injuries, and/or (b) were fraudulently and

excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### c.      Compound Rx 2

416.    Certain Allstate Claimants were prescribed "Compound Rx 2," which Compounded Product was prescribed by one or more of the Prescribing Defendants, including Ushyarov, and purportedly dispensed and delivered by one or more of the Pharmacy Defendants, including Refill Rx.

417.    In addition to not being medically necessary, Compound Rx 2 was always dispensed and delivered to Allstate Claimants in a pre-determined, pre-formulated amount.

418.    Moreover, Refill Rx also was caused to mail to Allstate one or more demand for No-Fault reimbursement that reflected an excessive and wholly unlawful charge for the dispensing and delivery of this Compounded Product.

419.    The chart below provides examples of instances where Refill Rx was purportedly caused to dispense and deliver Compound Rx 2 to Allstate Claimants in pre-determined, pre-formulated quantities:

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| J.B. | 0394359822 | Refill Rx | Compound Rx 2 | 12/30/2015 | Label |
| J.C. | 0391540333 | Refill Rx | Compound Rx 2 | 12/21/2015 | Label |
| A.K. | 0407439835 | Refill Rx | Compound Rx 2 | 5/20/2016 | Label |

420.     As proof of the intent of Refill Rx, and those acting on behalf of Refill Rx, to defraud Allstate by unlawfully dispensing Compounded Products under the false pretense that each Compounded Product was specifically formulated to the unique needs of each individual patient, each of the Compound Rx 2 Compounded Products dispensed to the above-listed Allstate Claimants—along with most, if not all, of the other Allstate Claimants that purportedly received this Compounded Product—consisted of the same following generic drugs: Ethoxy Diglycol Liquid, Imipramine Powder, Cyclobenzaprine Powder, Baclofen Powder, and Flurbiprofen Powder.

421.     According to documents mailed to Allstate by, or on behalf of, Refill Rx in support of the charges levied by Refill Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for all of these included drugs were supplied by Medisca.

422.     Each prescription mailed to Allstate by, or on behalf of, Refill Rx in support of the charges levied by Refill Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, called for 87.6 grams of Versapro Cream Base.

423.     According to documents mailed to Allstate by, or on behalf of, Refill Rx in support of the charges levied by Refill Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for the Versapro Cream Base included in Compound Rx 2 were supplied by Medisca.

424.   In connection with the Compound Rx 2 Compounded Product purportedly dispensed and delivered to the Allstate Claimants J.B., J.C., and A.K.[15], Refill Rx formulated this Compounded Product, and charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Versapro Cream Base | 38779252901 | 87.6 | $280.32 | $224.26 | $56.06 |
| Ethoxy Diglycol Liquid | 38779190301 | 12 mL | $4.10 | $3.28 | $0.82 |
| Imipramine Powder | 38779044309 | 3.6 | $107.74 | $32.56 | $75.18 |
| Cyclobenzaprine Powder | 38779039508 | 2.4 | $111.20 | $88.96 | $22.24 |
| Baclofen Powder | 38779038808 | 2.4 | $85.51 | $68.41 | $17.10 |
| Flurbiprofen Powder | 38779273909 | 12 | $438.96 | $351.17 | $87.79 |
| | | | $1,027.83 | $768.63 | **$259.20** |

425.   Even assuming that Refill Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca were not fraudulent or inflated, had Refill Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Refill Rx would have only been lawfully entitled to charge and collect $768.63 for the Compound Rx 2 Compounded Product purportedly dispensed to Allstate

---

[15] The documents submitted to Allstate in support of the charges for the Compound Rx 2 for claimant A.K. reflect a charge of $40.70 for the ingredient Imipramine Powder. Therefore, the amount fraudulently charged for the Compound Rx 2 purportedly dispensed to claimant A.K. was $192.16.

Claimants J.B., J.C., and A.K., provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

426.    However, as demonstrated above, the total amount that Refill Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 2 Compounded Product purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $259.20 for claimants J.B. and J.C. and $192.16 for claimant A.K.

427.    Accordingly, because (a) the prescription and dispensing of the Compound Rx 2 Compounded Product was not medically necessary for the treatment of any of the Allstate Claimants' reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Refill Rx in connection with its purported provision of this Compounded Product were fraudulent and excessive, Refill Rx's reimbursement demands mailed to Allstate in connection with each of the Allstate Claimants are not compensable under New York's No-Fault laws.

428.    To the extent that Allstate was caused to make payments related to these Compound Rx 2 Cream Compounded Products purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the defendants, including Refill Rx, in connection with these Compound Rx 2 Compounded Products.

429.    Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Refill Rx in connection with these Compound Rx 2 Compounded Products remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these Compound Rx 2 Compounded Products (a) were never medically necessary for the treatment of the Allstate Claimants' accident-related injuries, and/or (b) were fraudulently and

excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### d.      Compound Rx 4

430.      "Compound Rx 4" is a Compounded Product prescribed to Allstate Claimants, which Compounded Product was prescribed by certain Prescribing Defendants, including Ushyarov and Barakat, and purportedly dispensed and delivered by one or more of the Pharmacy Defendants, including Direct Rx and Refill Rx.

431.      In addition to not being medically necessary, Compound Rx 4 was always dispensed and delivered to Allstate Claimants in a pre-determined, pre-formulated amount.

432.      Moreover, Direct Rx and Refill Rx also were caused to mail to Allstate one or more demand for No-Fault reimbursement that reflected an excessive and wholly unlawful charge for the dispensing and delivery of this Compounded Product.

433.      The chart below provides examples of instances where Refill Rx and Direct Rx were purportedly caused to dispense and deliver Compound Rx 4 to Allstate Claimants in pre-determined, pre-formulated quantities:

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| L.P. | 0417022126 | Refill Rx | Compound Rx 4 | 8/11/2016 | Stamp |
| L.P. | 0417022126 | Refill Rx | Compound Rx 4 | 6/22/2016 | Stamp |
| C.S. | 0427228093 | Refill Rx | Compound Rx 4 | 9/22/2016 | Label |

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| E.T. | 0407302017 | Refill Rx | Compound Rx 4 | 6/29/2016 | Stamp |
| J.B. | 0436367122 | Direct Rx | Compound Rx 4 | 11/29/2016 | Label |
| J.B. | 0436367122 | Direct Rx | Compound Rx 4 | 2/2/2017 | Label |
| J.B. | 0436367122 | Direct Rx | Compound Rx 4 | 1/4/2017 | Label |
| C.A. | 0442233698 | Direct Rx | Compound Rx 4 | 3/15/2017 | Label |
| J.S. | 0455115931 | Direct Rx | Compound Rx 4 | 6/14/2017 | Stamp |
| Y.P. | 0434199419 | Direct Rx | Compound Rx 4 | 1/5/2017 | Label |
| Y.P. | 0434199419 | Direct Rx | Compound Rx 4 | 12/8/2016 | Label |
| C.R. | 0455115931 | Direct Rx | Compound Rx 4 | 6/14/2017 | Stamp |

434.    As explained below, these Compound Rx 4 Compounded Products purportedly dispensed to the claimants listed in the above chart were neither medically necessary nor lawfully charged.

435.    First, several prescribing providers, including one or more of the Prescribing Defendants, submitted a Letter of Medical Necessity purporting to justify the need for the Compound Rx 4 Compounded Product, but, in actuality, revealing that this Compounded Product was not individualized to the patient to whom it was prescribed.

436.    For instance, on January 26, 2017, Barakat, through Richmond Medical, submitted a Letter of Medical Necessity regarding the Compound Rx 4 Compounded Product prescribed by Barakat to claimant J.B. (claim no. 0436367122).

437.    Subsequently, approximately six (6) months later, on June 30, 2017, David Abbatematteo, M.D., through Metro Pain Specialists, P.C., purported to author a Letter of Medical Necessity in support of the Compound Rx 4 Compounded Product prescribed by him for claimant C.A. (claim no. 0442233698).

438.    Several months following the submission of this Letter of Medical Necessity, on November 7, 2017, Inna Levtsenko, NP, through Metro Pain Specialists, P.C., signed a Letter of Medical Necessity directed to Allstate in support of the Compound Rx 4 Compounded Product prescribed by her for claimant C.R. (claim no. 04551159312).

439.    However, despite pertaining to three (3) individual patients and purportedly being written by three (3) separate providers months apart, these letters share identical substantive language regarding these claimants' rehabilitation programs, treatment, complaints, evaluation results, and impressions.

440.    Therefore, these Letters of Medical Necessity plainly do not evidence any medical necessity for Compound Rx 4 as these letters are essentially mere carbon copy templates distributed to these prescribing providers for submission to insurers such as Allstate as a means to induce these insurers to make payments on fraudulent and non-compensable No-Fault claims for Compounded Products such as Compound Rx 4.

441.    As further proof of the intent of Refill Rx and Direct Rx, and those acting on behalf of Refill Rx and Direct Rx, to defraud Allstate by unlawfully dispensing Compounded Products under the false pretense that each Compounded Product was specifically formulated to the unique

needs of each individual patient, each of the Compound Rx 4 Compounded Products dispensed to the above-listed Allstate Claimants—along with most, if not all, of the other Allstate Claimants that purportedly received this Compounded Product—consisted of the same following generic drugs: Gabapentin Powder, Flurbiprofen Powder, Ethoxy Diglycol Liquid, Menthol EA, Imipramine Powder, Cyclobenzaprine HCL Powder, and Baclofen Powder.

442.    According to documents mailed to Allstate by, or on behalf of, Direct Rx and Refill Rx in support of the charges levied by Direct Rx and Refill Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for all of these included drugs were supplied by Medisca.

443.    The records mailed to Allstate by, or on behalf of, Direct Rx in support of the charges levied by Direct Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above called for 74.4 grams of Versapro Cream Base, while the records mailed to Allstate by, or on behalf of, Refill Rx in support of the charges levied by Refill Rx for purportedly dispensing and delivering this Compounded Produced to the Allstate Claimants listed above, called for 75.1 grams of Versapro Cream Base.

444.    According to documents mailed to Allstate by, or on behalf of, Direct Rx and Refill Rx in support of the charges levied by Direct Rx and Refill Rx for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for the Versapro Cream Base included in Compound Rx 4 were supplied by Medisca.

445.    In connection with the Compound Rx 4 purportedly dispensed and delivered to the Allstate Claimants L.P., C.S., and E.T., Refill Rx formulated this Compounded Product, and charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Versapro Cream Base | 38779252903 | 75.1 | $240.32 | $192.26 | $48.06 |
| Menthol EA | 38779052109 | 5.9 | $13.45 | $10.76 | $2.69 |
| Imipramine Powder | 38779044309 | 3.5 | $39.57 | $31.65 | $7.92 |
| Gabapentin Powder | 38779246109 | 7.1 | $423.02 | $339.95 | $83.07 |
| Flurbiprofen Powder | 38779273909 | 11.8 | $431.64 | $345.32 | $86.32 |
| Ethoxy Diglycol Liquid | 38779190301 | 11.8 mL | $4.04 | $3.23 | $0.81 |
| Cyclobenzaprine Powder | 38779039508 | 2.4 | $111.20 | $88.96 | $22.24 |
| Baclofen Powder | 38779038808 | 2.4 | $85.51 | $68.41 | $17.10 |
|  |  |  | $1,348.75 | $1,080.53 | **$268.22** |

446.    Even assuming that Refill Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca were not fraudulent or inflated, had Refill Rx lawfully billed Allstate in accordance with the prevailing Fee Schedule, Refill Rx would have only been lawfully entitled to charge and collect $1,080.53 for the Compound Rx 4 purportedly dispensed to Allstate Claimants L.P., C.S., and E.T., provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

447.    However, as demonstrated above, the total amount that Refill Rx (or those acting under its direction and control) billed Allstate for the same Compound Rx 4 Compounded Product

purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $268.22.

448.    In connection with the Compound Rx 4 Compounded Products purportedly dispensed and delivered to the Allstate Claimants J.B., C.A., J.S., Y.P., and C.R., Direct Rx formulated this Compounded Product, and charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Versapro Cream Base | 38779252903 | 74.4 | $238.08 | $190.46 | $47.62 |
| Menthol EA | 38779052108 | 6 | $13.45 | $10.94 | $2.51 |
| Imipramine Powder | 38779044305 | 3.6 | $39.57 | $32.56 | $7.01 |
| Gabapentin Powder | 38779246108 | 7.2 | $430.92 | $344.74 | $86.18 |
| Flurbiprofen Powder | 38779273908 | 12 | $438.96 | $351.17 | $87.79 |
| Ethoxy Diglycol Liquid | 38779190301 | 12 mL | $4.04 | $3.28 | $0.76 |
| Cyclobenzaprine Powder | 38779039508 | 2.4 | $111.20 | $88.96 | $22.24 |
| Baclofen Powder | 38779038808 | 2.4 | $85.51 | $68.41 | $17.10 |
|  |  |  | $1,361.73 | $1,090.52 | **$271.21** |

449.    Even assuming that Direct Rx's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca were not fraudulent or inflated, had Direct Rx lawfully billed Allstate in accordance with

the prevailing Fee Schedule, Direct Rx would have only been lawfully entitled to charge and collect $1,090.52 for the Compound Rx 4 purportedly dispensed to Allstate Claimants J.B., C.A., J.S., Y.P., and C.R. provided that this Compounded Product was necessary to treat any of the Allstate Claimants' accident-related injuries, which it was not.

450.    However, as demonstrated above, the total amount that Direct Rx was caused to bill Allstate for the same Compound Rx 4 Compounded Product purportedly provided to Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $271.21.

451.    As noted above, the quantities for the ingredients in Compound Rx 4 Compounded Product as purportedly delivered and dispensed by Refill Rx for Allstate Claimants L.P., C.S., and E.T. differed slightly from the amounts of the identical ingredients contained in the Compound Rx 4 as purportedly dispensed and delivered by Direct Rx for Allstate Claimants J.B., C.A., J.S., Y.P., and C.R.

452.    However, according to documents mailed to Allstate by, or on behalf of, Direct Rx and Refill Rx, each of these pharmacies purportedly dispensed and delivered Compound Rx 4 Compounded Products pursuant to uniform quantities of ingredients.

453.    Accordingly, because (a) the prescription and dispensing of the Compound Rx 4 Compounded Product were not medically necessary for the treatment of any of the Allstate Claimants' reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Direct Rx and Refill Rx in connection with their purported provision of this Compounded Product were fraudulent and excessive, Direct Rx's and Refill Rx's reimbursement demands mailed to Allstate in connection with each of the Allstate Claimants are not compensable under New York's No-Fault laws.

454.     To the extent that Allstate was caused to make payments related to these Compound Rx 4 Compounded Products purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the defendants, including Refill Rx and Direct Rx, in connection with these Compound Rx 4 Compounded Products.

455.     Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, one or more of the Pharmacy Defendants, including Direct Rx and Refill Rx, in connection with these Compound Rx 4 Compounded Products remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these Compound Rx 4 Compounded Products (a) were never medically necessary for the treatment of the Allstate Claimants' accident-related injuries, and/or (b) were fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### e.     Compound Rx GLK

456.     Numerous Allstate Claimants also were prescribed a Compounded Product dubbed "Compound Rx GLK," which Compounded Product was prescribed by one or more Prescribing Defendant, including Ushyarov, Pattugalan, and a provider treating patients under Pattugalan at GONY Medical, and purportedly dispensed and delivered by one or more Pharmacy Defendant, including New Century.

457.     In addition to not being medically necessary, Compound Rx GLK was always dispensed and delivered to Allstate Claimants in a pre-determined, pre-formulated amount.

458.    Moreover, New Century also was caused to mail to Allstate one or more demand for No-Fault reimbursement that reflected an excessive and wholly unlawful charge for the dispensing and delivery of this Compounded Product.

459.    The chart below provides examples of instances where New Century was purportedly caused to dispense and deliver Compound Rx GLK to Allstate Claimants in pre-determined, pre-formulated quantities:

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| R.J. | 0371486648 | New Century | Compound Rx GLK | 7/1/2015 | Stamp |
| R.J. | 0371486648 | New Century | Compound Rx GLK | 7/23/2015 | Stamp |
| R.L. | 0371719170 | New Century | Compound Rx GLK | 9/8/2015 | Stamp |
| N.T. | 0379747909 | New Century | Compound Rx GLK | 12/22/2015 | Stamp |
| N.T. | 0379747909 | New Century | Compound Rx GLK | 9/17/2015 | Stamp |
| R.V. | 0384638532 | New Century | Compound Rx GLK | 9/8/2015 | Stamp |
| G.M. | 0413250424 | New Century | Compound Rx GLK | 6/16/2016 | Stamp |
| M.C. | 0413250424 | New Century | Compound Rx GLK | 7/7/2016 | Stamp |
| C.A. | 0425656220 | New Century | Compound Rx GLK | 9/4/2016 | Stamp |
| D.A. | 0405435025 | New Century | Compound Rx GLK | 3/31/2016 | Stamp |

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| F.R. | 0384833588 | New Century | Compound Rx GLK | 9/29/2015 | Stamp |
| H.M. | 0405435025 | New Century | Compound Rx GLK | 5/6/2016 | Stamp |
| M.A. | 0413250424 | New Century | Compound Rx GLK | 6/12/2016 | Stamp |
| A.T. | 0352982978 | New Century | Compound Rx GLK | 4/6/2015 | Stamp |
| B.I. | 0362848335 | New Century | Compound Rx GLK | 5/5/2015 | Unknown |
| B.D. | 0379562480 | New Century | Compound Rx GLK | 12/15/2015 | Unknown |
| A.T. | 0384317285 | New Century | Compound Rx GLK | 10/1/2015 | Stamp |
| C.G. | 0382538387 | New Century | Compound Rx GLK | 9/8/2015 | Stamp |
| A.O. | 0380638643 | New Century | Compound Rx GLK | 8/24/2015 | Stamp |
| A.O. | 0380638643 | New Century | Compound Rx GLK | 9/21/2015 | Stamp |
| A.L. | 0376140067 | New Century | Compound Rx GLK | 11/3/2015 | Stamp |
| B.F. | 0388586760 | New Century | Compound Rx GLK | 10/26/2015 | Stamp |
| E.C. | 0388586760 | New Century | Compound Rx GLK | 11/23/2015 | Stamp |
| J.C. | 0387016645 | New Century | Compound Rx GLK | 10/26/2015 | Stamp |

| Claimant Initials | Claim No. | Pharmacy Defendant | Name of Compounded Product | Date Purportedly Dispensed and Delivered | Prescribed by Stamp/Label of Ingredients/Quantities |
|---|---|---|---|---|---|
| F.C. | 0372236877 | New Century | Compound Rx GLK | 7/23/2015 | Stamp |
| J.R. | 0372244277 | New Century | Compound Rx GLK | 8/18/2015 | Stamp |
| M.K. | 0380998640 | New Century | Compound Rx GLK | 11/4/2015 | Stamp |
| S.O. | 0356858779 | New Century | Compound Rx GLK | 6/4/2015 | Stamp |
| D.P. | 0377146899 | New Century | Compound Rx GLK | 7/28/2015 | Stamp |
| P.R. | 0412455206 | New Century | Compound Rx GLK | 4/13/2016 | Stamp |
| D.S. | 0430660894 | New Century | Compound Rx GLK | 12/30/2016 | Stamp |
| R.C. | 0450823760 | New Century | Compound Rx GLK | 5/2/2017 | Stamp |
| M.U. | 0460396848 | New Century | Compound Rx GLK | 7/5/2017 | Stamp |
| G.J. | 0462064148 | New Century | Compound Rx GLK | 7/12/2017 | Stamp |
| A.J. | 0462064148 | New Century | Compound Rx GLK | 7/12/2017 | Stamp |

460.    As proof of the intent of New Century, and those acting on behalf of New Century, to defraud Allstate by unlawfully dispensing Compound Rx GLK under the false pretense that each Compounded Product was specifically formulated to the unique needs of each individual patient, each of the Compound Rx GLK Compounded Products purportedly dispensed to the

above-listed Allstate Claimants—along with most, if not all, of the other Allstate Claimants that purportedly received this Compounded Product—consisted of the same following generic drugs: Gabapentin EA, Ketoprofen Powder, and Lidocaine Hydrochloride Monohydrate Powder.

461.    According to documents mailed to Allstate by, or on behalf of, New Century in support of the charges levied by New Century for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for all of these included drugs were supplied by Medisca.

462.    Each prescription mailed to Allstate by, or on behalf of, New Century in support of the charges levied by New Century for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, called for 90 grams of PLO Transdermal Cream.

463.    According to documents mailed to Allstate by, or on behalf of, New Century in support of the charges levied by New Century for purportedly dispensing and delivering this Compounded Product to the Allstate Claimants listed above, the NDCs listed for the PLO Transdermal Cream included in Compound Rx GLK were supplied by Medisca.

464.    In connection with the Compound Rx GLK purportedly dispensed and delivered to the Allstate Claimants R.J., R.L., N.T., R.V., G.M., M.C., C.A., D.A., F.R., H.M., M.A., A.T., B.I., B.D., A.T., C.G., A.O., A.L., B.F., E.C., J.C., F.C., J.R., M.K., O.S., D.P., P.R., D.S., R.C., M.U., G.J., and A.J., New Century formulated this Compounded Product and charged Allstate, as follows:

| Drug Name | NDC | Quantity (in grams) | Total Billed | Total Allowed by Fee Schedule | Amount Fraudulently Charged |
|---|---|---|---|---|---|
| Gabapentin EA | 38779246109[16] | 10 | $598.50 | $478.80 | $119.70 |
| Ketoprofen Powder | 38779007809[17] | 10 | $104.50 | $83.60 | $20.90 |
| Lidocaine Hydrochloride Monohydrate Powder | 38779008209[18] | 10 | $42.75 | $34.20 | $8.55 |
| PLO Transdermal Cream | 38779234001[19] | 90 | $103.50 | $82.80 | $20.70 |
| | | | $849.25 | $679.40 | **$169.85** |

465.    Even assuming that New Century's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca were not fraudulent or inflated, had New Century lawfully billed Allstate in accordance with the prevailing Fee Schedule, New Century would have only been lawfully entitled to charge and collect $679.40 for the Compound Rx GLK Compounded Product purportedly

---

[16] The documents submitted to Allstate in support of the charges for the Compound Rx GLK for claimants N.T. (for the Compound Rx GLK purportedly dispensed on or about December 22, 2015), G.M., M.C., C.A., D.A., H.M., M.A., B.D., E.C., P.R., D.S., R.C., M.U., G.J., and A.J. reflected a NDC of 38779246103 for Gabapentin EA.

[17] The documents submitted to Allstate in support of the charges for the Compound Rx GLK for claimants N.T. (for the Compound Rx GLK purportedly dispensed on or about December 22, 2015) G.M., M.C., C.A., D.A., H.M., M.A., B.D., E.C., P.R., D.S., R.C., M.U., G.J., and A.J. reflected a NDC of 38779007803 for Ketoprofen Powder.

[18] The documents submitted to Allstate in support of the charges for the Compound Rx GLK for claimants N.T. (for the Compound Rx GLK purportedly dispensed on or about December 22, 2015) C.A., D.A., H.M., M.A., B.D., E.C., P.R., R.C., M.U., G.J., and A.J. reflected a NDC of 38779008203 for Lidocaine Hydrochloride Monohydrate Powder.

[19] The documents submitted to Allstate in support of the charges for the Compound Rx GLK for claimants N.T. (for the Compound Rx GLK purportedly dispensed on or about December 22, 2015) C.A., G.M., M.C., C.A., D.M., H.M., M.A., B.D., E.C., P.R., D.S., R.C., M.U., G.J., and A.J. reflected a NDC of 38779234000 for PLO Transdermal Cream.

dispensed to Allstate Claimants R.J., R.L., N.T., R.V., G.M., M.C., C.A., D.A., F.R., H.M., M.A., A.T., B.I., B.D., A.T., C.G., A.O., A.L., B.F., E.C., J.C., F.C., J.R., M.K., O.S., D.P., P.R., D.S., R.C., M.U., G.J., and A.J., provided that these Compounded Products were necessary to treat any of these Allstate Claimants' accident-related injuries, which they were not.

466.    However, as demonstrated above, the total amount that New Century was caused to bill Allstate for the same Compound Rx GLK Compounded Product purportedly provided to these Allstate Claimants exceeds the amount lawfully allowed under the prevailing Fee Schedule by approximately $169.85.

467.    Accordingly, because (a) the prescription and dispensing of the Compound Rx GLK Compounded Product was not medically necessary for the treatment of any of the Allstate Claimants' reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, New Century in connection with its purported provision of this Compounded Product were fraudulent and excessive, New Century's reimbursement demands mailed to Allstate in connection with each of the Allstate Claimants are not compensable under New York's No-Fault laws.

468.    To the extent that Allstate was caused to make payments related to this Compound Rx GLK Compounded Product purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the defendants, including New Century, in connection with this Compound Rx GLK Compounded Product.

469.    Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, New Century in connection with this Compound Rx GLK Compounded Product remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because this Compound Rx GLK Compounded Product (a) was never medically necessary for the

treatment of the Allstate Claimants' accident-related injuries, and/or (b) was fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### f.    *Prescription Drugs*

470.    In addition to their unlawful charges for the Compounded Products (as described in the examples set forth above), the Pharmacy Defendants have also engaged in unlawful, excessive, and deceptive billing practices in connection with the dispensing and delivery of prescription drugs to Allstate Claimants.

471.    In many cases, when Allstate Claimants were prescribed Compounded Products, those same claimants were also prescribed an array of other prescription drugs.

472.    However, the charges submitted to Allstate for those prescription drugs were unlawful and grossly excessive.

473.    For example, as demonstrated in the following table, each time that the majority of the Pharmacy Defendants purportedly dispensed and delivered these prescription drugs to Allstate Claimants, the Pharmacy Defendants submitted charges that were in excess of the drug's AWP:

| Drug Name | Pharmacy Defendant | NDC | AWP (per unit) | Pharmacy Defendant's Charge (per unit) | % of Charges over AWP |
|---|---|---|---|---|---|
| Meloxicam Tab 15mg | Refill Rx | 68180050203 | $4.8444 | $5.0107 | 3.43% |
| Meloxicam Tab 15mg | New Century | 29300012501 | $4.845 | $5.0117 | 3.44% |
| Cyclobenzaprine Tab 10mg | Refill Rx | 00603307932 | $1.09149 | $1.2413 | 13.73% |
| Cyclobenzaprine Tab 10mg | New Century | 10702000710 | $1.16485 | $1.2413 | 6.57% |
| Ibuprofen Tab 800 mg | New Century | 53746046605 | $0.685 | $0.7683 | 12.17% |
| Ibuprofen Tab 800 mg | Direct Rx | 67877032101 | $0.8049 | $0.9605 | 19.33% |

| Drug Name | Pharmacy Defendant | NDC | AWP (per unit) | Pharmacy Defendant's Charge (per unit) | % of Charges over AWP |
|---|---|---|---|---|---|
| Gabapentin Cap 100 mg | New Century | 31722022105 | $0.5324 | $0.5876 | 10.36% |
| Lidocaine Patch 5% | Direct Rx | 00591352530 | $9.36033 | $10.3713 | 10.80% |
| Methocarbamol Tab 500 mg | Direct Rx | 31722053305 | $0.4825 | $0.5802 | 20.25% |
| Naproxen Tab 500 mg | Direct Rx | 68462019005 | $1.1925 | $1.3873 | 16.34% |
| Naproxen Tab 500 mg | New Century | 65162019050 | $1.14678 | $1.2303 | 7.29% |
| Terocin 4% Film | Direct Rx | 50488100101 | $42.6 | $47.01 | 10.35% |
| Tramadol HCL Tab 50 mg | New Century | 57664037713 | $0.81656 | $1.0343 | 26.66% |

474.   To compound their already unlawful and excessive billing for these prescription drugs, the Pharmacy Defendants' charges for each of the following medications exceeded the Fee Schedule's lawful allowable charges by substantial percentages:

| Drug Name | Pharmacy Defendant | NDC | Pharmacy Defendant's Charge (per unit) | Amount Allowed under Fee Schedule (per unit) | % In Excess of Fee Schedule |
|---|---|---|---|---|---|
| Meloxicam Tab 7.5 mg | New Century | 29300012401 | $3.1687 | $2.53496 | 28.30% |
| Meloxicam Tab 15 mg | Refill Rx | 68180050203 | $5.0107 | $3.87552 | 29.29% |
| Cyclobenzaprine Tab 10 mg | Refill Rx | 00603307932 | $1.2413 | $0.873192 | 42.16% |
| Cyclobenzaprine Tab 10 mg | Direct Rx | 00603307928 | $1.11422 | $1.3753 | 54.29% |
| Cyclobenzaprine Tab 10 mg | New Century | 00603307932 | $1.2577 | $0.873192 | 44.03% |
| Ibuprofen Tab 800 mg | New Century | 53746046605 | $0.7683 | $0.548 | 40.21% |
| Ibuprofen Tab 800 mg | Direct Rx | 67877032101 | $0.9605 | $0.64392 | 19.33% |
| Gabapentin Cap 100 mg | New Century | 31722022105 | $0.5876 | $0.42592 | 37.95% |

| Drug Name | Pharmacy Defendant | NDC | Pharmacy Defendant's Charge (per unit) | Amount Allowed under Fee Schedule (per unit) | % In Excess of Fee Schedule |
|---|---|---|---|---|---|
| Lidocaine Patch 5% | Direct Rx | 00591352530 | $10.3713 | $7.488264 | 38.50% |
| Methocarbamol Tab 750 mg | Refill Rx | 00603448628 | $0.6897 | $0.69 | 25.05% |
| Methocarbamol Tab 500 mg | Direct Rx | 31722053305 | $0.5802 | $0.386 | 50.32% |
| Naproxen Tab 500 mg | Direct Rx | 68462019005 | $1.3873 | $0.954 | 45.42% |
| Naproxen Tab 500 mg | Refill Rx | 53746019005 | $1.147 | $0.917424 | 25.02% |
| Naproxen Tab 500 mg | New Century | 65162019050 | $1.14678 | $1.2303 | 34.11% |
| Terocin 4% Film | Direct Rx | 50488100101 | $47.01 | $37.488 | 25.40% |
| Terocin Patch 4% | New Century | 50488100101 | $42.6833 | $37.488 | 13.86% |
| Terocin Patch 4% | Refill Rx | 50488100101 | $42.60 | $37.488 | 13.64% |

475.    Accordingly, it is clear that the majority of the Pharmacy Defendants have unlawfully and grossly overcharged Allstate in connection with these and other prescription drugs.

476.    Overall, and by way of example, the majority of the Pharmacy Defendants and those working on their behalf unlawfully overcharged Allstate by the following amounts each and every time that these prescription drugs were dispensed and delivered to an Allstate Claimant. All of these charges are grossly excessive, and are designed to (a) induce Allstate to pay the Pharmacy Defendants more than lawfully allowed, and (b) provide, upon information and belief, the Pharmacy Defendants with the finances necessary to engage in the unlawful financial and referral relationships with prescribing providers:

| Drug Name | Pharmacy Defendant | NDC | Qty | Pharmacy Defendant's Invoice Price | Allowed Charge (per Fee Schedule) | Variance (Excess Charged) |
|---|---|---|---|---|---|---|
| Meloxicam Tab 7.5 mg | New Century | 29300012401 | 60 | $195.14 | $152.10 | $43.04 |

| Drug Name | Pharmacy Defendant | NDC | Qty | Pharmacy Defendant's Invoice Price | Allowed Charge (per Fee Schedule) | Variance (Excess Charged) |
|---|---|---|---|---|---|---|
| Meloxicam Tab 15 mg | Refill Rx | 68180050203 | 30 | $150.32 | $116.27 | $34.05 |
| Cyclobenzaprine Tab 10 mg | Direct Rx | 00603307928 | 30 | $41.26 | $26.74 | $14.52 |
| Cyclobenzaprine Tab 10 mg | New Century | 00603307932 | 30 | $37.73 | $26.20 | $11.53 |
| Cyclobenzaprine Tab 10mg | Refill Rx | 00603307932 | 30 | $37.24 | $26.20 | $11.04 |
| Ibuprofen Tab 800 mg | New Century | 53746046605 | 60 | $46.10 | $32.88 | $13.22 |
| Ibuprofen Tab 800 mg | Direct Rx | 67877032101 | 60 | $38.64 | $42.50 | $18.99 |
| Lidocaine Patch 5% | Direct Rx | 00591352530 | 60 | $622.28 | $449.30 | $172.98 |
| Methocarbamol Tab 500 mg | Direct Rx | 31722053305 | 90 | $52.22 | $34.74 | $17.48 |
| Methocarbamol Tab 750 mg | Refill Rx | 00603448628 | 30 | $20.70 | $16.55 | $4.15 |
| Naproxen Tab 500 mg | Direct Rx | 68462019005 | 60 | $83.24 | $57.24 | $26.00 |
| Naproxen Tab 500 mg | New Century | 65162019050 | 60 | $73.82 | $55.05 | $18.77 |
| Terocin 4% Film | Direct Rx | 50488100101 | 30 | $1,410.30 | $1,124.64 | $285.66 |
| Terocin Patch 4% | Refill Rx | 50488100101 | 30 | $1,278.00 | $1,124.64 | $153.36 |
| Terocin Patch 4% | New Century | 50488100101 | 60 | $2,561.00 | $2,249.28 | $311.72 |

477.   In addition to the fact that most, if not all, of the Allstate Claimants did not require these prescription drugs in the quantities purportedly dispensed to the Pharmacy Defendants, because the charges submitted to Allstate by, or on behalf of, the majority of the Pharmacy Defendants in connection with these prescription drugs—and many others—were fraudulent, unlawful, and excessive, these Pharmacy Defendants' reimbursement demands mailed to Allstate in connection with each of the Allstate Claimants are not compensable under New York's No-Fault laws.

478.     To the extent that Allstate was caused to make payments related to these, and other, prescription drugs purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, the Pharmacy Defendants in connection with all such prescription drugs.

479.     Moreover, to the extent that any of the charges submitted in connection with any such prescription drugs remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these prescription drugs (a) were fraudulently and excessively charged, and/or (b) were virtually never medically necessary for the treatment of the Allstate Claimants' accident-related injuries, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### 2.     Price Inflation

#### a.     *Compounded Products*

480.     The defendants' scheme to defraud Allstate through the purported dispensing and delivery of the Compounded Products and other non-prescription drugs is made all the more lucrative by the fact that the already inflated and excessive fees charged by the majority of the Pharmacy Defendants, in most cases, bear no relation to these Pharmacy Defendants' actual acquisition costs for the drugs included in the Compounded Products, or for the non-prescription drugs provided to Allstate Claimants, such as Terocin pain patches.

481.     As stated above, many of the drugs included in the Pharmacy Defendants' Compounded Products are sourced from Medisca.

482.     To calculate their charges for the Compounded Products, the Pharmacy Defendants use the AWP reported by Medisca for the drugs used in the Compounded Products.

483. While the AWP serves as the pricing benchmark for the drugs used in the Pharmacy Defendants' Compounded Products, the reported AWPs for the Medisca drugs used in the Pharmacy Defendants' Compounded Products are inflated, and bear absolutely no relation to the cost incurred, or most likely incurred, by the Pharmacy Defendants in obtaining these drugs for use in their Compounded Products.

484. For example, the generic Medisca drug Baclofen Powder, which was used in the Compound Rx 218N, Compound Rx 220W, Compound Rx 2, and Compound Rx 4 Compounded Products discussed above, and which is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-0388-08, had, at the time that the Compounded Products were dispensed and billed to Allstate, a reported AWP of $35.63 per gram.

485. However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Baclofen Powder were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Baclofen Powder at an average cost of $2.08 per gram.

486. Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and then charged for Baclofen Powder in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $33.55 for each gram of Baclofen Powder purportedly used.

487. As another example, the generic Medisca drug Cyclobenzaprine Powder, which was used in the Compound Rx 218N, Compound Rx 4, and Compound Rx 2 Compounded Products discussed above and is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-0395-05 and/or NDC 38779-0395-08, had, at the time that the Compounded Products were dispensed and billed to Allstate, a reported AWP of $46.332 per gram.

488.    However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Cyclobenzaprine Powder were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Cyclobenzaprine Powder at an average cost of $3.02 per gram.

489.    Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and then charged for Cyclobenzaprine Powder in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $43.31 for each gram of Cyclobenzaprine Powder purportedly used.

490.    As another example, the generic Medisca drug Flurbiprofen Powder, which was used in the Compound Rx 220W, Compound Rx 4, and Compound Rx 2 Compounded Products discussed above and is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-2739-09 and/or NDC 38779-2739-08, had, at the time that the Compounded Products were dispensed and billed to Allstate, a reported AWP of $36.58 per gram.

491.    However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Flurbiprofen Powder were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Flurbiprofen Powder at an average cost of $1.70 per gram.

492.    Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and then charged for Flurbiprofen Powder in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $34.88 for each gram of Flurbiprofen Powder purportedly used.

493.    The generic Medisca drug Ethoxy Diglycol Liquid, which was used in the Compound Rx 218N, Compound Rx 220W, Compound Rx 4, and Compound Rx 2 Compounded

Products discussed above, and which is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-1903-01, had, at the time that these Compounded Products were billed to Allstate, a reported AWP of $0.342 per unit.

494.    However, during the time that the Pharmacy Defendants' Compounded Products containing Ethoxy Diglycol Liquid were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Ethoxy Diglycol Liquid at an average cost of $0.06 per unit.

495.    Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and then charged for Ethoxy Diglycol Liquid sourced from Medisca in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $0.28 per unit.

496.    The generic Medisca drug Imipramine Powder, which was used in Compound Rx 4 and Compound Rx 2 discussed above, and which is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-0443-09 and/or NDC 38779-0443-05, had, at the time that the Compounded Products were billed to Allstate, a reported AWP of $11.305 per gram.

497.    However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Imipramine Powder were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Imipramine Powder at an average cost of $1.36 per gram.

498.    Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and charged for Imipramine Powder in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $9.95 for each gram of Imipramine Powder purportedly used.

499.   The generic Medisca drug Ketoprofen Powder, which was used in the Compound Rx 218N and Compound Rx GLK Compounded Products discussed above, and which is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-0078-08 and/or NDC 38779-0078-09, had, at the time that the Compounded Products were billed to Allstate, a reported AWP of $10.45 per gram.

500.   However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Ketoprofen Powder were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Ketoprofen Powder at an average cost of $0.39 per gram.

501.   Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and then charged for Ketoprofen Powder sourced by Medisca in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $10.06 for each gram of Ketoprofen Powder purportedly used.

502.   The generic Medisca drug Lidocaine Powder, which was used in the Compound Rx 220W Compounded Product discussed above, and which is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-0081-05 and/or NDC 38779-0081-03 had, at the time that the Compounded Products were dispensed and billed to Allstate, a reported AWP of $4.275 per gram.

503.   However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Lidocaine Powder were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Lidocaine Powder at an average cost of $0.16 per gram.

504.   Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants

included and then charged for Lidocaine Powder obtained from Medisca in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $4.12 for each gram of Lidocaine Powder purportedly used.

505.    The generic Medisca drug Lidocaine Hydrochloride Powder, which was used in the Compound Rx 218N, Compound Rx 220W, and Compound Rx GLK Compounded Products discussed above, and which is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-0082-09 and/or NDC 38779-0082-08, had, at the time that the Compounded Products were billed to Allstate, a reported AWP of $4.275 per gram.

506.    However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Lidocaine Hydrochloride Powder were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Lidocaine Hydrochloride Powder at an average cost of $0.15 per gram.

507.    Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and then charged for Lidocaine Hydrochloride Powder obtained from Medisca in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $4.13 for each gram of Lidocaine Hydrochloride Powder purportedly used.

508.    The generic Medisca drug Versapro Cream Base, which was used in the, Compound Rx 4 and Compound Rx 2 Compounded Products discussed above and is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-2529-03 and/or NDC 38779-2529-01, had, at the time that the Compounded Products were billed to Allstate, a reported AWP of $3.20 per gram.

509.     However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Versapro Cream Base were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Versapro Cream Base at an average cost of $0.06 per gram.

510.     Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and then charged for Versapro Cream Base obtained from Medisca in their Compounded Products, the Pharmacy Defendants stood to realize a profit approximately $3.14 for each gram of Versapro Cream Base purportedly used.

511.     As a final example of the profit generated by the defendants' scheme to defraud Allstate, the generic Medisca drug Gabapentin Powder, which was used in the Compound Rx 218N, Compound Rx 220W, Compound Rx 4, and Compound Rx GLK Compounded Products discussed above and is commonly listed on the Pharmacy Defendants' dispensing documents as NDC 38779-2461-08 and/or NDC 38779-2461-09, had, at the time that the Compounded Products were dispensed and billed to Allstate, a reported AWP of $59.85 per gram.

512.     However, during the time that the Pharmacy Defendants' Compounded Products containing Medisca's Gabapentin Powder were dispensed to Allstate Claimants and billed to Allstate, Medisca offered Gabapentin Powder at an average cost of $1.06 per gram.

513.     Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 20% reduction required by the Fee Schedule, each time that the Pharmacy Defendants included and then charged for Gabapentin Powder obtained from Medisca in their Compounded Products, the Pharmacy Defendants stood to realize a profit of approximately $58.79 for each gram of Gabapentin Powder purportedly used.

514.    The chart below demonstrates Direct Rx's total acquisition costs and gross profit for the Compound Rx 4 Compounded Product purportedly dispensed to Allstate Claimant Y.P. (claim no. 0434199419) on or about January 5, 2017:

| Ingredient | NDC | AWP Unit Price | Qty | Total Billed | Total Allowed by Fee Schedule | Total Acquisition Cost | Gross Profit |
|---|---|---|---|---|---|---|---|
| Gabapentin Crystal | 38779246108 | $59.85 | 7.2 | $430.92 | $344.74 | $7.61 | $423.31 |
| Flurbiprofen Powder | 38779273908 | $36.58 | 12 | $438.96 | $351.17 | $20.41 | $418.55 |
| Versapro Cream Base | 38779252903 | $3.20 | 74.4 | $238.08 | $190.46 | $4.24 | $233.84 |
| Ethoxy Diglycol Liquid | 38779190301 | $0.34 | 12 | $4.04 | $3.28 | $0.75 | $3.29 |
| Menthol | 38779052108 | $2.28 | 6 | $13.45 | $10.94 | $1.68 | $11.77 |
| Imipramine Powder | 38779044305 | $11.31 | 3.6 | $39.57 | $32.56 | $4.90 | $34.67 |
| Cyclobenzaprine Powder | 38779039508 | $46.33 | 2.4 | $111.20 | $88.96 | $7.25 | $103.95 |
| Baclofen Powder | 38779038808 | $35.63 | 2.4 | $85.51 | $68.41 | $5.00 | $80.51 |
| | | | | $1,361.73 | $1,090.52 | $51.84 | $1,309.89 |

515.    The chart below demonstrates Refill Rx's total acquisition costs and gross profit for the Compound Rx 2 Compounded Product purportedly dispensed to Allstate Claimant J.B. (claim no. 0394359822) on or about December 30, 2015:

| Ingredient | NDC | AWP Unit Price | Qty | Total Billed | Total Allowed by Fee Schedule | Total Acquisition Cost | Gross Profit |
|---|---|---|---|---|---|---|---|
| Versapro Cream Base | 38779252901 | $3.20 | 87.6 | $280.32 | $224.26 | $4.99 | $275.33 |
| Ethoxy Diglycol Liquid | 38779190301 | $0.34 | 12 | $4.10 | $3.28 | $0.75 | $3.35 |
| Imipramine Powder | 38779044309 | $11.31 | 3.6 | $107.74 | $32.56 | $4.90 | $102.84 |
| Cyclobenzaprine Powder | 38779039508 | $46.33 | 2.4 | $111.20 | $88.96 | $7.25 | $103.95 |
| Baclofen Powder | 38779038808 | $35.63 | 2.4 | $85.51 | $68.41 | $5.00 | $80.51 |
| Flurbiprofen Powder | 38779273909 | $36.58 | 12 | $438.96 | $351.17 | $20.41 | $418.55 |
|  |  |  |  | $1,027.83 | $768.63 | $43.30 | $984.53 |

### b. *Terocin Pain Patches*

516.  As described above, certain Pharmacy Defendants' charges related to the dispensing and delivery of Terocin pain patches to Allstate Claimants were unlawful because the Terocin pain patch is an over-the-counter drug, and, as such, is not reimbursable under No-Fault.

517.  However, even if the Terocin pain patches were reimbursable, these Pharmacy Defendants' charges for these items, like all of the drugs contained in their Compounded Products, are grossly excessive and bear no relation to these Pharmacy Defendants' acquisition costs.

518.  Like the drugs contained in their Compounded Products, to calculate their charges for the Terocin pain patches, these Pharmacy Defendants use the AWP reported by the manufacturer of the Terocin pain patches.

519.     While the AWP serves as the pricing benchmark for prescription drugs covered under No-Fault, the reported AWP for Terocin pain patches are inflated, and bear absolutely no relation to the cost most likely incurred by the Pharmacy Defendants in obtaining these items.

520.     The Terocin pain patches (NDC 50488-1001-01), which are sold as packages containing ten (10) "units" (i.e., patches) had a reported AWP of $32.60 per patch from June 1, 2013 to July 30, 2015, and then $42.60 per patch from July 1, 2015 until February 27, 2017, at which time the AWP increased to $48.50 per patch.

521.     However, on or about November 4, 2016 (when the reported AWP per patch was $42.60), one or more Pharmacy Defendant purchased the same Terocin pain patches dispensed by the Pharmacy Defendants from the manufacturer for $3.50 per patch.

522.     Accordingly, taking into account the Pharmacy Defendants' demonstrated failure to take the 12% reduction required by the Fee Schedule for brand name drugs (assuming that Terocin pain patches were chargeable under the Fee Schedule, which they are not), each time that these Pharmacy Defendants dispensed Terocin pain patches to an Allstate Claimant and then billed Allstate at the time that the reported AWP per patch was $42.60, these Pharmacy Defendants realized a profit of $39.10 for each patch dispensed.

523.     Considering that these Pharmacy Defendants dispensed thirty (30) or sixty (60) Terocin pain patches at a time to Allstate Claimants, these Pharmacy Defendants attempted to realize a profit of between $1,173.00 and $2,346.00 every time that they were caused to dispense Terocin pain patches to an Allstate Claimant between July 1, 2015 and February 27, 2017.

524.     Therefore, the billing for over-the-counter Terocin pain patches as if these patches required a prescription was a lucrative addition to the defendants' scheme to defraud Allstate, and served no purpose other than to line the pockets of certain of the Pharmacy Defendants and provide

an additional income source used by these Pharmacy Defendants and the Pharmacy Owner Defendants to maintain unlawful financial relationships with certain prescribing providers, including, upon information and belief, one or more of the Prescribing Defendants.

### 3.    Billing for Drugs Never Actually Dispensed

525.    One or more of the Pharmacy Defendants have also schemed to defraud Allstate by seeking No-Fault reimbursement payments in connection with drugs and medications, including Compounded Products, that were never actually dispensed to, or received by, one or more Allstate Claimant.

526.    Even though the billed-for drugs and medications were never dispensed to, or received by, such Allstate Claimant(s), one or more of the Pharmacy Defendants, and those acting on their behalf, have aggressively pursued No-Fault payments from Allstate for such drugs and medications in direct violation of New York law.

527.    For example, Allstate Claimant J.V. (claim no. 0435243605) sought healthcare services from Pattugalan at GONY Medical following a motor vehicle accident that took place on November 2, 2016.

528.    J.V. first treated with Pattugalan on November 8, 2016.

529.    That very day, on November 8, 2016, Carline Boubert, the physician assistant working with Pattugalan at GONY Medical, prescribed a Compounded Product to J.V., which was purportedly dispensed and delivered to J.V. on or about November 9, 2016 by New Century.

530.    However, J.V. adamantly denies having received any creams during the course of his treatment in connection with the November 2, 2016 motor vehicle accident either through the mail or in person.

531. Despite J.V.'s having never received any Compounded Products from any healthcare providers in connection with this accident, on or about November 29, 2016, New Century mailed to Allstate an NF-3 form and supporting documentation demanding payment for a Compounded Product purportedly dispensed and delivered to J.V.

532. The Compounded Product purportedly dispensed and delivered to J.V. by New Century consisted of the following medications: Gabapentin powder (10g); Ketoprofen powder (10g); and Lidocaine HCL powder (10g).

533. According to the NF-3 mailed to Allstate by (or on behalf of) New Century, a total payment of $849.25 was demanded by New Century in connection with the Compounded Product purportedly delivered to J.V.

534. Overall, J.V. never received this Compounded Product from New Century listed on the NF-3 form and supporting documents mailed to Allstate by New Century in connection with New Century's No-Fault reimbursement demands.

535. Another Allstate Claimant, J.F. (claim no. 0451978225) was injured in a motor vehicle accident on March 10, 2017.

536. On March 29, 2017, New Century purportedly delivered Terocin pain patches to J.F.

537. However, J.F. maintains that he did not receive any Terocin pain patches.

538. Despite J.F.'s having never received any Terocin pain patches from any healthcare providers in connection with this accident, on or about April 13, 2017, New Century mailed to Allstate an NF-3 form and supporting documentation demanding payment for the Terocin pain patches purportedly dispensed and delivered to J.F.

539.    New Century billed Allstate $2,561.00 for Terocin pain patches purportedly dispensed to J.F. on March 29, 2017.

540.    Overall, J.F. never received these Terocin pain patches from New Century listed on the NF-3 form and supporting documents mailed to Allstate by New Century in connection with New Century's No-Fault reimbursement demands.

541.    Similarly, Allstate Claimant R.G. (claim no. 0450985007) was injured in a motor vehicle accident on March 23, 2017.

542.    R.G. had an initial visit on March 29, 2017 with El-Sanduby at NY Medical Arts in connection with the injuries that she sustained in this motor vehicle accident.

543.    This same day, on March 29, 2017, El-Sanduby prescribed to R.G. a Compound Rx 218N Compounded Product, which was purportedly delivered to R.G. by Direct Rx on or about March 31, 2017.

544.    However, R.G. denies having received any creams in connection with this accident.

545.    The Compounded Product purportedly dispensed and delivered to R.G. by Direct Rx consisted of the following medications: Lidocaine HCL powder (2.5g); Ketoprofen powder (20g); Ibuprofen powder (20g); Gabapentin powder (6g); Ethoxy Diglycol liquid (17.5 mL); Cyclobenzaprine HCL powder (2g); and Baclofen powder (2g).

546.    According to the NF-3 form mailed to Allstate by (or on behalf of) Direct Rx on or about April 25, 2017, a total payment of $923.10 was demanded by Direct Rx in connection with the Compounded Product purportedly delivered to R.G.

547.    Overall, R.G. never received this Compounded Product from Direct Rx listed on the NF-3 form and supporting documents mailed to Allstate by New Century in connection with Direct Rx's No-Fault reimbursement demands.

548.    To the extent that Allstate was caused to make payments related to any Compounded Products or other drugs that were never actually dispensed or delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, the Pharmacy Defendants in connection with all such undelivered items.

549.    Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, the Pharmacy Defendants in connection with these undelivered Compounded Products or other drugs remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions.

### E.    FRAUDULENT PROVISION OF MEDICAL SERVICES AND TREATMENTS

550.    As a part of this scheme, the Prescribing Defendants and the PC Defendants engaged in numerous unlawful acts, including (a) providing and billing for physician services in a fraudulent manner, and (b) recommending and administering a battery of excessive and unwarranted examinations, tests, and treatments as a means of collecting payments from Allstate.

551.    The documents and invoices created and submitted to Allstate by (or on behalf of) the PC Defendants routinely misrepresented that the billed-for services were performed in a legitimate and clinically-reasonable manner.

552.    However, as explained below, the tests and treatments provided to patients of the PC Defendants were medically unnecessary and excessive.

553.    The PC Defendants also falsely billed Allstate by misrepresenting the nature and extent of the services that were actually provided.

554.    As alleged herein, not only has this scheme injured Allstate, but it has also compromised and/or endangered the well-being of the Prescribing Defendants' and the PC

Defendants' patients by subjecting them to tests and treatments that were not warranted, and to medications that were not proven safe or effective.

555.    Because of the misconduct described below, none of the PC Defendants' claims for No-Fault reimbursement under Insurance Law § 5102 are—or ever were—compensable.

### 1.    Examinations and Consultations

556.    The patient examinations and consultations were vital to both the PC Defendants' efforts to defraud Allstate, and to the overall success of the defendants' scheme to defraud.

557.    At the beginning of treatment, these initial encounters helped set the stage for excessive and unwarranted patient care by opening several avenues through which the PC Defendants could obtain payments from Allstate—payments that they were not lawfully entitled to receive.

558.    In most cases, the results of these examinations and evaluations were used to justify the battery of tests and treatments that were provided to patients of the PC Defendants.

559.    These encounters also provided an opportunity for the Prescribing Defendants to write prescriptions for patients of the PC Defendants.  These prescriptions were often for Compounded Products and other drugs, and were always filled by a Pharmacy Defendant.

560.    Because the examinations and evaluations were always cursory and insubstantial, the PC Defendants' charges for these services were false and fraudulent.

561.    As detailed above, the Fee Schedule is used by providers and insurers to determine the level of reimbursement payable on legitimate claims.

562.    The Fee Schedule uses Current Procedural Terminology ("CPT") codes, modifiers, and descriptions.

563.    CPT codes are created and owned by the American Medical Association ("AMA"), and are found in the CPT codebook, a publication that is updated annually.  The CPT codes reflect current medical practice.

564.    To receive correct payment for their services, providers must correctly identify the procedure performed.

565.    Generally, the Fee Schedule's reimbursement rates are determined by considering the (a) the physician work associated with the procedure, (b) the practice expense associated with providing the service, and (c) the malpractice expense.

566.    Reimbursement for medical services is directly proportionate to the level of the CPT code billed (i.e., the higher the level of CPT code billed, the greater the amount of reimbursement).

567.    Billing a service at a higher level CPT code than actually performed, for the purpose of receiving greater reimbursement, is an example of a fraudulent billing practice, and such charges are not compensable.

568.    The PC Defendants charged Allstate for patient examinations under CPT codes 99204 and 99205.

569.    These charges were false and fraudulent because by using these CPT codes, the PC Defendants made several misrepresentations about the nature and extent of these examinations and evaluations.

570.    For example, any charges for examinations submitted under CPT codes 99204 or 99205 must meet the criteria listed below:

| CPT Code | History | Examination | Medical Decision Making | Face to Face Time |
|---|---|---|---|---|
| 99202 | Expanded Problem Focused | Expanded Problem Focused | Straight forward | 20 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

571.    Thus, any charges for examinations classified under CPT codes 99204 or 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "high complexity," and (d) face-to-face time of either forty-five (45) or sixty (60) minutes.

572.    In the case of such patient examinations, the factors considered to determine the "complexity" of medical decision making when assigning a proper CPT code designation include:

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data To Be Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| Straight forward medical decision making (CPT 99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT 99203) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT 99204) | Multiple | Moderate | Moderate |
| High complexity decision making (CPT 99205) | Extensive | Extensive | High |

573.    To qualify for a given type of decision making, two of the three elements in the table must be met or exceeded.

574.    Because their examinations were actually minimal and insubstantial, the PC Defendants' representations about the nature and extent of the services were false, and the charges based on these misrepresentations were equally false.

575.    Because the examinations provided to the PC Defendants' patients were falsely billed, each charge submitted to Allstate by the PC Defendants for these examinations is not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibits 1-5.

576.    To the extent that Allstate paid the PC Defendants in reliance on the documents created and submitted to Allstate by the PC Defendants in connection with any examinations provided and billed for under CPT codes 99204 or 99205, Allstate is entitled to recover all payments made to the PC Defendants in connection with any such examinations, including, but not limited to, the examinations listed in Exhibits 1-5.

577.    Additionally, to the extent that any of the PC Defendants' charges submitted in connection with these examinations remain unpaid (including, but not limited to, the examinations listed in Exhibits 1-5), Allstate is under no obligation to make any payments in connection with those transactions because the examinations were falsely billed, and are therefore not compensable under New York's No-Fault Laws.

578.    The PC Defendants also engaged in similar misconduct with respect to patient consultations billed under CPT codes 99244 and 99245.

579.    A "consultation" is a type of service provided by a physician whose opinion or advice regarding the evaluation and/or management of a specific problem is requested by another physician or appropriate source.

580.    The request for consultation must be documented in the chart by a written consultation request or documentation of a telephone request for consultation.

581.    Here, the required consultation request was never present in any of the records submitted in support of the PC Defendants' claims.

582.    Additionally, the CPT codes used by the PC Defendants when charging Allstate for these consultations deliberately misrepresented the nature and extent of the services actually rendered.

583.    The criteria used to assign the correct CPT code to an initial patient consultation includes consideration of the following components:

| CPT Code | History | Examination | Medical Decision Making | Face to Face Time |
|---|---|---|---|---|
| 99241 | Problem Focused | Problem Focused | Straight forward | 15 minutes |
| 99242 | Expanded problem focused | Expanded problem focused | Straight forward | 30 minutes |
| 99243 | Detailed | Detailed | Low complexity | 40 minutes |
| 99244 | Comprehensive | Comprehensive | Moderate complexity | 60 minutes |
| 99245 | Comprehensive | Comprehensive | High complexity | 80 minutes |

584.    Thus, a provider may only charge for consultations under CPT codes 99244 or 99245 if they include (a) a comprehensive history, (b) a comprehensive examination, (c) medical decision making of "moderate complexity," and (d) face-to-face time of either sixty (60) or eighty (80) minutes.

585.    The factors considered to determine the "complexity" of medical decision-making when assigning a proper CPT code designation include:

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data To Be Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| Straight forward medical decision making (CPT 99241-99242) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT 99243) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT 99244) | Multiple | Moderate | Moderate |
| High complexity decision making (CPT 99245) | Extensive | Extensive | High |

586.    As with examinations, to qualify for a given type of decision making when charging for consultations, providers must meet or exceed two of the three elements in the table set forth above.

587.    Because their consultations were actually cursory and insubstantial, the PC Defendants' representations about the nature and extent of the services were false, and the charges based on these misrepresentations were equally false.

588.    Because the consultations provided to the PC Defendants' patients were falsely billed, each charge submitted to Allstate by the PC Defendants for these consultations is not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibits 1-5.

589.    To the extent that Allstate paid the PC Defendants in reliance on the documents created and submitted to Allstate by the PC Defendants in connection with any consultations provided and billed for under CPT codes 99244 or 99245, Allstate is entitled to recover all payments made to the PC Defendants in connection with any such consultations, including, but not limited to, the consultations listed in Exhibits 1-5.

590.    Additionally, to the extent that any of the PC Defendants' charges submitted in connection with these consultations remain unpaid (including, but not limited to, the consultations listed in Exhibits 1-5), Allstate is under no obligation to make any payments in connection with those transactions because the consultations were falsely billed, and are therefore not compensable under New York's No-Fault Laws.

### 2.    Diagnostic Testing

591.    Electrodiagnostic ("EDX") testing services, such as needle electromyography ("EMG") studies and nerve conduction velocity ("NCV") studies, were a cornerstone of the PC Defendants' practices.

592.    The provision of EDX testing services to patients was of great benefit to the PC Defendants' scheme to defraud Allstate because (a) the studies are expensive, and (b) the results of the studies could—and would—most often be used to justify the prescription and provision of further unnecessary medical services.

593.    Two major types of EDX tests are NCV studies, and needle EMG tests.

594.    NCV studies are non-invasive studies in which peripheral nerves are stimulated with electrical current.

595.    EMG tests measure the electrical activity of muscles, and are often done in connection with NCV studies.

596.    An EMG test involves the insertion of a needle into various muscles in the spinal area ("paraspinal muscles"), and in the arms and/or legs to measure electrical activity in each muscle.

597.    EDX testing must never follow a predetermined protocol.  The decision of which nerves and muscles to test in each limb should be tailored to each patient's unique circumstances, and to their unique EDX findings.

598.    In a legitimate clinical setting, the decision of which nerves to study for each patient is based on (a) an evaluation of the patient's history, (b) a detailed neurologic examination of the patient, and (c) the "real time" results obtained during the actual tests.

599.    As a result, the nature and extent of EDX studies should vary from patient to patient.

600.    For example, if an abnormality is found during the tests, further investigation should be undertaken to determine the exact nature of the abnormality and the scope of the problem in terms of the number of nerves involved.

601.    Moreover, the nerves and muscles chosen for EDX testing must depend on each patient's specific complaints, physical examination findings, and prior EDX findings.

602.    In other words, the nature and extent of EDX testing should never be the same for every patient.

603.    Throughout the course of this scheme, the PC Defendants deployed EDX testing without any basis in evidence-based guidelines and contrary to the standard of care.

604.    For example, the Prescribing Defendants and the PC Defendants consistently rendered EDX studies bilaterally without any medical indication whatsoever, which indicates that the tests were never tailored to the particulars of each patient. Indeed, the PC Defendants' patients underwent EDX testing even without any evidence of significant neurological dysfunction, bowel

or bladder dysfunction, saddle anesthesia (i.e., loss of sensation associated with cauda equina syndrome), or signs of myelopathy that would have promoted such aggressive and rapid performance of such diagnostic testing.

605.    Because the EDX tests were deployed in this manner, it is clear that the tests were wholly unnecessary to evaluate and assess each patient's condition.

606.    Not only was such EDX testing unnecessary, but it also (a) inflated the charges submitted to Allstate, and (b) placed the patients at additional—and unwarranted—physical risk of injury and infection.

607.    Accordingly, the EDX tests provided to the patients listed in Exhibits 6-10 were excessive and not warranted by the condition of the patient, and the charges submitted by the PC Defendants in connection with these tests are not compensable under New York's No-Fault laws.

608.    To the extent that Allstate paid the PC Defendants in reliance on the documents created and submitted in connection with the EDX tests itemized in Exhibits 6-10, Allstate is entitled to recover all payments made to the PC Defendants in connection with these tests.

609.    Moreover, to the extent any of the charges submitted in connection with these EDX tests remain unpaid, Allstate is under no obligation to make any further payments to the PC Defendants in connection with those tests because these studies were excessive and not warranted by the condition of the patient, and thus are not compensable under New York's No-Fault laws.

## VI.    <u>SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY</u>

610.    Throughout the course of this entire scheme, Aronov, Matatov, Sharafyan, Kandov, Yaguda, Ushyarov, El-Sanduby, Barakat, Pattugalan, and Delacruz-Gomez, working through the Pharmacy Defendants and/or through the PC Defendants, (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement

documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

611.    Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

612.    Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

A.    NEW CENTURY ENTERPRISE

613.    Aronov, Matatov, Ushyarov, El-Sanduby, and/or Pattugalan either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from New Century to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

614.    Aronov and Matatov caused New Century to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that New Century mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

615.    Aronov's and Matatov's participation in the operation and management of New Century, which included, among other things, (a) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, (e) billing Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, (f) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (g) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by New Century, rendered New Century completely ineligible for No-Fault reimbursement under New York law.

616.    As a result of the above-described conduct, Aronov and Matatov purposely caused New Century to make a misrepresentation each and every time that New Century mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

617.    Moreover, because (a) Aronov and Matatov engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of New

Century, (b) Aronov and Matatov caused New Century to seek No-Fault reimbursement from Allstate (even though New Century was not lawfully entitled to such reimbursement), and (c) New Century used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Aronov and Matatov committed mail fraud.

618. Ushyarov, El-Sanduby, and Pattugalan also purposely caused New Century to make misrepresentations when New Century mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement for drugs and medications, including Compounded Products, that were purportedly delivered and dispensed by New Century pursuant to a prescription written (or caused to be written) by Ushyarov, El-Sanduby, or Pattugalan through (a) the writing of prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be purportedly dispensed and delivered by New Century, (b) the creation and submission of records and notes for medically unnecessary and excessive treatments, tests, and services through First Class Medical, NY Medical Arts, and GONY Medical that purportedly justified prescriptions written by Ushyarov, El-Sanduby, and Pattugalan (or someone acting under their direction or control) for drugs and medications, including Compounded Products, that were billed for by New Century, and/or (c) the creation and submission of one or more template letter of medical necessity or peer-review rebuttal through First Class Medical, NY Medical Arts, or GONY Medical that falsely justified the necessity of the medications and drugs, including Compounded Products, that were billed for by New Century.

619. As a result of the above-described conduct, Ushyarov, El-Sanduby, and Pattugalan purposely caused New Century to make a misrepresentation each and every time that New Century mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault

reimbursement for drugs and medications, including Compounded Products, pursuant to a prescription written (or caused to be written) by Ushyarov, El-Sanduby, or Pattugalan.

620.    Moreover, because (a) Ushayarov, El-Sanduby, and Pattugalan engaged in (or caused) the above-described unlawful conduct, (b) Ushyarov, El-Sanduby, and Pattugalan caused New Century to seek No-Fault reimbursement from Allstate (even though New Century was not lawfully entitled to such reimbursement), and (c) New Century used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Ushyarov, El-Sanduby, and Pattugalan committed mail fraud.

621.    At all relevant times, Aronov, Matatov, Ushyarov, El-Sanduby, and Pattugalan knew that New Century (including its employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimant's attorney, other healthcare provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) New Century.

622.    Allstate estimates that the unlawful operation of the New Century enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 11 and incorporated herein by reference as if set forth in its entirety.

**B.    REFILL RX ENTERPRISE**

623.    Sharafyan, Ushyarov, and/or El-Sanduby either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription records and treatment records, letters of medical necessity, peer-review rebuttals, and/or

invoices/bills from Refill Rx to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

624.    Sharafyan, Ushyarov, and/or El-Sanduby caused Refill Rx to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Refill Rx mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

625.    Sharafyan's participation in the operation and management of Refill Rx, which included, among other things, (a) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, (e) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (f) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Refill Rx, rendered Refill Rx completely ineligible for No-Fault reimbursement under New York law.

626.    As a result of the above-described conduct, Sharafyan purposely caused Refill Rx to make a misrepresentation each and every time that Refill Rx mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

627.    Moreover, because (a) Sharafyan engaged in (or caused) the above-described unlawful conduct through his participation in the operation and management of Refill Rx, (b)

Sharafyan caused Refill Rx to seek No-Fault reimbursement from Allstate (even though Refill Rx was not lawfully entitled to such reimbursement), and (c) Refill Rx used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Sharafyan committed mail fraud.

628.   Ushyarov and El-Sanduby also purposely caused Refill Rx to make misrepresentations when Refill Rx mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement for drugs and medications, including Compounded Products, that were purportedly delivered and dispensed by Refill Rx pursuant to a prescription written (or caused to be written) by Ushyarov or El-Sanduby through (a) the writing of prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be purportedly dispensed and delivered by Refill Rx, (b) the creation and submission of records and notes for medically unnecessary and excessive treatments, tests, and services through First Class Medical and NY Medical Arts that purportedly justified prescriptions written by Ushyarov and El-Sanduby (or someone acting under their direction or control) for drugs and medications, including Compounded Products, that were billed for by Refill Rx, (c) the creation and submission of one or more template Letter of Medical Necessity through First Class Medical or NY Medical Arts that falsely justified the necessity of the medications and drugs, including Compounded Products, that were billed for by Refill Rx, and/or (d) the creation and submission of one or more template peer-review rebuttal through NY Medical Arts that falsely justified the necessity of the medications and drugs, including Compounded Products, that were billed for by Refill Rx.

629.   As a result of the above-described conduct, Ushyarov and El-Sanduby purposely caused Refill Rx to make a misrepresentation each and every time that Refill Rx mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement for drugs

and medications, including Compounded Products, pursuant to a prescription written (or caused to be written) by Ushyarov or El-Sanduby.

630.     Moreover, because (a) Ushayarov and El-Sanduby engaged in (or caused) the above-described unlawful conduct, (b) Ushyarov and El-Sanduby caused Refill Rx to seek No-Fault reimbursement from Allstate (even though Refill Rx was not lawfully entitled to such reimbursement), and (c) Refill Rx used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Ushyarov and El-Sanduby committed mail fraud.

631.     At all relevant times, Sharafyan, Ushyarov, and El-Sanduby knew that Refill Rx (including its employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimant's attorney, other healthcare provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Refill Rx.

632.     Allstate estimates that the unlawful operation of the Refill Rx enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 12 and incorporated herein by reference as if set forth in its entirety.

### C.     MY RX PHARMACY ENTERPRISE

633.     Kandov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription records and invoices/bills from My Rx Pharmacy to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

634. Kandov caused My Rx Pharmacy to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that My Rx Pharmacy mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

635. Kandov's participation in the operation and management of My Rx Pharmacy, which included, among other things, (a) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, and (d) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, rendered My Rx Pharmacy completely ineligible for No-Fault reimbursement under New York law.

636. As a result of the above-described conduct, Kandov purposely caused My Rx Pharmacy to make a misrepresentation each and every time that My Rx Pharmacy mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

637. Moreover, because (a) Kandov engaged in (or caused) the above-described unlawful conduct through his participation in the operation and management of My Rx Pharmacy, (b) Kandov caused My Rx Pharmacy to seek No-Fault reimbursement from Allstate (even though My Rx Pharmacy was not lawfully entitled to such reimbursement), and (c) My Rx Pharmacy used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Kandov committed mail fraud.

638. At all relevant times, Kandov knew that My Rx Pharmacy (including its employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an

Allstate Claimant's attorney, other healthcare provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) My Rx Pharmacy.

639.     Allstate estimates that the unlawful operation of the My Rx Pharmacy enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 13 and incorporated herein by reference as if set forth in its entirety.

### D.     DIRECT RX ENTERPRISE

640.     Yaguda, El-Sanduby, Barakat, and Delacruz-Gomez either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription records and treatment records, Letters of Medical Necessity, peer-review rebuttals, and/or invoices/bills from Direct Rx to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

641.     Yaguda caused Direct Rx to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Direct Rx mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

642.     Yaguda's participation in the operation and management of Direct Rx, which included, among other things, (a) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly

excessive rates, (e) billing Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, (f) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (g) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Direct Rx, rendered Direct Rx completely ineligible for No-Fault reimbursement under New York law.

643.    As a result of the above-described conduct, Yaguda purposely caused Direct Rx to make a misrepresentation each and every time that Direct Rx mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

644.    Moreover, because (a) Yaguda engaged in (or caused) the above-described unlawful conduct through his participation in the operation and management of Direct Rx, (b) Yaguda caused Direct Rx to seek No-Fault reimbursement from Allstate (even though Direct Rx was not lawfully entitled to such reimbursement), and (c) Direct Rx used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Yaguda committed mail fraud.

645.    El-Sanduby, Barakat, and Delacruz-Gomez also purposely caused Direct Rx to make misrepresentations when Direct Rx mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement for drugs and medications, including Compounded Products, that were purportedly delivered and dispensed by Direct Rx pursuant to a prescription written (or caused to be written) by El-Sanduby, Barakat, and Delacruz-Gomez through (a) the writing of prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be purportedly dispensed and delivered by Direct Rx, (b) the

creation and submission of records and notes for medically unnecessary and excessive treatments, tests, and services through NY Medical Arts, Richmond Medical, and Life Health Care that purportedly justified prescriptions written by El-Sanduby, Barakat, and Delacruz-Gomez (or someone acting under their direction or control) for drugs and medications, including Compounded Products, that were billed for by Direct Rx, (c) the creation and submission of one or more template Letter of Medical Necessity through NY Medical Arts, Richmond Medical, and Life Health Care that falsely justified the necessity of the medications and drugs, including Compounded Products, that were billed for by Direct Rx, and/or (d) the creation and submission of one or more template peer-review rebuttal through Richmond Medical and Life Health Care that falsely justified the necessity of the medications and drugs, including Compounded Products, that were billed for by Direct Rx.

646. As a result of the above-described conduct, El-Sanduby, Barakat, and Delacruz-Gomez purposely caused Direct Rx to make a misrepresentation each and every time that Direct Rx mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement for drugs and medications, including Compounded Products, pursuant to a prescription written (or caused to be written) by El-Sanduby, Barakat, and Delacruz-Gomez.

647. Moreover, because (a) El-Sanduby, Barakat, and Delacruz-Gomez engaged in (or caused) the above-described unlawful conduct, (b) El-Sanduby, Barakat, and Delacruz-Gomez caused Direct Rx to seek No-Fault reimbursement from Allstate (even though Direct Rx was not lawfully entitled to such reimbursement), and (c) Direct Rx used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that El-Sanduby, Barakat, and Delacruz-Gomez committed mail fraud.

648.     At all relevant times, Yaguda, El-Sanduby, Barakat, and Delacruz-Gomez knew that Direct Rx (including its employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimant's attorney, other healthcare provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Direct Rx.

649.     Allstate estimates that the unlawful operation of the Direct Rx enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 14 and incorporated herein by reference as if set forth in its entirety.

## E.     FIRST CLASS MEDICAL ENTERPRISE

650.     In conducting the affairs of the First Class Medical enterprise, Ushyarov either (a) personally used the U.S. Mail to further the scheme by causing prescription records, patient treatment records, and bills/invoices from First Class Medical to be mailed to Allstate and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of First Class Medical's business.

651.     At all relevant times, Ushayarov caused First Class Medical to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that First Class Medical mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

652.     However, as alleged herein, because the treatment rendered by Ushyarov (or those acting under his direction and control) to Allstate Claimants through First Class Medical was excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to

ensure financial enrichment, First Class Medical was not eligible for No-Fault reimbursement under New York law.

653.    Therefore, Ushyarov caused First Class Medical to make a misrepresentation each and every time that First Class Medical mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

654.    Moreover, because (a) Ushyarov participated in conducting the affairs of First Class Medical and received First Class Medical's professional physician fees and profits, (b) Ushayarov purposely caused First Class Medical to seek No-Fault reimbursement from Allstate (even though First Class Medical was not lawfully entitled to such reimbursement), and (c) First Class Medical used the U.S. Mail to seek reimbursement, it is clear that Ushyarov committed mail fraud.

655.    At all relevant times, Ushyarov knew that First Class Medical, First Class Medical's billing companies and/or agents, a patient, a claimant, an insurance carrier, an Allstate Claimant's attorney, other healthcare provider, a pharmacy, or Allstate would use the U.S. Mail in connection with each fraudulent claim, including issuing payments based upon documentation mailed by First Class Medical.

656.    Allstate estimates that the unlawful operation of the First Class Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 15 and incorporated herein by reference as if set forth in its entirety.

F.    **NY MEDICAL ARTS ENTERPRISE**

657.    In conducting the affairs of the NY Medical Arts enterprise, El-Sanduby either (a) personally used the U.S. Mail to further the scheme by causing prescription records, patient treatment records, and bills/invoices from NY Medical Arts to be mailed to Allstate and/or counsel

for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of NY Medical Arts' business.

658.    At all relevant times, El-Sanduby caused NY Medical Arts to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that NY Medical Arts mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

659.    However, as alleged herein, because the treatment rendered by El-Sanduby (or those acting under his direction and control) to Allstate Claimants through NY Medical Arts was excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment, NY Medical Arts was not eligible for No-Fault reimbursement under New York law.

660.    Therefore, El-Sanduby caused NY Medical Arts to make a misrepresentation each and every time that NY Medical Arts mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

661.    Moreover, because (a) El-Sanduby participated in conducting the affairs of NY Medical Arts and received NY Medical Arts' professional physician fees and profits, (b) El-Sanduby purposely caused NY Medical Arts to seek No-Fault reimbursement from Allstate (even though NY Medical Arts was not lawfully entitled to such reimbursement), and (c) NY Medical Arts used the U.S. Mail to seek reimbursement, it is clear that El-Sanduby committed mail fraud.

662.    At all relevant times, El-Sanduby knew that NY Medical Arts, NY Medical Arts' billing companies and/or agents, a patient, a claimant, an insurance carrier, an Allstate Claimant's attorney, other healthcare provider, a pharmacy, or Allstate would use the U.S. Mail in connection

with each fraudulent claim, including issuing payments based upon documentation mailed by NY Medical Arts.

663.    Allstate estimates that the unlawful operation of the NY Medical Arts enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 16 and incorporated herein by reference as if set forth in its entirety.

### G.    RICHMOND MEDICAL ENTERPRISE

664.    In conducting the affairs of the Richmond Medical enterprise, Barakat either (a) personally used the U.S. Mail to further the scheme by causing prescription records, patient treatment records, and bills/invoices from Richmond Medical to be mailed to Allstate and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of Richmond Medical's business.

665.    At all relevant times, Barakat caused Richmond Medical to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Richmond Medical mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

666.    However, as alleged herein, because the treatment rendered by Barakat (or those acting under his direction and control) to Allstate Claimants through Richmond Medical was excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment, Richmond Medical was not eligible for No-Fault reimbursement under New York law.

667.    Therefore, Barakat caused Richmond Medical to make a misrepresentation each and every time that Richmond Medical mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

668.    Moreover, because (a) Barakat participated in conducting the affairs of Richmond Medical and received Richmond Medical's professional physician fees and profits, (b) Barakat purposely caused Richmond Medical to seek No-Fault reimbursement from Allstate (even though Richmond Medical was not lawfully entitled to such reimbursement), and (c) Richmond Medical used the U.S. Mail to seek reimbursement, it is clear that Barakat committed mail fraud.

669.    At all relevant times, Barakat knew that Richmond Medical, Richmond Medical's billing companies and/or agents, a patient, a claimant, an insurance carrier, an Allstate Claimant's attorney, other healthcare provider, a pharmacy, or Allstate would use the U.S. Mail in connection with each fraudulent claim, including issuing payments based upon documentation mailed by Richmond Medical.

670.    Allstate estimates that the unlawful operation of the Richmond Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 17 and incorporated herein by reference as if set forth in its entirety.

**H.    GONY MEDICAL ENTERPRISE**

671.    In conducting the affairs of the GONY Medical enterprise, Pattugalan either (a) personally used the U.S. Mail to further the scheme by causing prescription records, patient treatment records, and bills/invoices from GONY Medical to be mailed to Allstate and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of GONY Medical's business.

672.    At all relevant times, Pattugalan caused GONY Medical to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that GONY Medical mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

673.    However, as alleged herein, because the treatment rendered by Pattugalan (or those acting under his direction and control) to Allstate Claimants through GONY Medical was excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment, GONY Medical was not eligible for No-Fault reimbursement under New York law.

674.    Therefore, Pattugalan caused GONY Medical to make a misrepresentation each and every time that GONY Medical mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

675.    Moreover, because (a) Pattugalan participated in conducting the affairs of GONY Medical and received GONY Medical's professional physician fees and profits, (b) Pattugalan purposely caused GONY Medical to seek No-Fault reimbursement from Allstate (even though GONY Medical was not lawfully entitled to such reimbursement), and (c) GONY Medical used the U.S. Mail to seek reimbursement, it is clear that Pattugalan committed mail fraud.

676.    At all relevant times, Pattugalan knew that GONY Medical, GONY Medical's billing companies and/or agents, a patient, a claimant, an insurance carrier, an Allstate Claimant's attorney, other healthcare provider, a pharmacy, or Allstate would use the U.S. Mail in connection with each fraudulent claim, including issuing payments based upon documentation mailed by GONY Medical.

677.     Allstate estimates that the unlawful operation of the GONY Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 18 and incorporated herein by reference as if set forth in its entirety.

### I.     LIFE HEALTH CARE ENTERPRISE

678.     In conducting the affairs of the Life Health Care enterprise, Delacruz-Gomez either (a) personally used the U.S. Mail to further the scheme by causing prescription records, patient treatment records, and bills/invoices from Life Health Care to be mailed to Allstate and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of Life Health Care's business.

679.     At all relevant times, Delacruz-Gomez caused Life Health Care to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Life Health Care mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

680.     However, as alleged herein, because the treatment rendered by Delacruz-Gomez (or those acting under his direction and control) to Allstate Claimants through Life Health Care was excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment, Life Health Care was not eligible for No-Fault reimbursement under New York law.

681.     Therefore, Delacruz-Gomez caused Life Health Care to make a misrepresentation each and every time that Life Health Care mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

682.    Moreover, because (a) Delacruz-Gomez participated in conducting the affairs of Life Health Care and received Life Health Care's professional physician fees and profits, (b) Delacruz-Gomez purposely caused Life Health Care to seek No-Fault reimbursement from Allstate (even though Life Health Care was not lawfully entitled to such reimbursement), and (c) Life Health Care used the U.S. Mail to seek reimbursement, it is clear that Delacruz-Gomez committed mail fraud.

683.    At all relevant times, Delacruz-Gomez knew that Life Health Care, Life Health Care's billing companies and/or agents, a patient, a claimant, an insurance carrier, an Allstate Claimant's attorney, other healthcare provider, a pharmacy, or Allstate would use the U.S. Mail in connection with each fraudulent claim, including issuing payments based upon documentation mailed by Life Health Care.

684.    Allstate estimates that the unlawful operation of the Life Health Care enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 19 and incorporated herein by reference as if set forth in its entirety.

## VII.   SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.   NEW CENTURY ENTERPRISE

685.    At all relevant times during the operation of the New Century enterprise, Aronov, Matatov, Ushyarov, El-Sanduby, Pattugalan, First Class Medical, NY Medical Arts, and GONY Medical purposely caused New Century to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges

related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of New Century.

686. At all relevant times, Aronov and Matatov directly participated in the operation and management of New Century.

687. During the relevant period, Aronov and Matatov induced Ushyarov, El-Sanduby, and Pattugalan (or those individuals working under their control) to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be dispensed and charged for by New Century.

688. Aronov, Matatov, Ushyarov, El-Sanduby, Pattugalan, First Class Medical, NY Medical Arts, and/or GONY Medical (along with those individuals working under their control) purposely concealed the lack of medical necessity for the prescriptions for drugs and medications, including Compounded Products, to be dispensed and charged by New Century.

689. For instance, as alleged herein, through First Class Medical, NY Medical Arts, and GONY Medical, Ushyarov, El-Sanduby, and Pattugalan (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) peer-review rebuttals that falsely attested to the medical necessity of drugs and medications, including Compounded Products, that were prescribed by Ushyarov, El-Sanduby, or Pattugalan (or those working under their direction and control), and purportedly dispensed and delivered by New Century, to an Allstate Claimant.

690. Ushyarov, El-Sanduby, and Pattugalan (or those working under their direction and control), through First Class Medical, NY Medical Arts, and GONY Medical, additionally created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of certain drugs and medications, including Compounded

Products, that were prescribed by Ushyarov, El-Sanduby, or Pattugalan, and purportedly dispensed and delivered by New Century, to an Allstate Claimant.

691.    Because Aronov and Matatov were responsible for causing New Century's (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, (e) billing Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, (f) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (g) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by New Century, New Century was caused to falsely claim eligibility for No-Fault reimbursement each and every time that New Century sought No-Fault reimbursement from Allstate.

692.    As alleged above, Aronov, Matatov, Ushyarov, El-Sanduby, and/or Pattugalan (or those persons working under their or their confederates' control) caused New Century to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

693.     Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

694.     Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services and products never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

695.     Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

696.     Thus, every time that Aronov and Matatov (along with those individuals working under their control) caused New Century to submit No-Fault reimbursement demands to Allstate, Aronov and Matatov (and those individuals working under their control) necessarily certified that New Century was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

697.     The full extent of Aronov, Matatov, Ushyarov, El-Sanduby, Pattugalan, First Class Medical, NY Medical Arts, and GONY Medical's fraudulent and unlawful acts relative to their participation in the New Century enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

**B.     REFILL RX ENTERPRISE**

698.     At all relevant times during the operation of the Refill Rx enterprise, Sharafyan, Ushyarov, El-Sanduby, First Class Medical, and NY Medical Arts purposely caused Refill Rx to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to prescription drugs and other

pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of Refill Rx.

699.    At all relevant times, Sharafyan directly participated in the operation and management of Refill Rx.

700.    During the relevant period, Sharafyan induced Ushyarov and El-Sanduby (or those working under their control) to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be dispensed and charged for by Refill Rx.

701.    Sharafyan, Ushyarov, El-Sanduby, First Class Medical, and/or NY Medical Arts (along with those individuals working under their control) purposely concealed the lack of medical necessity for the prescriptions for drugs and medications, including Compounded Products, to be dispensed and charged by Refill Rx.

702.    For instance, as alleged herein, through First Class Medical and NY Medical Arts, Ushyarov and El-Sanduby (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) Letters of Medical Necessity and/or peer-review rebuttals that falsely attested to the medical necessity of drugs and medications, including Compounded Products, that were prescribed by Ushyarov and El-Sanduby (or those working under their direction and control), and purportedly dispensed and delivered by Refill Rx to an Allstate Claimant.

703.    Ushyarov and El-Sanduby (or those working under their direction and control), through First Class Medical and NY Medical Arts, additionally created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of certain drugs and medications, including Compounded Products, that were prescribed

by Ushyarov and El-Sanduby, and purportedly dispensed and delivered by Refill Rx, to an Allstate Claimant.

704. Because Sharafyan were responsible for causing Refill Rx's (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, (e) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (f) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Refill Rx, Refill Rx was caused to falsely claim eligibility for No-Fault reimbursement each and every time that Refill Rx sought No-Fault reimbursement from Allstate.

705. As alleged above, Sharafyan, Ushyarov, and/or El-Sanduby (or those persons working under their or their confederates' control) caused Refill Rx to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

706. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

707.     Many of the false, fraudulent, and unlawful acts are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

708.     Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

709.     Thus, every time that Sharafyan (along with those individuals working under his control) caused Refill Rx to submit No-Fault reimbursement demands to Allstate, Sharafyan (and those individuals working under his control) necessarily certified that Refill Rx was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

710.     The full extent of Sharafyan, Ushyarov, El-Sanduby, First Class Medical, and NY Medical Arts' fraudulent and unlawful acts relative to their participation in the Refill Rx enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### C.     MY RX PHARMACY ENTERPRISE

711.     At all relevant times during the operation of the My Rx Pharmacy enterprise, Kandov purposely caused My Rx Pharmacy to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of My Rx Pharmacy.

712.     At all relevant times, Kandov directly participated in the operation and management of My Rx Pharmacy.

713.     Because Kandov was responsible for causing My Rx Pharmacy's (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing

requirements, (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (d) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, My Rx Pharmacy was caused to falsely claim eligibility for No-Fault reimbursement each and every time that My Rx Pharmacy sought No-Fault reimbursement from Allstate.

714.    As alleged above, Kandov (or those persons working under his or his confederates' control) caused My Rx Pharmacy to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, and/or (d) not actually provided as represented.

715.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

716.    Many of the false, fraudulent, and unlawful acts are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

717.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

718.    Thus, every time that Kandov (along with those individuals working under his control) caused My Rx Pharmacy to submit No-Fault reimbursement demands to Allstate, Kandov

(and those individuals working under his control) necessarily certified that My Rx Pharmacy was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

719. The full extent of Kandov's fraudulent and unlawful acts relative to his control over the My Rx Pharmacy enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### D. DIRECT RX ENTERPRISE

720. At all relevant times during the operation of the Direct Rx enterprise, Yaguda, El-Sanduby, Delacruz-Gomez, Barakat, NY Medical Arts, Richmond Medical, and Life Health Care purposely caused Direct Rx to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of Direct Rx.

721. At all relevant times, Yaguda directly participated in the operation and management of Direct Rx.

722. During the relevant period, Yaguda induced El-Sanduby, Delacruz-Gomez, and Barakat (or those individuals working under their control) to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be dispensed and charged for by Direct Rx.

723. Yaguda, El-Sanduby, Delacruz-Gomez, Barakat, NY Medical Arts, Life Health Care, and/or Richmond Medical (along with those individuals working under their control) purposely concealed the lack of medical necessity for the prescriptions for drugs and medications, including Compounded Products, to be dispensed and charged for by Direct Rx.

724.    For instance, as alleged herein, through NY Medical Arts, Life Health Care, Richmond Medical, El-Sanduby, Delacruz-Gomez, and Barakat (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) Letters of Medical Necessity and/or peer-review rebuttals that falsely attested to the medical necessity of drugs and medications, including Compounded Products, that were prescribed by El-Sanduby, Delacruz-Gomez, and Barakat (or those working under their direction and control), and purportedly dispensed and delivered by Direct Rx, to an Allstate Claimant.

725.    El-Sanduby, Delacruz-Gomez, and Barakat (or those working under their direction and control), through NY Medical Arts, Life Health Care, and/or Richmond Medical, additionally created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of certain drugs and medications, including Compounded Products, that were prescribed by El-Sanduby, Delacruz-Gomez, and Barakat (or those working under their direction and control), and purportedly dispensed and delivered by Direct Rx, to an Allstate Claimant.

726.    Because Yaguda was responsible for causing Direct Rx's (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, (e) billing Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, (e) falsely representing, and charging for, certain drugs as if the drugs required a

prescription even though they did not, and (f) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Direct Rx, Direct Rx was caused to falsely claim eligibility for No-Fault reimbursement each and every time that Direct Rx sought No-Fault reimbursement from Allstate.

727.    As alleged above, Yaguda, El-Sanduby, Delacruz-Gomez, and Barakat (or those persons working under their or their confederates' control) caused Direct Rx to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

728.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

729.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services and products never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

730.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

731.    Thus, every time that Yaguda (along with those individuals working under his control) caused Direct Rx to submit No-Fault reimbursement demands to Allstate, Yaguda (and

those individuals working under his control) necessarily certified that Direct Rx was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

732.    The full extent of Yaguda, El-Sanduby, Delacruz-Gomez, Barakat, NY Medical Arts, Richmond Medical, and/or Life Health Care's fraudulent and unlawful acts relative to their control over the Direct Rx enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### E.    FIRST CLASS MEDICAL ENTERPRISE

733.    At all relevant times during the operation of the First Class Medical enterprise, Ushyarov purposely caused First Class Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to health care services purportedly provided to patients who treated at First Class Medical.

734.    Throughout the relevant period, Ushyarov attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with First Class Medical patients, as well as the validity of the charges for such services.

735.    At all relevant times, Ushyarov, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with each and every other aspect of his oath as a licensed physician.

736.    As alleged above, Ushyarov (or those persons working under his or his confederates' control) caused First Class Medical to create and submit to Allstate treatment records and demands for payment relative to health care services that were (a) unnecessary, (b) excessive, and/or (c) rendered pursuant to a predetermined protocol.

737.     Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

738.     Many of these facts are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

739.     Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

740.     Thus, every time that Ushyarov (along with those individuals working under his control) caused First Class Medical to submit No-Fault reimbursement demands to Allstate, Ushyarov (and those individuals working under his control) necessarily certified that First Class Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

741.     The full extent of Ushyarov's fraudulent and unlawful acts relative to his control over the First Class Medical enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

F.     <u>NY MEDICAL ARTS ENTERPRISE</u>

742.     At all relevant times during the operation of the NY Medical Arts enterprise, El-Sanduby purposely caused NY Medical Arts to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to health care services purportedly provided to patients who treated at NY Medical Arts.

743.     Throughout the relevant period, El-Sanduby attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly

performed in connection with NY Medical Arts patients, as well as the validity of the charges for such services.

744.    At all relevant times, El-Sanduby, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with each and every other aspect of his oath as a licensed physician.

745.    As alleged above, El-Sanduby (or those persons working under his or his confederates' control) caused NY Medical Arts to create and submit to Allstate treatment records and demands for payment relative to health care services that were (a) unnecessary, (b) excessive, and/or (c) rendered pursuant to a predetermined protocol.

746.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

747.    Many of these facts are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

748.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

749.    Thus, every time that El-Sanduby (along with those individuals working under his control) caused NY Medical Arts to submit No-Fault reimbursement demands to Allstate, El-Sanduby (and those individuals working under his control) necessarily certified that NY Medical Arts was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

750.    The full extent of El-Sanduby's fraudulent and unlawful acts relative to his control over the NY Medical Arts enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### G.    RICHMOND MEDICAL ENTERPRISE

751.    At all relevant times during the operation of the Richmond Medical enterprise, Barakat purposely caused Richmond Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to health care services purportedly provided to patients who treated at Richmond Medical.

752.    Throughout the relevant period, Barakat attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Richmond Medical patients, as well as the validity of the charges for such services.

753.    At all relevant times, Barakat, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with each and every other aspect of his oath as a licensed physician.

754.    As alleged above, Barakat (or those persons working under his or his confederates' control) caused Richmond Medical to create and submit to Allstate treatment records and demands for payment relative to health care services that were (a) unnecessary, (b) excessive, and/or (c) rendered pursuant to a predetermined protocol.

755.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

756.    Many of these facts are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

757.     Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

758.     Thus, every time that Barakat (along with those individuals working under his control) caused Richmond Medical to submit No-Fault reimbursement demands to Allstate, Barakat (and those individuals working under his control) necessarily certified that Richmond Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

759.     The full extent of Barakat's fraudulent and unlawful acts relative to his control over the Richmond Medical enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### H.     GONY MEDICAL ENTERPRISE

760.     At all relevant times during the operation of the GONY Medical enterprise, Pattugalan purposely caused GONY Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to health care services purportedly provided to patients who treated at GONY Medical.

761.     Throughout the relevant period, Pattugalan attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with GONY Medical patients, as well as the validity of the charges for such services.

762.     At all relevant times, Pattugalan, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with each and every other aspect of his oath as a licensed physician.

763.    As alleged above, Pattugalan (or those persons working under his or his confederates' control) caused GONY Medical to create and submit to Allstate treatment records and demands for payment relative to health care services that were (a) unnecessary, (b) excessive, and/or (c) rendered pursuant to a predetermined protocol.

764.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

765.    Many of these facts are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

766.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

767.    Thus, every time that Pattugalan (along with those individuals working under his control) caused GONY Medical to submit No-Fault reimbursement demands to Allstate, Pattugalan (and those individuals working under his control) necessarily certified that GONY Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

768.    The full extent of Pattugalan's fraudulent and unlawful acts relative to his control over the GONY Medical enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## I.    LIFE HEALTH CARE ENTERPRISE

769.    At all relevant times during the operation of the Life Health Care enterprise, Delacruz-Gomez purposely caused Life Health Care to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to

promptly pay charges related to health care services purportedly provided to patients who treated at Life Health Care.

770. Throughout the relevant period, Delacruz-Gomez attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Life Health Care patients, as well as the validity of the charges for such services.

771. At all relevant times, Delacruz-Gomez, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with each and every other aspect of his oath as a licensed physician.

772. As alleged above, Delacruz-Gomez (or those persons working under his or his confederates' control) caused Life Health Care to create and submit to Allstate treatment records and demands for payment relative to health care services that were (a) unnecessary, (b) excessive, and/or (c) rendered pursuant to a predetermined protocol.

773. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

774. Many of these facts are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

775. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

776. Thus, every time that Delacruz-Gomez (along with those individuals working under his control) caused Life Health Care to submit No-Fault reimbursement demands to Allstate,

Delacruz-Gomez (and those individuals working under his control) necessarily certified that Life Health Care was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

777.    The full extent of Delacruz-Gomez's fraudulent and unlawful acts relative to his control over the Life Health Care enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## VIII.   ALLSTATE'S JUSTIFIABLE RELIANCE

778.    Each claim submitted to Allstate by (or on behalf of) New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care was verified pursuant to Insurance Law § 403.

779.    At all relevant times, Ushyarov, El-Sanduby, Barakat, Pattugalan, and Delacruz-Gomez, as duly licensed physicians, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with each and every other aspect of their oath as a licensed medical professional.

780.    To induce Allstate to promptly pay New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care's patient invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care were eligible to be reimbursed under New York's No-Fault Laws.

781.    Further, to induce Allstate to promptly pay the fraudulent charges for prescription drug and other pharmacy services purportedly provided to Allstate Claimants, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or non-compensable charges from Allstate. These attorneys and law firms routinely file time-consuming and expensive lawsuits and

arbitration matters against Allstate in the event that New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care's charges are not promptly paid in full.

782.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate by (or on behalf of) New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care in support of the fraudulent and/or non-compensable charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

783.    At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care's reimbursement eligibility under New York law.

784.    In reasonable reliance on these misrepresentations, Allstate paid money to New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care to its detriment.

785.    Allstate would not have paid these monies had the defendants provided true and accurate information about New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care's reimbursement eligibility under New York law, including (a) New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care's  No-Fault reimbursement eligibility under N.Y. Insurance Law § 5101, *et seq*., and (b) the fact and necessity of the services purportedly provided to those Allstate Claimants

and customers of New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care eligible for insurance coverage under an automobile insurance policy issued by Allstate.

786.   As a result, Allstate was caused make No-Fault benefit payments totaling over $1,630,841.00 to New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care in reasonable reliance on New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care's false No-Fault claim reimbursement documentation, and their false representations regarding New Century, Refill Rx, My Rx Pharmacy, Direct Rx, First Class Medical, NY Medical Arts, Richmond Medical, GONY Medical, and Life Health Care's eligibility for reimbursement under New York's No-Fault Laws.

## IX.   <u>DAMAGES</u>

787.   The defendants' pattern of fraudulent and unlawful conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for:

a.   Payments made to New Century Pharmacy Inc. in connection with first-party ("No-Fault") claims in excess of $62,322.17, the exact amount to be determined at trial. The chart annexed at Exhibit 20, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to New Century Pharmacy Inc. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

b.   Payments made to Refill Rx Pharmacy Inc in connection with first-party ("No-Fault") claims in excess of $38,932.76, the exact amount to be determined at trial. The chart annexed at Exhibit 21, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Refill Rx Pharmacy Inc in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

c.  Payments made to My Rx Pharmacy, Inc. in connection with first-party ("No-Fault") claims in excess of $110,345.25, the exact amount to be determined at trial. The chart annexed at Exhibit 22, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to My Rx Pharmacy, Inc. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

d.  Payments made to Direct Rx Pharmacy Inc in connection with first-party ("No-Fault") claims in excess of $111,280.38, the exact amount to be determined at trial. The chart annexed at Exhibit 23, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Direct Rx Pharmacy Inc in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

e.  Payments made to First Class Medical, P.C. in connection with first-party ("No-Fault") claims in excess of $769,695.30, the exact amount to be determined at trial. The chart annexed at Exhibit 24, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to First Class Medical, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

f.  Payments made to NY Medical Arts, P.C. in connection with first-party ("No-Fault") claims in excess of $112,862.51, the exact amount to be determined at trial. The chart annexed at Exhibit 25, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to NY Medical Arts, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

g.  Payments made to Richmond Medical Care P.C. in connection with first-party ("No-Fault") claims in excess of $207,950.86, the exact amount to be determined at trial. The chart annexed at Exhibit 26, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Richmond Medical Care P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

h.  Payments made to GONY Medical Services P.C. in connection with first-party ("No-Fault") claims in excess of $179,692.60, the exact amount to be determined at trial. The chart annexed at Exhibit 27, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to GONY Medical Services P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

i.  Payments made to Life Health Care Medical, P.C. in connection with first-party ("No-Fault") claims in excess of $37,760.11, the exact amount to be determined at trial. The chart annexed at Exhibit 28, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Life Health Care Medical, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

## X.      CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NEW CENTURY PHARMACY INC. ENTERPRISE
### (Against Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C.)

788.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

789.     In furtherance of their operation and management of New Century Pharmacy Inc., Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C. ("Count I Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

790.     The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 11.

791.     Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

792.     Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

793.     Payments made by Allstate to New Century Pharmacy Inc. were delivered through the U.S. Mail.

794.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by New Century Pharmacy Inc. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

795.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to New Century Pharmacy Inc., for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

796.    The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count I Defendants to continue perpetrating this scheme without being detected.

797.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

798.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to New Century Pharmacy Inc. for the benefit of the Count I Defendants.

799.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

800.    New Century Pharmacy Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

801.     The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

802.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

803.     The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

804.     By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## NEW CENTURY PHARMACY INC. ENTERPRISE
**(Against Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C.)**

805.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

806.     Through their participation in the operation and management of New Century Pharmacy Inc., Defendants Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C. (collectively, the "Count II Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c).

807.     The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of New Century Pharmacy Inc. by means of a

pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 11, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

808.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of New Century Pharmacy Inc., even though New Century Pharmacy Inc., as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

809.    The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

810.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

811.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### REFILL RX PHARMACY INC ENTERPRISE
### (Against Alexander Sharafyan, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C.)

812.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

813.    In furtherance of their operation and management of Refill Rx Pharmacy Inc, Alexander Sharafyan, Mani Ushyarov, D.O., Amr. A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C. ("Count III Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

814.    The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 12.

815.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

816.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

817.    Payments made by Allstate to Refill Rx Pharmacy Inc were delivered through the U.S. Mail.

818.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by Refill Rx Pharmacy Inc for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

819.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and

employees, issued drafts to Refill Rx Pharmacy Inc, for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

820.    The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count III Defendants to continue perpetrating this scheme without being detected.

821.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

822.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Refill Rx Pharmacy Inc for the benefit of the Count III Defendants.

823.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

824.    Refill Rx Pharmacy Inc constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

825.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

826.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

827.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

828.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## REFILL RX PHARMACY INC ENTERPRISE
### (Against Alexander Sharafyan, Mani Ushyarov, D.O., Amr. A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C.)

829.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

830.    Through their participation in the operation and management of Refill Rx Pharmacy Inc, Defendants Alexander Sharafyan, Mani Ushyarov, D.O., Amr. A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C. (collectively, the "Count IV Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c).

831.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Refill Rx Pharmacy Inc by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 12, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

832.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Refill Rx Pharmacy Inc, even though Refill Rx Pharmacy Inc, as a result of the Count VI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

833. The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

834. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

835. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## MY RX PHARMACY, INC. ENTERPRISE
### (Against Boris Kandov)

836. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

837. In furtherance of his operation and management of My Rx Pharmacy, Inc., Boris Kandov ("Count V Defendant"), intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

838. The Count V Defendant employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 13.

839.     Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

840.     Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

841.     Payments made by Allstate to My Rx Pharmacy, Inc. were delivered through the U.S. Mail.

842.     As documented above, the Count V Defendant repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by My Rx Pharmacy, Inc. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

843.     As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to My Rx Pharmacy, Inc., for the benefit of the Count V Defendant, that would not otherwise have been paid.

844.     The Count V Defendant's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count V Defendant to continue perpetrating this scheme without being detected.

845. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

846. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to My Rx Pharmacy, Inc. for the benefit of the Count V Defendant.

847. Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

848. My Rx Pharmacy, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

849. The Count V Defendant associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

850. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendant's conduct.

851. The Count V Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

852. By virtue of the Count V Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DIRECT RX PHARMACY INC ENTERPRISE**
**(Against Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre**
**Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C.,**
**Richmond Medical Care P.C., and Life Health Care Medical, P.C.)**

853.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

854.     In furtherance of their operation and management of Direct Rx Pharmacy Inc, Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C. ("Count VI Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

855.     The Count VI Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

856.     Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

857.     Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

858.     Payments made by Allstate to Direct Rx Pharmacy Inc were delivered through the U.S. Mail.

859.    As documented above, the Count VI Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by Direct Rx Pharmacy Inc for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

860.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Direct Rx Pharmacy Inc, for the benefit of one or more of the Count VI Defendants, that would not otherwise have been paid.

861.    The Count VI Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count VI Defendants to continue perpetrating this scheme without being detected.

862.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

863.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Direct Rx Pharmacy Inc for the benefit of the Count VI Defendants.

864.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

865.    Direct Rx Pharmacy Inc constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

866. The Count VI Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

867. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VI Defendants' conduct.

868. The Count VI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

869. By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### DIRECT RX PHARMACY INC ENTERPRISE
**(Against Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C.)**

870. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

871. Through their participation in the operation and management of Direct Rx Pharmacy Inc, Defendants Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C. (collectively, the "Count VII Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c).

872. The Count VII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Direct Rx Pharmacy Inc by means of a pattern

of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 14, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

873. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Direct Rx Pharmacy Inc, even though Direct Rx Pharmacy Inc, as a result of the Count VII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

874. The Count VII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

875. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

876. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## FIRST CLASS MEDICAL, P.C. ENTERPRISE
### (Against Mani Ushyarov, D.O.)

877. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

878. In furtherance of his operation and management of First Class Medical, P.C., Mani Ushyarov, D.O. ("Count VIII Defendant"), intentionally prepared and mailed (or caused to be

prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

879.     The Count VIII Defendant employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 15.

880.     Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

881.     Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

882.     Payments made by Allstate to First Class Medical, P.C. were delivered through the U.S. Mail.

883.     As documented above, the Count VIII Defendant repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by First Class Medical, P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

884.     As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to First Class Medical, P.C., for the benefit of the Count VIII Defendant, that would not otherwise have been paid.

885.     The Count VIII Defendant's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count VIII Defendant to continue perpetrating this scheme without being detected.

886.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

887.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to First Class Medical, P.C. for the benefit of the Count VIII Defendant.

888.     Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

889.     First Class Medical, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

890.     The Count VIII Defendant associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

891.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VIII Defendant's conduct.

892.     The Count VIII Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

893.     By virtue of the Count VIII Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted

by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NY MEDICAL ARTS, P.C. ENTERPRISE
#### (Against Amr A. El-Sanduby, M.D.)

894.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

895.    In furtherance of his operation and management of NY Medical Arts, P.C., Amr A. El-Sanduby, M.D. ("Count IX Defendant"), intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

896.    The Count IX Defendant employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 16.

897.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

898.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

899.    Payments made by Allstate to NY Medical Arts, P.C. were delivered through the U.S. Mail.

900.    As documented above, the Count IX Defendant repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate

related to Compounded Products and other drugs dispensed and delivered by NY Medical Arts, P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

901.　As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to NY Medical Arts, P.C., for the benefit of the Count IX Defendant, that would not otherwise have been paid.

902.　The Count IX Defendant's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count IX Defendant to continue perpetrating this scheme without being detected.

903.　The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

904.　The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to NY Medical Arts, P.C. for the benefit of the Count IX Defendant.

905.　Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

906.　NY Medical Arts, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

907.     The Count IX Defendant associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

908.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendant's conduct.

909.     The Count IX Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

910.     By virtue of the Count IX Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### RICHMOND MEDICAL CARE P.C. ENTERPRISE
### (Against Jean-Pierre Georges Barakat, M.D.)

911.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

912.     In furtherance of his operation and management of Richmond Medical Care P.C., Jean-Pierre Georges Barakat, M.D. ("Count X Defendant"), intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

913.     The Count X Defendant employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 17.

914.     Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

915.     Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

916.     Payments made by Allstate to Richmond Medical Care P.C. were delivered through the U.S. Mail.

917.     As documented above, the Count X Defendant repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by Richmond Medical Care P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

918.     As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Richmond Medical Care P.C., for the benefit of the Count X Defendant, that would not otherwise have been paid.

919.     The Count X Defendant's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count X Defendant to continue perpetrating this scheme without being detected.

920.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

921.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Richmond Medical Care P.C. for the benefit of the Count X Defendant.

922.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

923.    Richmond Medical Care P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

924.    The Count X Defendant associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

925.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count X Defendant's conduct.

926.    The Count X Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

927.    By virtue of the Count X Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT XI</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**GONY MEDICAL SERVICES P.C. ENTERPRISE**
**(Against Tomas M. Pattugalan, Jr., M.D.)**

928.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

929.    In furtherance of his operation and management of GONY Medical Services P.C., Tomas M. Pattugalan, Jr., M.D. ("Count XI Defendant") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

930.    The Count XI Defendant employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 18.

931.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

932.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

933.    Payments made by Allstate to GONY Medical Services P.C. were delivered through the U.S. Mail.

934.    As documented above, the Count XI Defendant repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by GONY Medical

Services P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

935.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to GONY Medical Services P.C., for the benefit of the Count XI Defendant, that would not otherwise have been paid.

936.    The Count XI Defendant's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count XI Defendant to continue perpetrating this scheme without being detected.

937.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

938.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to GONY Medical Services P.C. for the benefit of the Count XI Defendant.

939.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

940.    GONY Medical Services P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

941.   The Count XI Defendant associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

942.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendant's conduct.

943.   The Count XI Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

944.   By virtue of the Count XI Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### LIFE HEALTH CARE MEDICAL, P.C. ENTERPRISE
### (Against Rafael Antonio Delacruz-Gomez, M.D.)

945.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

946.   In furtherance of his operation and management of Life Health Care Medical, P.C., Rafael Antonio Delacruz-Gomez, M.D. ("Count XII Defendant") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

947.   The Count XII Defendant employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 19.

948.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

949.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

950.    Payments made by Allstate to Life Health Care Medical, P.C. were delivered through the U.S. Mail.

951.    As documented above, the Count XII Defendant repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by Life Health Care Medical, P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

952.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Life Health Care Medical, P.C., for the benefit of the Count XII Defendant, that would not otherwise have been paid.

953.    The Count XII Defendant's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count XII Defendant to continue perpetrating this scheme without being detected.

954. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

955. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Life Health Care Medical, P.C. for the benefit of the Count XII Defendant.

956. Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

957. Life Health Care Medical, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

958. The Count XII Defendant associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

959. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XII Defendant's conduct.

960. The Count XII Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

961. By virtue of the Count XII Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
## COMMON-LAW FRAUD
**(Against New Century Pharmacy Inc., Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas M. Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C.)**

962.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

963.     Defendants New Century Pharmacy Inc., Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas M. Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C. (collectively, "Count XIII Defendants") schemed to defraud Allstate by, among other things, (a) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, (e) billing Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, (f) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (g) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by New Century.

964.     The Count XIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to New Century Pharmacy Inc.'s eligibility for and entitlement to No-Fault reimbursement under New York law.

965.    The misrepresentations of fact by the Count XIII Defendants included, but were not limited to, material misrepresentations of fact made in New Century Pharmacy Inc. NF-3 forms, prescription forms, patient treatment records, delivery receipts, peer-review rebuttals, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and/or requests for payment.

966.    The Count XIII Defendants' representations were false, or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

967.    The misrepresentations were intentionally made by the Count XIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims on behalf of New Century Pharmacy Inc. demanding payment of No-Fault insurance benefits.

968.    The Count XIII Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Allstate Claimants were false, and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate or lawfully compensable.

969.    Allstate reasonably relied, to its detriment, upon the Count XIII Defendants' material misrepresentations concerning New Century Pharmacy Inc.'s eligibility to receive No-Fault reimbursement in paying numerous bills for prescription drug and other pharmacy expenses pursuant to New York's No-Fault insurance laws.

970.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to New Century Pharmacy Inc.—in excess of $62,322.00—for prescription drug and other pharmacy expenses and services rendered to Allstate Claimants, even though New Century Pharmacy Inc. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XIV
## COMMON-LAW FRAUD
**(Against Refill Rx Pharmacy Inc, Alexander Sharafyan, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C.)**

971.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

972.    Defendants Refill Rx Pharmacy Inc, Alexander Sharafyan, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C. (collectively, "Count XIV Defendants") schemed to defraud Allstate by, among other things, (a) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, (e) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (f) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Refill Rx Pharmacy Inc.

973.    The Count XIV Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to Refill Rx Pharmacy Inc's eligibility for and entitlement to No-Fault reimbursement under New York law.

974.    The misrepresentations of fact by the Count XIV Defendants included, but were not limited to, material misrepresentations of fact made in Refill Rx Pharmacy Inc's NF-3 forms,

prescription forms, patient treatment records, delivery receipts, letters of medical necessity, peer-review rebuttals, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and requests for payment.

975.    The Count XIV Defendants' representations were false, or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

976.    The misrepresentations were intentionally made by the Count XIV Defendants in furtherance of their scheme to defraud Allstate by submitting claims on behalf of Refill Rx Pharmacy Inc demanding payment of No-Fault insurance benefits.

977.    The Count XIV Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Allstate Claimants were false, and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate or lawfully compensable.

978.    Allstate reasonably relied, to its detriment, upon the Count XIV Defendants' material misrepresentations concerning Refill Rx Pharmacy Inc's eligibility to receive No-Fault reimbursement in paying numerous bills for prescription drug and other pharmacy expenses pursuant to New York's No-Fault insurance laws.

979.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Refill Rx Pharmacy Inc—in excess of $38,932.00—for prescription drug and other pharmacy expenses and services rendered to Allstate Claimants, even though Refill Rx Pharmacy Inc was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

<u>COUNT XV</u>
**COMMON-LAW FRAUD**
**(Against My Rx Pharmacy, Inc. and Boris Kandov)**

980.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

981.     Defendants My Rx Pharmacy, Inc. and Boris Kandov (collectively, "Count XV Defendants") schemed to defraud Allstate by, among other things, (a) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (d) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws.

982.     The Count XV Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to My Rx Pharmacy, Inc.'s eligibility for and entitlement to No-Fault reimbursement under New York law.

983.     The misrepresentations of fact by the Count XV Defendants included, but were not limited to, material misrepresentations of fact made in My Rx Pharmacy, Inc.'s NF-3 forms, prescription forms, patient treatment records, delivery receipts, peer-review rebuttals, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and requests for payment.

984.     The Count XV Defendants' representations were false, or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

985.    The misrepresentations were intentionally made by the Count XV Defendants in furtherance of their scheme to defraud Allstate by submitting claims on behalf of My Rx Pharmacy, Inc. demanding payment of No-Fault insurance benefits.

986.    The Count XV Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Allstate Claimants were false, and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate or lawfully compensable.

987.    Allstate reasonably relied, to its detriment, upon the Count XV Defendants' material misrepresentations concerning My Rx Pharmacy, Inc.'s eligibility to receive No-Fault reimbursement in paying numerous bills for prescription drug and other pharmacy expenses pursuant to New York's No-Fault insurance laws.

988.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to My Rx Pharmacy, Inc.—in excess of $110,345.00—for prescription drug and other pharmacy expenses and services rendered to Allstate Claimants, even though My Rx Pharmacy, Inc. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XVI
## COMMON-LAW FRAUD
**(Against Direct Rx Pharmacy Inc, Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C.)**

989.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

990.    Defendants Direct Rx Pharmacy Inc, Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C.

(collectively, "Count XVI Defendants") schemed to defraud Allstate by, among other things, (a) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, (e) billing Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, (f) falsely representing, and charging for, certain drugs as if the drugs required a prescription even though they did not, and (g) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Direct Rx Pharmacy Inc.

991.    The Count XVI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to Direct Rx Pharmacy Inc's eligibility for and entitlement to No-Fault reimbursement under New York law.

992.    The misrepresentations of fact by the Count XVI Defendants included, but were not limited to, material misrepresentations of fact made in Direct Rx Pharmacy Inc's NF-3 forms, prescription forms, patient treatment records, delivery receipts, letters of medical necessity, peer-review rebuttals, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and/or requests for payment.

993.    The Count XVI Defendants' representations were false, or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

994.    The misrepresentations were intentionally made by the Count XVI Defendants in furtherance of their scheme to defraud Allstate by submitting claims on behalf of Direct Rx Pharmacy Inc demanding payment of No-Fault insurance benefits.

995.    The Count XVI Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Allstate Claimants were false, and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate or lawfully compensable.

996.    Allstate reasonably relied, to its detriment, upon the Count XVI Defendants' material misrepresentations concerning Direct Rx Pharmacy Inc's eligibility to receive No-Fault reimbursement in paying numerous bills for prescription drug and other pharmacy expenses pursuant to New York's No-Fault insurance laws.

997.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Direct Rx Pharmacy Inc—in excess of $111,280.00—for prescription drug and other pharmacy expenses and services rendered to Allstate Claimants, even though Direct Rx Pharmacy Inc was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XVII
## COMMON-LAW FRAUD
### (Against First Class Medical, P.C. and Mani Ushyarov, D.O.)

998.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs above in paragraphs 1 through 787 as if fully set forth herein.

999.    Defendants First Class Medical, P.C. and Mani Ushyarov, D.O. (collectively, "Count XVII Defendants") schemed to defraud Allstate through the provision to one or more Allstate Claimant of treatment, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1000.   The Count XVII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to First Class Medical, P.C.'s eligibility for and entitlement to No-Fault reimbursement under New York law.

1001.   The Count XVII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1002.   The misrepresentations were intentionally made by the Count XVII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from First Class Medical, P.C. for payment of No-Fault insurance benefits.

1003.   The Count XVII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1004.   Allstate reasonably relied, to its detriment, upon the Count XVII Defendants' material misrepresentations concerning First Class Medical, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for health care expenses pursuant to No-Fault insurance claims.

1005.   Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to First Class Medical, P.C.—in excess of $769,695.00—for health care expenses and services rendered to Allstate claimants, even though First Class Medical, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XVIII
## COMMON-LAW FRAUD
### (Against NY Medical Arts, P.C. and Amr A. El-Sanduby, M.D.)

1006.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs above in paragraphs 1 through 787 as if fully set forth herein.

1007.   Defendants NY Medical Arts, P.C. and Amr A. El-Sanduby, M.D. (collectively, "Count XVIII Defendants") schemed to defraud Allstate through the provision to one or more Allstate Claimant of treatment, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1008.   The Count XVIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to NY Medical Arts, P.C.'s eligibility for and entitlement to No-Fault reimbursement under New York law.

1009.   The Count XVIII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1010.   The misrepresentations were intentionally made by the Count XVIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from NY Medical Arts, P.C. for payment of No-Fault insurance benefits.

1011.   The Count XVIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1012.   Allstate reasonably relied, to its detriment, upon Count XVIII Defendants' material misrepresentations concerning NY Medical Arts, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for health care expenses pursuant to No-Fault insurance claims.

1013.   Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to NY Medical Arts, P.C.—in excess of $112,862.00—for health care expenses and services rendered to Allstate claimants, even though NY Medical Arts, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XIX
## COMMON-LAW FRAUD
**(Against Richmond Medical Care P.C. and Jean-Pierre Georges Barakat, M.D.)**

1014.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs above in paragraphs 1 through 787 as if fully set forth herein.

1015.   Defendants Richmond Medical Care P.C. and Jean-Pierre Georges Barakat, M.D. (collectively, "Count XIX Defendants") schemed to defraud Allstate through the provision to one or more Allstate Claimant of treatment, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1016.   The Count XIX Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to Richmond Medical Care P.C.'s eligibility for and entitlement to No-Fault reimbursement under New York law.

1017.   The Count XIX Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1018.   The misrepresentations were intentionally made by the Count XIX Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Richmond Medical Care P.C. for payment of No-Fault insurance benefits.

1019.   The Count XIX Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1020.   Allstate reasonably relied, to its detriment, upon the Count XIX Defendants' material misrepresentations concerning Richmond Medical Care P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for health care expenses pursuant to No-Fault insurance claims.

1021.   Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Richmond Medical Care P.C.—in excess of $207,950.00—for health care expenses and services rendered to Allstate claimants, even though Richmond Medical Care P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XX
## COMMON-LAW FRAUD
### (Against GONY Medical Services P.C. and Tomas M. Pattugalan, Jr., M.D.)

1022.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs above in paragraphs 1 through 787 as if fully set forth herein.

1023.   Defendants GONY Medical Services P.C. and Tomas M. Pattugalan, Jr., M.D. (collectively, "Count XX Defendants") schemed to defraud Allstate through the provision to one or more Allstate Claimant of treatment, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1024.   The Count XX Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to GONY Medical Services P.C.'s eligibility for and entitlement to No-Fault reimbursement under New York law.

1025.   The Count XX Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1026.   The misrepresentations were intentionally made by the Count XX Defendants in furtherance of their scheme to defraud Allstate by submitting claims from GONY Medical Services P.C. for payment of No-Fault insurance benefits.

1027.   The Count XX Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1028.   Allstate reasonably relied, to its detriment, upon the Count XX Defendants' material misrepresentations concerning GONY Medical Services P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for health care expenses pursuant to No-Fault insurance claims.

1029.   Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to GONY Medical Services P.C.—in excess of $179,692.00—for health care expenses and services rendered to Allstate claimants, even though GONY Medical Services P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XXI
## COMMON-LAW FRAUD
**(Against Life Health Care Medical, P.C. and Rafael Antonio Delacruz-Gomez, M.D.)**

1030.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs above in paragraphs 1 through 787 as if fully set forth herein.

1031.   Defendants Life Health Care Medical, P.C. and Rafael Antonio Delacruz-Gomez, M.D. (collectively, "Count XXI Defendants") schemed to defraud Allstate through the provision to one or more Allstate Claimant of treatment, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1032.   The Count XXI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to Life Health Care Medical, P.C.'s eligibility for and entitlement to No-Fault reimbursement under New York law.

1033.   The Count XXI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1034.   The misrepresentations were intentionally made by the Count XXI Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Life Health Care Medical, P.C. for payment of No-Fault insurance benefits.

1035.   The Count XXI Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1036.   Allstate reasonably relied, to its detriment, upon the Count XXI Defendants' material misrepresentations concerning Life Health Care Medical, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for health care expenses pursuant to No-Fault insurance claims.

1037.   Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Life Health Care Medical, P.C.—in excess of $37,760.00—for health care expenses and services rendered to Allstate claimants, even though Life Health Care Medical, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XXII
## UNJUST ENRICHMENT
**(Against New Century Pharmacy Inc., Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas M. Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C.)**

1038.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

1039.   As alleged herein, Defendants New Century Pharmacy Inc., Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas M. Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C. (collectively, "Count XXII Defendants"), through various means, conspired to induce Allstate to make numerous and substantial payments to New Century Pharmacy Inc. pursuant to New York's No-Fault Laws.

1040.   When Allstate paid New Century Pharmacy Inc., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXII Defendants, or those persons working under their control, made (or were caused to make) concerning New Century Pharmacy Inc.'s reimbursement eligibility under New York's No-Fault Laws.

1041.   Each and every No-Fault reimbursement payment that Allstate was caused to make to (or for the benefit of) New Century Pharmacy Inc. during the course of this scheme constitutes a benefit that the Count XXII Defendants aggressively caused New Century Pharmacy Inc. to seek and voluntarily accept.

1042.   Throughout the course of their scheme, the Count XXII Defendants caused New Century Pharmacy Inc. to wrongfully obtain a multitude of payments from Allstate—in excess of $62,322.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1043.   Under New York law, the Count XXII Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Allstate in connection with claims where New Century Pharmacy Inc. (a) produced and dispensed Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensed and billed Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) unlawfully charged Allstate for Compounded Products and other drugs at grossly excessive rates, (e) falsely billed Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, and (f) maintained unlawful

relationships with and induced, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by New Century Pharmacy Inc.

1044.   As a direct and proximate result of this unlawful conduct relating to the dispensing and delivery of Compounded Products and other drugs to Allstate Claimants, at no point was New Century Pharmacy Inc. ever eligible for reimbursement under New York's No-Fault Laws.

1045.   Throughout the duration of this scheme, the Count XXII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to New Century Pharmacy Inc.

1046.   Retention of those benefits by any of the Count XXII Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT XXIII
## UNJUST ENRICHMENT
**(Against Refill Rx Pharmacy Inc, Alexander Sharafyan, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C.)**

1047.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

1048.   As alleged herein, Defendants Refill Rx Pharmacy Inc, Alexander Sharafyan, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C. (collectively, "Count XXIII Defendants"), through various means, conspired to induce Allstate to make numerous and substantial payments to Refill Rx Pharmacy Inc pursuant to New York's No-Fault Laws.

1049.   When Allstate paid Refill Rx Pharmacy Inc, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXIII Defendants, or those persons working under their control, made (or were caused to make) concerning Refill Rx Pharmacy Inc's reimbursement eligibility under New York's No-Fault Laws.

1050.   Each and every No-Fault reimbursement payment that Allstate was caused to make to (or for the benefit of) Refill Rx Pharmacy Inc during the course of this scheme constitutes a benefit that the Count XXIII Defendants aggressively caused Refill Rx Pharmacy Inc to seek and voluntarily accept.

1051.   Throughout the course of their scheme, the Count XXIII Defendants caused Refill Rx Pharmacy Inc to wrongfully obtain a multitude of payments from Allstate—in excess of $38,932.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1052.   Under New York law, the Count XXIII Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Allstate in connection with claims where the defendants (a) produced and dispensed Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensed and billed Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) unlawfully charged Allstate for Compounded Products and other drugs at grossly excessive rates, and (e) maintained unlawful relationships with and induced, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for

medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Refill Rx Pharmacy Inc.

1053.   As a direct and proximate result of this unlawful conduct relating to the dispensing and delivery of Compounded Products and other drugs to Allstate Claimants, at no point was Refill Rx Pharmacy Inc ever eligible for reimbursement under New York's No-Fault Laws.

1054.   Throughout the duration of this scheme, the Count XXIII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Refill Rx Pharmacy Inc.

1055.   Retention of those benefits by any of the Count XXIII Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT XXIV**
**UNJUST ENRICHMENT**
**(Against My Rx Pharmacy, Inc. and Boris Kandov)**

1056.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

1057.   As alleged herein, Defendants My Rx Pharmacy, Inc. and Boris Kandov (collectively, "Count XXIV Defendants"), through various means, caused Allstate to make numerous and substantial payments to My Rx Pharmacy, Inc. pursuant to New York's No-Fault Laws.

1058.   When Allstate paid My Rx Pharmacy, Inc., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXIV Defendants, or those persons working under their control, made (or were caused to

make) concerning My Rx Pharmacy, Inc.'s reimbursement eligibility under New York's No-Fault Laws.

1059.   Each and every No-Fault reimbursement payment that Allstate was caused to make to (or for the benefit of) My Rx Pharmacy, Inc. during the course of this scheme constitutes a benefit that the Count XXIV Defendants aggressively caused My Rx Pharmacy, Inc. to seek and voluntarily accept.

1060.   Throughout the course of their scheme, the Count XXIV Defendants caused My Rx Pharmacy, Inc. to wrongfully obtain a multitude of payments from Allstate—in excess of $110,345.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1061.   Under New York law, the Count XXIV Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Allstate in connection with claims where My Rx Pharmacy, Inc. (a) produced and dispensed Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensed and billed Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, and (c) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws.

1062.   As a direct and proximate result of this unlawful conduct relating to the dispensing and delivery of Compounded Products and other drugs to Allstate Claimants, at no point was My Rx Pharmacy, Inc. ever eligible for reimbursement under New York's No-Fault Laws.

1063.   Throughout the duration of this scheme, the Count XXIV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in

part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to My Rx Pharmacy, Inc.

1064.   Retention of those benefits by any of the Count XXIV Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT XXV
## UNJUST ENRICHMENT
**(Against Direct Rx Pharmacy Inc, Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C.)**

1065.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 787 as if fully set forth herein.

1066.   As alleged herein, Defendants Direct Rx Pharmacy Inc, Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C. (collectively, "Count XXV Defendants"), through various means, conspired to induce Allstate to make numerous and substantial payments to Direct Rx Pharmacy Inc pursuant to New York's No-Fault Laws.

1067.   When Allstate paid Direct Rx Pharmacy Inc, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXV Defendants, or those persons working under their control, made (or were caused to make) concerning Direct Rx Pharmacy Inc's reimbursement eligibility under New York's No-Fault Laws.

1068.   Each and every No-Fault reimbursement payment that Allstate was caused to make to (or for the benefit of) Direct Rx Pharmacy Inc during the course of this scheme constitutes a

benefit that the Count XXV Defendants aggressively caused Direct Rx Pharmacy Inc to seek and voluntarily accept.

1069.   Throughout the course of their scheme, the Count XXV Defendants caused Direct Rx Pharmacy Inc to wrongfully obtain a multitude of payments from Allstate—in excess of $111,280.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1070.   Under New York law, the Count XXV Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Allstate in connection with claims where Direct Rx Pharmacy Inc (a) produced and dispensed Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensed and billed Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) unlawfully charged Allstate for Compounded Products and other drugs at grossly excessive rates, (e) falsely billed Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, and (f) maintained unlawful relationships with and induced, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Direct Rx Pharmacy Inc.

1071.   As a direct and proximate result of this unlawful conduct relating to the dispensing and delivery of Compounded Products and other drugs to Allstate Claimants, at no point was Direct Rx Pharmacy Inc ever eligible for reimbursement under New York's No-Fault Laws.

1072.   Throughout the duration of this scheme, the Count XXV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Direct Rx Pharmacy Inc.

1073.   Retention of those benefits by any of the Count XXV Defendants would violate fundamental principles of justice, equity and good conscience.

### COUNT XXVI
### UNJUST ENRICHMENT
**(Against First Class Medical, P.C. and Mani Ushyarov, D.O.)**

1074.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1075.   As alleged herein, First Class Medical, P.C. and Mani Ushyarov, D.O. (collectively, "Count XXVI Defendants") conspired to induce Allstate to make numerous and substantial payments to First Class Medical, P.C. pursuant to New York's No-Fault Laws.

1076.   As alleged herein, First Class Medical, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, the Count XXVI Defendants provided treatments, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1077.   When Allstate paid First Class Medical, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that First Class Medical, P.C., or those persons working under its control, made concerning First Class Medical, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1078.   Each and every No-Fault reimbursement payment that Allstate was caused to make to First Class Medical, P.C. during the course of this scheme constitutes a benefit that the Count XXVI Defendants aggressively caused First Class Medical, P.C. to seek and voluntarily accept.

1079.   Throughout the course of their scheme, the Count XXVI Defendants caused First Class Medical, P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of $769,695.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1080.   Throughout the course of this scheme, the Count XXVI Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to First Class Medical, P.C.

1081.   Retention of those benefits by the Count XXVI Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXVII
### UNJUST ENRICHMENT
**(Against NY Medical Arts, P.C. and Amr A. El-Sanduby, M.D.)**

1082.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1083.   As alleged herein, NY Medical Arts, P.C. and Amr A. El-Sanduby, M.D. (collectively, "Count XXVII Defendants") conspired to induce Allstate to make numerous and substantial payments to NY Medical Arts, P.C. pursuant to New York's No-Fault Laws.

1084.   As alleged herein, NY Medical Arts, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, the Count XXVII Defendants

provided treatments, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1085.   When Allstate paid NY Medical Arts, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that NY Medical Arts, P.C., or those persons working under its control, made concerning NY Medical Arts, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1086.   Each and every No-Fault reimbursement payment that Allstate was caused to make to NY Medical Arts, P.C. during the course of this scheme constitutes a benefit that the Count XXVII Defendants aggressively caused First Class Medical, P.C. to seek and voluntarily accept.

1087.   Throughout the course of their scheme, the Count XXVII Defendants caused NY Medical Arts, P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of $112,862.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1088.   Throughout the course of this scheme, the Count XXVII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to NY Medical Arts, P.C.

1089.   Retention of those benefits by the Count XXVII Defendants would violate fundamental principles of justice, equity, and good conscience.

### COUNT XXVIII
### UNJUST ENRICHMENT
### (Against Richmond Medical Care P.C. and Jean-Pierre Georges Barakat, M.D.)

1090.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1091.   As alleged herein, Richmond Medical Care P.C. and Jean-Pierre Georges Barakat, M.D. (collectively, "Count XXVIII Defendants") conspired to induce Allstate to make numerous and substantial payments to Richmond Medical Care P.C. pursuant to New York's No-Fault Laws.

1092.   As alleged herein, Richmond Medical Care P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, the Count XXVIII Defendants provided treatments, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1093.   When Allstate paid Richmond Medical Care P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that Richmond Medical Care P.C., or those persons working under its control, made concerning Richmond Medical Care P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1094.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Richmond Medical Care P.C. during the course of this scheme constitutes a benefit that the Count XXVIII Defendants aggressively caused Richmond Medical Care P.C. to seek and voluntarily accept.

1095.   Throughout the course of their scheme, the Count XXVIII Defendants caused Richmond Medical Care P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of $207,950.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1096.   Throughout the course of this scheme, the Count XXVIII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Richmond Medical Care P.C.

1097.  Retention of those benefits by the Count XXVIII Defendants would violate fundamental principles of justice, equity, and good conscience.

### COUNT XXIX
### UNJUST ENRICHMENT
**(Against GONY Medical Services P.C. and Tomas M. Pattugalan, Jr., M.D.)**

1098.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1099.  As alleged herein, GONY Medical Services P.C. and Tomas M. Pattugalan, Jr., M.D. (collectively, "Count XXIX Defendants") conspired to induce Allstate to make numerous and substantial payments to GONY Medical Services P.C. pursuant to New York's No-Fault Laws.

1100.  As alleged herein, GONY Medical Services P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, the Count XXIX Defendants provided treatments, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1101.  When Allstate paid GONY Medical Services P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that GONY Medical Services P.C., or those persons working under its control, made concerning GONY Medical Services P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1102.  Each and every No-Fault reimbursement payment that Allstate was caused to make to GONY Medical Services P.C. during the course of this scheme constitutes a benefit that the Count XXIX Defendants aggressively caused GONY Medical Services P.C. to seek and voluntarily accept.

1103.  Throughout the course of their scheme, the Count XXIX Defendants caused GONY Medical Services P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of

$179,692.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1104.   Throughout the course of this scheme, the Count XXIX Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to GONY Medical Services P.C.

1105.   Retention of those benefits by the Count XXIX Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXX
## UNJUST ENRICHMENT
**(Against Life Health Care Medical, P.C. and Rafael Antonio Delacruz-Gomez, M.D.)**

1106.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1107.   As alleged herein, Life Health Care Medical, P.C. and Rafael Antonio Delacruz-Gomez, M.D. (collectively, "Count XXX Defendants") conspired to induce Allstate to make numerous and substantial payments to Life Health Care Medical, P.C. pursuant to New York's No-Fault Laws.

1108.   As alleged herein, Life Health Care Medical, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, the Count XXX Defendants provided treatments, tests, and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed to ensure financial enrichment.

1109.   When Allstate paid Life Health Care Medical, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that Life Health Care Medical, P.C., or those persons working under its control, made

concerning Life Health Care Medical, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1110.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Life Health Care Medical, P.C. during the course of this scheme constitutes a benefit that the Count XXX Defendants aggressively caused Life Health Care Medical, P.C. to seek and voluntarily accept.

1111.   Throughout the course of their scheme, the Count XXX Defendants caused Life Health Care Medical, P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of $37,760.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1112.   Throughout the course of this scheme, the Count XXX Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Life Health Care Medical, P.C.

1113.   Retention of those benefits by the Count XXX Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXXI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against New Century Pharmacy Inc.)

1114.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1115.   To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1116.   In view of its (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements (including, without limitation, those regulations and licensing requirements concerning unlawful financial and other arrangements with prescribing providers, and the manufacturing of compounded medications), (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging of Allstate for Compounded Products and other drugs at grossly excessive rates, (e) billing of Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, and (f) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by New Century Pharmacy Inc., New Century Pharmacy Inc. was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1117.   New Century Pharmacy Inc. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1118.   New Century Pharmacy Inc. continues to challenge Allstate's prior claim denials.

1119.   New Century Pharmacy Inc. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1120.   A justifiable controversy exists between Allstate and New Century Pharmacy Inc. because New Century Pharmacy Inc. rejects Allstate's ability to deny such claims.

1121.   Allstate has no adequate remedy at law.

1122.   New Century Pharmacy Inc. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by New Century Pharmacy Inc.

1123.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that New Century Pharmacy Inc. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, New Century Pharmacy Inc.

## COUNT XXXII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Refill Rx Pharmacy Inc)

1124.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1125.   To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1126.   In view of its (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements (including, without limitation, those regulations and licensing requirements concerning unlawful financial and other arrangements with prescribing

providers, and the manufacturing of compounded medications), (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging of Allstate for Compounded Products and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Refill Rx Pharmacy Inc, Refill Rx Pharmacy Inc was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1127.   Refill Rx Pharmacy Inc continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1128.   Refill Rx Pharmacy Inc continues to challenge Allstate's prior claim denials.

1129.   Refill Rx Pharmacy Inc continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1130.   A justifiable controversy exists between Allstate and Refill Rx Pharmacy Inc because Refill Rx Pharmacy Inc rejects Allstate's ability to deny such claims.

1131.   Allstate has no adequate remedy at law.

1132.   Refill Rx Pharmacy Inc also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no

obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Refill Rx Pharmacy Inc.

1133.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that Refill Rx Pharmacy Inc has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Refill Rx Pharmacy Inc.

**COUNT XXXIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against My Rx Pharmacy, Inc.)**

1134.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1135.   To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1136.   In view of its (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements (including, without limitation, those regulations and licensing requirements concerning unlawful financial and other arrangements with prescribing providers, and the manufacturing of compounded medications), (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, and (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, My Rx Pharmacy, Inc. was, at all relevant times, completely ineligible

226

for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1137.   My Rx Pharmacy, Inc. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1138.   My Rx Pharmacy, Inc. continues to challenge Allstate's prior claim denials.

1139.   My Rx Pharmacy, Inc. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1140.   A justifiable controversy exists between Allstate and My Rx Pharmacy, Inc. because My Rx Pharmacy, Inc. rejects Allstate's ability to deny such claims.

1141.   Allstate has no adequate remedy at law.

1142.   My Rx Pharmacy, Inc. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by My Rx Pharmacy, Inc.

1143.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that My Rx Pharmacy, Inc. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, My Rx Pharmacy, Inc.

**COUNT XXXIV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Direct Rx Pharmacy Inc)**

1144.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1145.   To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1146.   In view of its (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements (including, without limitation, those regulations and licensing requirements concerning unlawful financial and other arrangements with prescribing providers, and the manufacturing of compounded medications), (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging of Allstate for Compounded Products and other drugs at grossly excessive rates, (e) billing of Allstate for Compounded Products and other drugs that were, in certain instances, never actually provided and/or dispensed, and (f) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including one or more Prescribing Defendant, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Direct Rx Pharmacy Inc, Direct Rx Pharmacy Inc was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1147.   Direct Rx Pharmacy Inc continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1148.   Direct Rx Pharmacy Inc continues to challenge Allstate's prior claim denials.

1149.   Direct Rx Pharmacy Inc continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1150.   A justifiable controversy exists between Allstate and Direct Rx Pharmacy Inc because Direct Rx Pharmacy Inc rejects Allstate's ability to deny such claims.

1151.   Allstate has no adequate remedy at law.

1152.   Direct Rx Pharmacy Inc also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Direct Rx Pharmacy Inc.

1153.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that Direct Rx Pharmacy Inc has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Direct Rx Pharmacy Inc.

### COUNT XXXV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against First Class Medical, P.C.)

1154.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1155.   An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1156.   In view of its billing for medically unnecessary and excessive healthcare services, First Class Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1157.   First Class Medical, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1158.   First Class Medical, P.C. continues to challenge Allstate's prior claim denials.

1159.   First Class Medical, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1160.   A justifiable controversy exists between Allstate and First Class Medical, P.C. because First Class Medical, P.C. rejects Allstate's ability to deny such claims.

1161.   Allstate has no adequate remedy at law.

1162.   First Class Medical, P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by First Class Medical, P.C.

1163.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that First Class Medical, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault

benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, First Class Medical, P.C.

## COUNT XXXVI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against NY Medical Arts, P.C.)

1164.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1165.   An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1166.   In view of its billing for medically unnecessary and excessive healthcare services, NY Medical Arts, P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1167.   NY Medical Arts, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1168.   NY Medical Arts, P.C. continues to challenge Allstate's prior claim denials.

1169.   NY Medical Arts, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1170.   A justifiable controversy exists between Allstate and NY Medical Arts, P.C. because NY Medical Arts, P.C. rejects Allstate's ability to deny such claims.

1171.   Allstate has no adequate remedy at law.

1172.   NY Medical Arts, P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by NY Medical Arts, P.C.

1173.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that NY Medical Arts, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, NY Medical Arts, P.C.

**COUNT XXXVII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Richmond Medical Care P.C.)**

1174.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1175.   An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1176.   In view of its billing for medically unnecessary and excessive healthcare services, Richmond Medical Care P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1177.   Richmond Medical Care P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1178.   Richmond Medical Care P.C. continues to challenge Allstate's prior claim denials.

1179.   Richmond Medical Care P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1180.   A justifiable controversy exists between Allstate and Richmond Medical Care P.C. because Richmond Medical Care P.C. rejects Allstate's ability to deny such claims.

1181.   Allstate has no adequate remedy at law.

1182.   Richmond Medical Care P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Richmond Medical Care P.C.

1183.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that Richmond Medical Care P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Richmond Medical Care P.C.

## COUNT XXXVIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
#### (Against GONY Medical Services P.C.)

1184.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1185.   An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1186.   In view of its billing for medically unnecessary and excessive healthcare services, GONY Medical Services P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1187.   GONY Medical Services P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1188.   GONY Medical Services P.C. continues to challenge Allstate's prior claim denials.

1189.   GONY Medical Services P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1190.   A justifiable controversy exists between Allstate and GONY Medical Services P.C. because GONY Medical Services P.C. rejects Allstate's ability to deny such claims.

1191.   Allstate has no adequate remedy at law.

1192.   GONY Medical Services P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by GONY Medical Services P.C.

1193.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that GONY Medical Services P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or

otherwise pending bills that have been submitted to Allstate by, or on behalf of, GONY Medical Services P.C.

## COUNT XXXXIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Life Health Care Medical, P.C.)

1194.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 787 as if set forth fully herein.

1195.   An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1196.   In view of its billing for medically unnecessary and excessive healthcare services, Life Health Care Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1197.   Life Health Care Medical, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1198.   Life Health Care Medical, P.C. continues to challenge Allstate's prior claim denials.

1199.   Life Health Care Medical, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1200.   A justifiable controversy exists between Allstate and Life Health Care Medical, P.C. because Life Health Care Medical, P.C. rejects Allstate's ability to deny such claims.

1201.   Allstate has no adequate remedy at law.

1202.  Life Health Care Medical, P.C. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Life Health Care Medical, P.C.

1203.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) that Life Health Care Medical, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Life Health Care Medical, P.C.

## XI.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**NEW CENTURY PHARMACY INC. ENTERPRISE**
**(Against Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### NEW CENTURY PHARMACY INC. ENTERPRISE
### (Against Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### REFILL RX PHARMACY INC ENTERPRISE
### (Against Alexander Sharafyan, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### REFILL RX PHARMACY INC ENTERPRISE
**(Against Alexander Sharafyan, Mani Ushyarov, D.O., Amr. A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### MY RX PHARMACY, INC. ENTERPRISE
**(Against Boris Kandov)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count V Defendant from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### DIRECT RX PHARMACY INC ENTERPRISE
**(Against Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

238

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### DIRECT RX PHARMACY INC ENTERPRISE
**(Against Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count VII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### FIRST CLASS MEDICAL, P.C. ENTERPRISE
**(Against Mani Ushyarov, D.O.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count VIII Defendant from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NY MEDICAL ARTS, P.C. ENTERPRISE
### (Against Amr A. El-Sanduby, M.D.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count IX Defendant from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### RICHMOND MEDICAL CARE P.C. ENTERPRISE
### (Against Jean-Pierre Georges Barakat, M.D.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count X Defendant from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### GONY MEDICAL SERVICES P.C. ENTERPRISE
### (Against Tomas M. Pattugalan, Jr., M.D.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count XI Defendant from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**LIFE HEALTH CARE MEDICAL, P.C. ENTERPRISE**

**(Against Rafael Antonio Delacruz-Gomez, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count XII Defendant from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XIII**
**COMMON-LAW FRAUD**
**(Against New Century Pharmacy Inc., Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas M. Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Count XIII Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by New Century Pharmacy Inc. seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XIV
## COMMON-LAW FRAUD
**(Against Refill Rx Pharmacy Inc, Alexander Sharafyan, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Count XIV Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Refill Rx Pharmacy Inc seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XV
## COMMON-LAW FRAUD
**(Against My Rx Pharmacy, Inc. and Boris Kandov)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Count XV Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by My Rx Pharmacy, Inc. seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XVI
## COMMON-LAW FRAUD
**(Against Direct Rx Pharmacy Inc, Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Count XVI Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Direct Rx

Pharmacy Inc seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

### COUNT XVII
### COMMON-LAW FRAUD
### (Against First Class Medical, P.C. and Mani Ushyarov, D.O.)

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the Count XVII Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by First Class

Medical, P.C. seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

### COUNT XVIII
### COMMON-LAW FRAUD
### (Against NY Medical Arts, P.C. and Amr A. El-Sanduby, M.D.)

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the Count XVIII Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by NY Medical

Arts, P.C. seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

### COUNT XIX
### COMMON-LAW FRAUD
### (Against Richmond Medical Care P.C. and Jean-Pierre Georges Barakat, M.D.)

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the Count XIX Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Richmond

Medical Care P.C. seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

**COUNT XX**
**COMMON-LAW FRAUD**
**(Against GONY Medical Services P.C. and Tomas M. Pattugalan, Jr., M.D.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the Count XX Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by GONY Medical

Services P.C. seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

**COUNT XXI**
**COMMON-LAW FRAUD**
**(Against Life Health Care Medical, P.C. and Rafael Antonio Delacruz-Gomez, M.D.)**

(a) AWARD Allstate's actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the Count XXI Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Life Health

Care Medical, P.C. seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XXII
## UNJUST ENRICHMENT
**(Against New Century Pharmacy Inc., Eduard Aronov, Katrin Matatov, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., Tomas M. Pattugalan, Jr., M.D., First Class Medical, P.C., NY Medical Arts, P.C., and GONY Medical Services P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XXIII
## UNJUST ENRICHMENT
**(Against Refill Rx Pharmacy Inc, Alexander Sharafyan, Mani Ushyarov, D.O., Amr A. El-Sanduby, M.D., First Class Medical, P.C., and NY Medical Arts, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XXIV
## UNJUST ENRICHMENT
**(Against My Rx Pharmacy, Inc. and Boris Kandov)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XXV
## UNJUST ENRICHMENT
**(Against Direct Rx Pharmacy Inc, Rafo Yaguda f/k/a Rafail Yagudayev, Amr A. El-Sanduby, M.D., Jean-Pierre Georges Barakat, M.D., Rafael Antonio Delacruz-Gomez, M.D., NY Medical Arts, P.C., Richmond Medical Care P.C., and Life Health Care Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XXVI
## UNJUST ENRICHMENT
**(Against First Class Medical, P.C. and Mani Ushyarov, D.O.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

### COUNT XXVII
### UNJUST ENRICHMENT
**(Against NY Medical Arts, P.C. and Amr A. El-Sanduby, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

### COUNT XXVIII
### UNJUST ENRICHMENT
**(Against Richmond Medical Care P.C. and Jean-Pierre Georges Barakat, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

### COUNT XXIX
### UNJUST ENRICHMENT
**(Against GONY Medical Services P.C. and Tomas M. Pattugalan, Jr., M.D.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

### COUNT XXX
### UNJUST ENRICHMENT
**(Against Life Health Care Medical, P.C. and Rafael Antonio Delacruz-Gomez, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

### COUNT XXXI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against New Century Pharmacy Inc.)**

(a) DECLARE that New Century Pharmacy Inc., at all relevant times, was caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering New Century Pharmacy Inc. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that New Century Pharmacy Inc.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by New Century Pharmacy Inc.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXXII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Refill Rx Pharmacy Inc)

(a) DECLARE that Refill Rx Pharmacy Inc, at all relevant times, was caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering Refill Rx Pharmacy Inc completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that Refill Rx Pharmacy Inc's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Refill Rx Pharmacy Inc; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXXIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against My Rx Pharmacy, Inc.)

(a) DECLARE that My Rx Pharmacy, Inc., at all relevant times, was caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering My Rx Pharmacy, Inc. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that My Rx Pharmacy, Inc.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by My Rx Pharmacy, Inc.; and

(d) GRANT all other relief this Court deems just and appropriate.

247

## COUNT XXXIV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Direct Rx Pharmacy Inc)

(a) DECLARE that Direct Rx Pharmacy Inc, at all relevant times, was caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering Direct Rx Pharmacy Inc completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that Direct Rx Pharmacy Inc's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Direct Rx Pharmacy Inc; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXXV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against First Class Medical, P.C.)

(a) DECLARE that First Class Medical, Inc., at all relevant times, was caused to be operated in violation of one or more state licensing requirement, thus rendering First Class Medical, Inc. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that First Class Medical, Inc.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by First Class Medical, Inc.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXXVI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against NY Medical Arts, P.C.)

(a) DECLARE that NY Medical Arts, Inc., at all relevant times, was caused to be operated in violation of one or more state licensing requirement, thus rendering NY Medical Arts, Inc. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that NY Medical Arts, Inc.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by NY Medical Arts, Inc.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXXVII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Richmond Medical Care P.C.)

(a) DECLARE that Richmond Medical Care P.C., at all relevant times, was caused to be operated in violation of one or more state licensing requirement, thus rendering Richmond Medical Care P.C. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that Richmond Medical Care P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Richmond Medical Care P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXXVIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against GONY Medical Services P.C.)

(a) DECLARE that GONY Medical Services P.C., at all relevant times, was caused to be operated in violation of one or more state licensing requirement, thus rendering GONY

Medical Services P.C. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that GONY Medical Services P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by GONY Medical Services P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

### COUNT XXXIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Life Health Care Medical, P.C.)

(a) DECLARE that Life Health Care Medical, P.C., at all relevant times, was caused to be operated in violation of one or more state licensing requirement, thus rendering Life Health Care Medical, P.C. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that Life Health Care Medical, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Life Health Care Medical, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Michael W. Whitcher (MW7455)
mwhitcher@smithbrink.com
Jasmine Garcia-Vieux (JG1805)
jvieux@smithbrink.com
Shauna L. Sullivan (SS5624)
ssullivan@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
Ph:  (347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Property &*
*Casualty Insurance Company, Allstate Indemnity*
*Company, and Allstate Fire & Casualty Insurance*
*Company*

Dated:  October 9, 2019